IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SRI INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-1534-SLR/SRF |
| | ) |
| CISCO SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this  11th day of April, 2016, having reviewed defendant's motion

for sanctions and plaintiff's response thereto;

IT IS ORDERED that said motion (D.I. 280) is denied, for the reasons that follow:

1. **Background.[1]** I understand that the fact of compensation is not in dispute,

rather, how to characterize such compensation is at the crux of the motion.  In order to

resolve that issue, some background information is required.  SRI is a non-profit

research institute spun off from Stanford University.  As such, it has no stockholders

and no stock options to help recruit employees in Silicon Valley.  In lieu of stock, SRI

has established a royalty and equity sharing program for inventors and other

employees.  In addition, since SRI's research is federally funded, it is required by the

Bayh-Dole Act to share royalties with inventors.  *See* 35 U.S.C. § 202(c)(7)(B).  The

current version of SRI's royalty-sharing program has been in effect since 2008, and

--------------------

[1]Taken from the parties' briefs and declarations.  (D.I. 281, 282, 289, and 290)

includes all revenue SRI generates from commercialization of all of its technology, whether by licensing, settlement, or litigation.

2. The specifics of SRI's program are contained in the documents included at D.I. 282, exhibit 5, and can be summarized as follows:  (a) SRI's royalty sharing program distributes funds only if they exceed the expenses associated with commercialization; (b) the program compensates more than just inventors and direct contributors - every employee gets a share; (c) a fixed percentage of the proceeds over expenses goes back to SRI to fund internally sponsored research; (d) the program distributes funds from "commercialization" in whatever form without even mentioning litigation; (e) there is a three-year vesting schedule for participants such as inventors and direct contributors to receive any amounts allocated; and (f) SRI's Compensation Committee is tasked with ensuring that the amounts allocated to individuals, when added to their regular compensation, constitute reasonable compensation for services rendered.[2]

3. Cisco contends in its motion that SRI "paid its key fact witnesses for their testimony in prior litigation involving the patents-in-suit," and has "promised witnesses who are schedule to testify against Cisco at the upcoming trial substantial additional sums contingent on the outcome of this case." (D.I. 281 at 1)  More specifically, there is internal documentation that demonstrates distributions to certain individuals for their "litigation efforts," e.g.:

---

[2]SRI explains as well that employee compensation by non-profit organizations is regulated by the IRS, and that any royalty allocations for specific employees under SRI's program must be proposed by a vice president and approved by the Compensation Committee.

> Over the last months we have received more information about the reasons why the court decided in favor of SRI. Our distribution request in December did not adequately reflect these reasons and we ask to make a few revisions to better reflect the contributions of key individuals. . . .
>
> - Al Valdez, who left SRI and is forfeiting his share, received 18.8%. However, his patents were invalidated, reducing the significance of his role. We would reduce his share to 12%.
>
> - Pat Lincoln, Director, Computer Science Lab, was key to our success at trial, both in front of the judge and jury as well as holding together his team throughout the trial process. We would like to increase his share from 20% to 25%.

(D.I. 282, ex. 8) Another internal document illustrates the roles played by each recipient

and the allocations associated with such, e.g., Mr. Porras (one of the named inventors)

is listed as contributing both pre-litigation and during litigation (discovery and trial), while

Dr. Lincoln is listed as contributing to SRI's litigation efforts (discovery, trial, and

damages) and in terms of "team management." (*Id.*, ex. 13) In total, SRI has paid

millions of dollars to witnesses for their "litigation efforts." (*Id.*, ex. 16)

4. SRI maintains that the payments highlighted by Cisco "have been made

pursuant to SRI's royalty and equity sharing program; no payments were made for or

because of testimony." The memo described above nowhere mentions testimony, and

the author of the memo has averred that "success at trial did not meant the content of

testimony." (D.I. 289 at 3-4; D.I. 290, ex. 3 at 60-63, 90-93) Indeed, the June 6, 2012

memo itself better explains the request for compensation:

> In December 2011, the [Compensation] Committee approved a distribution under the Royalty Sharing Policy for the settlement of SRI's litigation against Symantec Corporation, for patent infringement of a technology called Emerald. SRI recently received income from this settlement which will be distributed to our staff and management. This memo requests [that] the Committee allow us to make a revision to the Inventor and Direct Contributor pool based on a reassessment of contribution. In addition, this

3

> memo confirms for the Committee that compensation received to date
> under this settlement is "reasonable" and not excessive, per IRS
> Intermediate Sanctions guidelines.

(D.I. 282, ex. 8)

5. **Standard of review.** There can be no dispute that a fact witness may be
compensated for "the reasonable cost of travel and subsistence incurred and the
reasonable value of time lost in attendance at any . . . trial, hearing, or proceeding."[3]
However, public policy forbids compensation of a fact witness for the "substance or
efficacy of the witness's testimony."[4] The question presented by the pending motion is
how one can discern when a witness' compensation is designed to induce testimony so
as to violate public policy and, thus, impugn the integrity of the judicial system. *See
Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Assoc.,* 865 F.
Supp. 1516, 1525-26 (S.D. Fla. 1994).

6. **Analysis.** There are no cases with facts identical to the ones at bar. Looking
at the range of cases that have addressed this issue, there are those where the
witnesses in fact were being paid **for their testimony.** *See, e.g., Golden Door,* where
an attorney asked the defendant to pay his clients substantial sums of money for their
testimony in a pending insurance claim case. *Id.* at 1525. *See also Rocheux
International of New Jersey, Inc. v. U.S. Merchants Financial Group, Inc.,* 2009 WL
3246837 (D.N.J. Oct. 5, 2009) (discussed in *Consolidated Rail Corp. v. CSX Transp.,
Inc.,* 2012 WL 511572, at \*9 (E.D. Mich. Feb. 16, 2012) (the proposed witness was a

---

[3]18 U.S.C. § 201(d).

[4]ABA Formal Op. 96-402.

4

disgruntled former employee of the defendant who contacted the plaintiff during discovery to offer "allegedly damaging testimony regarding that [d]efendant's business practices in exchange for a fee")). Towards the other end of the spectrum are cases like *Securities and Exhange Commission v. Nadel*, 2012 WL 1268297 (E.D.N.Y. April 16, 2012), in which the court addressed the situation where the witness was a full time salaried employee of the sponsoring party, and whose testimony was being offered as the opinion of an expert. In concluding that the sponsoring party/employer was not required to disclose the witness' specific salary or benefit information, the court explained that "the amount of the expert-employee's salary - as opposed to the mere fact the expert is an employee - would make no difference regarding bias so long as the salary and benefits are not tied in any way to the opinions offered by the employee-expert." *Id.* at *2. *Armenian Assembly of America, Inc. v. Cafesjian*, 924 F. Supp. 2d 183 (D.D.C. 2013) involves the most analogous fact pattern. In that case, defendant allegedly promised his employee (an attorney) that the employee would receive a bonus if the litigation were successful. According to the court, the employee "did more than simply testify. . . . [H]e spent countless hours assisting Cafesjian's counsel in preparing for depositions, summarizing the depositions for Cafesjian, reviewing pleadings, and assisting with the trial." *Id.* at 194. The court concluded that, "[a]bsent any evidence Cafesjian paid Waters [the employee] **for his testimony**, the [p]laintiffs' reliance on Section 201(c)(3) and the general public policy against compensating fact witnesses for their testimony is unavailing." *Id.* (emphasis in original).

7. The facts presented at bar compel the same conclusion. The payments

5

made to SRI's employees were made in the ordinary course of business as part of SRI's pre-existing compensation program.  Although the employees surely were aware of how the program worked, the program is not litigation-driven except for the fact that revenues are generated when an invention is commercialized, and commercialization can occur through successful litigation.[5]  While the distributions reflect SRI's evaluation of each employee's contribution to the commercialization efforts,[6] the distributions are not made until after the commercialization efforts have been realized; i.e., there are no quid pro quo arrangements implemented during litigation to induce specific testimony.

8. **Conclusion.**  Based on the reasoning above, Cisco's motion for sanctions is denied.  However, under the unusual compensation program sponsored by SRI,[7] the court will consider giving Cisco the opportunity to confirm with each employee-witness the fact that he/she stands to gain a percentage distribution of any monetary award made through this litigation.

United States District Judge

---

[5]Licenses for the use of inventions can be the product of business negotiations or the product of litigation, either through settlement agreements or court-entered judgments.

[6]Which can include litigation efforts.

[7]The court recognizes that every employee who testifies on behalf of his employer benefits generally if the employer is ultimately a successful litigant.  SRI's royalty and equity sharing program goes beyond a general benefit to one that is specifically calculated to account for the employee's contribution to that success.

6