IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SRI INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 13-1534-SLR |
| | ) | |
| CISCO SYSTEMS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Thomas L. Halkowski, Esquire of Fish & Richardson P.C., Wilmington, Delaware.  Of Counsel: Frank Scherkenbach, Esquire, David Kuznick, Esquire, Howard G. Pollack, Esquire, Mike Sobolev, Esquire, David M. Hoffman, Esquire, David S. Morris, Esquire, Philip W. Goter, Esquire, and Joanna M. Fuller, Esquire of Fish & Richardson P.C. Counsel for Plaintiff.

Jack B. Blumenfeld, Esquire and Michael J. Flynn, Esquire of Morris, Nichols, Arsht & Tunnell L.L.P., Wilmington, Delaware.  Of Counsel: Steven Cherny, Equire, Michael W. De Vries, P.C, Esquire, Adam R. Alper, P.C., Esquire, and Jason M. Wilcox, Esquire of Kirkland & Ellis, L.L.P.  Counsel for Defendant.

## MEMORANDUM OPINION

Dated: April 11 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff SRI International, Inc. ("SRI") filed suit against defendant Cisco Systems Inc. ("Cisco"), alleging infringement of U.S. Patent No. 6,711,615 ("the '615 patent") and 6,484,203 ("the '203 patent") (collectively, "the patents") on September 4, 2013. (D.I. 1) On December 18, 2013, Cisco answered the complaint and counterclaimed for non-infringement and invalidity. (D.I. 9) SRI answered the counterclaims on January 13, 2014. (D.I. 11) The court issued a claim construction order on May 14, 2015. (D.I. 138) Trial is scheduled to commence on May 2, 2016. (D.I. 40)

Presently before the court are Cisco's motion for summary judgment of invalidity under 35 U.S.C. § 101 (D.I. 158); Cisco's motion for summary judgment of invalidity under 35 U.S.C. § 102(b) and § 103 (D.I. 182);[1] Cisco's motion barring SRI from recovery of pre-suit damages based on the equitable doctrine of laches (D.I. 182); Cisco's motion for summary judgment for non-infringement (D.I. 182); Cisco's motion to exclude certain opinions of Dr. Prowse regarding SRI's lump settlement agreements (D.I. 213); Cisco's motion to exclude the testimony of Dr. Lee regarding apportionment (D.I. 216); and SRI's motion for summary judgment that Netranger and Hunteman are not prior art (D.I. 219). The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

### A. The Parties

---

[1] Three motions were filed under D.I. 182.

SRI is an independent, not-for-profit research institute incorporated under the laws of the State of California, with its principal place of business in Menlo Park, California. (D.I. 1 at ¶ 1)  SRI conducts client-supported research and development for government agencies, commercial businesses, foundations, and other organizations. (Id. at ¶ 6)  Among its many areas of research, SRI has engaged in research related to computer security and, more specifically, to large computer network intrusion detection systems and methods. (Id.)

Cisco is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Jose, California. (Id. at ¶ 2)  Cisco provides various intrusion prevention and intrusion detection products and services. (Id. at ¶ 14)

### B. Patents

The '615 patent (titled "Network Surveillance") is a continuation of the '203 patent (titled "Hierarchical Event Monitoring and Analysis"), and the patents share a common specification and priority date of November 9, 1998.[2]  (D.I 179 at 1)  SRI has asserted infringement of claims 1-4, 14-16, and 18 of the '615 patent and claims 1-4, 12-15, and 17 of the '203 patent.[3]  (Id. at 3)  The patents relate to the monitoring and surveillance

---

[2] Unless otherwise indicated, citations are to the '615 patent.

[3] SRI previously asserted the '203 and '615 patents before this court in SRI Int'l, Inc. v. Internet Security Sys., Inc., 647 F. Supp. 2d 323 (D. Del. 2009) (opinion after jury trial), 401 Fed App'x 530 (Fed. Cir. 2010) (SRI and Symantec then settled the litigation on confidential terms, Civ. No. 04-1199-SLR, D.I. 722).  The patents have also each undergone two reexaminations before the PTO, which reached the same result as the jury and confirmed the patentability of all claims.  The patents were also the subject of two cases before Judge White in the Northern District of California: Fortinet, Inc. v. SRI Int'l, Inc., Civ. No. 12-3231 JSW (N.D. Cal.), and Checkpoint Software Technologies, Inc. v. SRI International, Inc., Civ. No. 12-3231-JSW (N.D. Cal.).  (D.I. 220 at 7-8)

of computer networks for intrusion detection. In particular, the patents teach a

computer-automated method of hierarchical event monitoring and analysis within an

enterprise network that allows for real-time detection of intruders. Upon detecting any

suspicious activity, the network monitors generate reports of such activity. The claims

of the '203 and '615 patents focus on methods and systems for deploying a hierarchy of

network monitors that can generate and receive reports of suspicious network activity.

Independent claims 1 and 13 of the '615 patent read as follows:

> 1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:
>
> deploying a plurality of network monitors in the enterprise network;
>
> detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> generating, by the monitors, reports of said suspicious activity; and
>
> automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

(15:1-21)

> 13. An enterprise network monitoring system comprising:
>
> a plurality of network monitors deployed within an enterprise network, said plurality of network monitors detecting suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> said network monitors generating reports of said suspicious activity; and

one or more hierarchical monitors in the enterprise network, the
hierarchical monitors adapted to automatically receive and integrate the
reports of suspicious activity.

(15:56-16:6)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact

cannot be—or, alternatively, is—genuinely disputed must be supported either by citing

to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for the purposes of the motions only), admissions, interrogatory answers, or other

materials," or by "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has

carried its burden, the nonmovant must then "come forward with specific facts showing

that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation

marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more

than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. INVALIDITY

### A. 35 U.S.C. § 101

#### 1. Standard

Section 101 provides that patentable subject matter extends to four broad categories, including: "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process" is statutorily defined as a "process, art or method, and includes a new use of a known process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b). The Supreme Court has explained:

5

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the Patent Act's subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561 U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption," that is, "'that patent law not inhibit further discovery by improperly tying up the future use of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, — U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301 (2012)).

Although a fundamental principle cannot be patented, the Supreme Court has held that "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection," so long as that application would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S.

6

at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545

F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

> framework for distinguishing patents that claim laws of nature, natural
> phenomena, and abstract ideas from those that claim patent-eligible
> applications of those concepts. First, we determine whether the claims at
> issue are directed to one of those patent-ineligible concepts. If so, we
> then ask, "[w]hat else is there in the claims before us?" To answer that
> question, we consider the elements of each claim both individually and "as
> an ordered combination" to determine whether the additional elements
> "transform the nature of the claim" into a patent-eligible application. We
> have described step two of this analysis as a search for an "'inventive
> concept'"—i.e., an element or combination of elements that is "sufficient to
> ensure that the patent in practice amounts to significantly more than a
> patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[4]

"[T]o transform an unpatentable law of nature into a patent-eligible application of

such a law, one must do more than simply state the law of nature while adding the

words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63,

71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-

understood, routine, conventional activity," if such steps, "when viewed as a whole, add

nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at

1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient

to transform an unpatentable law of nature into a patent-eligible application of such a

law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas

---

[4] The machine-or-transformation test still may provide a "useful clue" in the second step
of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir.
2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance
Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). A claimed process can be patent-
eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it
transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954,
*aff'd on other grounds, Bilski II*, 561 U.S. 593.

'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561 U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[5] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," or whether the claims are directed to "a problem specifically arising in the realm of computer technology" and the claimed solution specifies how computer technology should be manipulated to overcome the problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

Since providing that explanation, the Federal Circuit has not preserved the validity of any other computer-implemented invention under § 101.[6] Indeed, in

---

[5] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).
[6] *See, e.g., In re Smith,* Civ. No. 2015-1664, 2016 WL 909410 (Fed. Cir. Mar. 10, 2016); *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314 (Fed. Cir. 2016);

8

reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is struck by

the evolution of the § 101 jurisprudence, from the complete rejection of patentability for

computer programs[7] to the almost complete acceptance of such,[8] to the current

(apparent) requirements that the patent claims in suit (1) disclose a problem

"necessarily rooted in computer technology," and (2) claim a solution that (a) not only

departs from the "routine and conventional" use of the technology, but (b) is sufficiently

specific so as to negate the risk of pre-emption. *See DDR*, 773 F.3d at 1257;

*Intellectual Ventures*, 792 F.3d at 1371. In other words, even though most of the patent

claims now being challenged under § 101 would have survived such challenges if

mounted at the time of issuance, these claims are now in jeopardy under the

heightened specificity required by the Federal Circuit post-*Alice*. Moreover, it is less

than clear how a § 101 inquiry that is focused through the lens of specificity can be

harmonized with the roles given to other aspects of the patent law (such as enablement

under § 112 and non-obviousness under § 103),[9] especially in light of the Federal

---

*Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, Civ. No. 2015-1411, 2015 WL 9461707 (Fed. Cir. Dec. 28, 2015); *Versata Dev. Grp., Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015); *Intellectual Ventures*, 792 F.3d 1363; *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015); *Allvoice Devs. US, LLC v. Microsoft Corp.*, 612 Fed. Appx. 1009 (Fed. Cir. 2015); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014).
[7] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in *Diehr*, whose solution was to declare all computer-based programming unpatentable, 450 U.S. at 219.
[8] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by Bilski I*, in which "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).
[9] Indeed, Judge Plager, in his dissent in *Dealertrack*, suggested that,

Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of broad subject matter categories for patent protection. *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the law, the § 101 analysis should be, and is, a difficult exercise.[10] At their broadest, the various decisions of the Federal Circuit[11] would likely ring the death-knell for patent protection of computer-implemented inventions,[12] a result not clearly mandated (at least not yet). On the other hand, to recognize and articulate the requisite degree of

---

as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under § 101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation . . ., and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute: "conditions of patentability," specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray into the jurisprudential morass of § 101 unless absolutely necessary.

*Dealertrack*, 674 F.3d at 1335. *But see CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).

[10] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35 U.S.C. § 285.

[11] *See, e.g., Dealertrack*, where the claim was about as specific as that examined in *DDR*, yet the Federal Circuit found the patent deficient because it did "not specify how the computer hardware and database [were] **specially programmed** to perform the steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of such programming details would likely nullify the ability of a patentee to enforce the patent, given the ease with which software can be tweaked and still perform the desired function.

[12] Ironically so, given the national concerns about piracy of American intellectual property.

specificity - either in the equipment used[13] or the steps claimed[14] - that transforms an abstract idea into patent-eligible subject matter is a challenging task. In trying to sort through the various iterations of the § 101 standard, the court looks to *DDR* as a benchmark; i.e., the claims (informed by the specification) must describe a problem and solution rooted in computer technology, and the solution must be (1) specific enough to preclude the risk of pre-emption, and (2) innovative enough to "override the routine and conventional" use of the computer. *DDR*, 773 F.3d at 1258-59.

## 2. Analysis

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Cisco argues that the claims are directed to the abstract idea "of monitoring and analyzing data from multiple sources to detect broader patterns of suspicious activity," which is "a fundamental building block of intelligence gathering and network security." (D.I. 159 at 7) Cisco analogizes this idea to a number of spy and security gathering endeavors, including "networks [employed by] ancient Chinese military strategists and both sides during the Revolutionary War" and police departments using crime reports to detect

---

[13] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a case where the Federal Circuit found that a GPS receiver was "integral" to the claims at issue. The Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333.

[14] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone v. Broadcom Corp.*, Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015).

11

"broader patterns of criminal activity." (*Id.* at 7-8) More specifically, Cisco argues that humans can perform each of the steps of the method (detecting suspicious network activity, generating reports of said activity, and receiving and integrating the reports), concluding that it is a process that may be performed in the human mind or using a pen and paper, thus, unpatentable. (*Id.* at 10-11) SRI disagrees, pointing out that a human would need to use hardware and software in order to examine network traffic. (D.I. 179 at 10-12)

That Cisco can simplify the invention enough to find a human counterpart (or argue that a human could somehow perform the steps of the method) does not suffice to make the concept abstract, as "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S.Ct. at 2354 (quoting *Mayo*, 132 S.Ct. at 1293). The patents address the vulnerability of computer networks' "interoperability and sophisticated integration of technology" to attack. (1:37-40) The claims at bar are, therefore, more complex than "merely recit[ing] the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," and are better understood as being "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257.

Turning to step two of the *Alice* framework, Cisco argues that the claims do not provide an inventive concept, describing the method as follows: A first step reciting conventional pre-solution activity (configuring and installing software); a generic and abstract second step (analyzing data from certain categories); a non-inventive third and

fourth step (generating and receiving reports at a centralized computer); and, a fifth step (combining reports to create new information). (D.I. 159 at 12-14) According to Cisco, the patents recite generic computers, i.e., the network monitors, which the parties have agreed are "software and/or hardware that can collect, analyze and/or respond to data." (*Id.* at 16; D.I. 47 at 1) The patents explain that "[s]election of packets can be based on different criteria" (5:12-38) and the claims at bar identify "particular categories of network traffic data . . . well suited for analysis in determining whether network traffic was suspicious when used in a hierarchical system." (D.I. 179 at 12) As to the hierarchical analysis, the patents explain that the "tiered collection and correlation of analysis results allows monitors 16a-16f to represent and profile global malicious or anomalous activity that is not visible locally." (8:53-56) The claims as an ordered combination (in light of the specification) sufficiently delineate "how" the method is performed to "improve the functioning of the computer itself," thereby providing an inventive concept. *Alice*, 134 S.Ct. at 2359. The same specificity suffices to negate the "risk [of] disproportionately tying up the use of the underlying ideas." *Alice*, 134 S.Ct. at 2354; *Mayo*, 132 S.Ct. at 1294. Cisco's motion for invalidity (D.I. 158) is denied.

### B. Anticipation

#### 1. Standard

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill

13

in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. *Id.* The prior art need not be ipsissimis verbis (i.e., use identical words as those recited in the claims) to be anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

A prior art reference also may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. *Id.* That is, "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* The Federal Circuit also has observed that "[i]nherency operates to anticipate entire inventions as well as single limitations within an invention." *Schering Corp. v. Geneva Pharms. Inc.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003). Moreover, recognition of an inherent limitation by a person of ordinary skill in the art before the critical date is not required to establish inherent anticipation. *Id.* at 1377.

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Labs Corp.*, 161

14

F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed. Cir. 1998).

### 2. Analysis

Cisco moves for summary judgment that EMERALD 1997[15] anticipates the patents. (D.I. 182 at 10; D.I. 186, ex. 3) EMERALD 1997 has been discussed in the court's prior opinions and by the Federal Circuit. *SRI*, 647 F. Supp. 2d at 333-34 (citing *SRI*, 456 F. Supp. 2d at 626); *SRI*, 511 F.3d at 1188-89. In short, EMERALD 1997 is a conceptual overview of the EMERALD system, the brainchild of SRI's EMERALD project on intrusion detection, published by Phillip Porras and Peter G. Neumann (both SRI employees) on behalf of SRI in October 1997. EMERALD 1997 contains a detailed description of SRI's early research in Intrusion Detection Expert System ("IDES") technology, and outlines the development of the Next Generation IDES ("NIDES") for detecting network anomalies. *Id.* at 334. The parties do not dispute that EMERALD 1997 is 35 U.S.C. § 102(b) prior art to the patents at issue. EMERALD 1997 is listed as a reference on the face of the '615 patent. The parties dispute only whether EMERALD 1997 discloses detection of any of the network traffic data categories listed in claim 1 of the '203 and '615 patents and whether EMERALD 1997 is enabled. One of the claimed categories of network traffic is "network connection requests."

EMERALD 1997 "introduces a hierarchically layered approach to network surveillance," pointing out that "[m]echanisms are needed to provide realtime detection

---

[15] Philip Porras and Peter G. Neumann, *EMERALD: Event Monitoring Enabling Response to Anomalous Live Disturbances*, Proceedings of the 20th National Information Systems Security Conference (October 1997).

15

of patterns in network operations that may indicate anomalous or malicious activity, and

to respond to this activity through automated countermeasures." (D.I. 186, ex. 3 at 354-

55) EMERALD 1997 describes in relevant part:

> The subscription list field is an important facility for gaining visibility into
> malicious or anomalous activity outside the immediate environment of an
> EMERALD monitor. The most obvious examples where relationships are
> important involve interdependencies among network services that make
> local policy decisions. Consider, for example, the interdependencies
> between access checks performed during network file system ["NFS"]
> mounting and the IP mapping of the DNS service. An unexpected mount
> monitored by the network file system service may be responded to
> differently if the DNS monitor informs the network file system monitor of
> suspicious updates to the mount requestor's DNS mapping.

(D.I. 186, ex. 3 at 358; D.I. 221, ex. A at ¶ 55) EMERALD 1997 further explains that

"[a]bove the service layer, signature engines scan the aggregate of intrusion reports

from service monitors in an attempt to detect more global coordinated attack scenarios

or scenarios that exploit interdependencies among network services. The DNS/NFS

attack discussed in Section III-B is one such example of an aggregate attack scenario."

(D.I. 186, ex. 3 at 360)

Cisco's expert, Dr. Clark, explains that one of ordinary skill in the art would

understand from the disclosures of EMERALD 1997 that "detecting the 'DNS/NFS

attack discussed in Section III-B' of EMERALD 1997 would require analysis of network

connection requests." He also opines that "[a]n NFS mount involves a network

connection request and thus the network file system monitor disclosed in EMERALD

1997 would detect suspicious mounts by examining and analyzing network connection

request packets." He concludes:

> A person of ordinary skill in the art would understand that monitoring
> specific network services . . . would require detecting and analyzing
> packets indicative of those well-known network service protocols, one of

16

the enumerated categories in claim 1 of the '615 patent.  EMERALD 1997
additional[ly] discloses two protocol-specific monitors in the "DNS/NFS
attack discussed in Section III-B" of EMERALD 1997 (p. 360): the "DNS
monitor" and "the network file system monitor." (p. 358).  A monitor that
observes only a specific network protocol, such as DNS or NFS, would
monitor and analyze packets indicative of those well-known service
protocols while ignoring other packets that are not indicative or DNS or
NFS.

(D.I. 185, ex. A at ¶¶ 104-05)   SRI's expert, Dr. Lee, opines that "Dr. Clark makes

several unsupportable leaps of inference" in his analysis.  More specifically, although

EMERALD 1997 describes "monitoring certain computer system activities," Dr. Lee

does not agree that "such monitoring must be done using not only data obtained from

the direct examination of network packets but also corresponding to one of the

enumerated categories of such data."  (D.I. 221, ex. A at ¶ 54) (emphasis omitted)  Dr.

Lee opines that,

> [w]hile it may be true that an "NFS mount involves a network connection
> request" it is clear that EMERALD 1997 makes no indication that directly
> monitoring network packets categorized as "network connection requests"
> is the way to detect suspicious NFS mounts.  Indeed, EMERALD 1997
> does not even suggest that directly monitoring network packets in general
> and analyzing the data obtained from them (as opposed to host audit logs
> or some other data source) – let alone any specific type of network traffic
> data – is the way to detect suspicious NFS mounts.  As explained above,
> EMERALD 1997 merely identifies a range of possible sources of data for
> analysis and a few examples of suspicious behavior that the yet-to-be-
> designed EMERALD system should be able to detect (such as the
> aforementioned NFS mounts and DNS table updates).  However, none of
> the disclosure of EMERALD specifically teaches using the data obtained
> from packets transporting these requests . . . .

(*Id.* at ¶ 55)  Dr. Lee concludes:

> Merely reciting monitoring network services does not disclose to or enable
> one of skill in the art to practice the claimed inventions of detecting
> suspicious network activity based on analysis of network traffic data (data
> obtained from the direct examination of network packets) selected from,
> inter alia, well known network service protocols.

(*Id.* at ¶ 56) (emphasis omitted)

Cisco cites to a single case, *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376 (Fed. Cir. 2015), in arguing that "a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Id.* at 1381 (citation omitted); (D.I. 184 at 10) The underlying facts in *Kennametal*, however, are distinguishable from those at bar. In *Kennametal*, it was not disputed that the reference ("Grab") expressly recited all the elements of the asserted claim; the only question was "whether the number of categories and components" disclosed in Grab was so large that the claimed combination "would not be immediately apparent to one of ordinary skill in the art." *Id.* at 1382. The Federal Circuit declared that, "[a]t the very least, Grab's express 'contemplat[ion]'" of the claimed combination was "sufficient evidence that a reasonable mind could find that a person of skill in the art, reading Grab's claim 5, would **immediately envisage**" the asserted combination. *Id.* at 1383 (emphasis added). The Court concluded:

> Thus, substantial evidence supports the Board's conclusion that Grab effectively teaches 15 combinations, of which one anticipates pending claim 1.
>
> Though it is true that there is no evidence of "actual performance" of combining the ruthenium binder and PVD coatings, this is not required. . . . "Rather, anticipation only requires that those suggestions be enabled to one of skill in the art."

*Id.* (citations omitted).

Unlike the facts in *Kennametal*, EMERALD 1997 does not expressly recite all the limitations of the asserted claims, specifically, the analysis of network traffic data from at

least one of the enumerated categories.  Nor does Cisco argue that the missing

limitation is inherently disclosed in the reference.  Instead, the essence of what Cisco

argues is that, because EMERALD 1997 discloses monitoring of network traffic data in

general, it would be obvious to a person of ordinary skill in the art to detect "suspicious

activity by analysis of particular network traffic data that falls within at least one of the

enumerated categories in the claims." (D.I. 184 at 12)  Cisco reasons in this regard that

EMERALD 1997 identifies a type of attack as a target for EMERALD 1997's signature

engines, that such an attack involves a "network connection request" (one of the

specifically enumerated categories of network traffic data in the asserted claims), and

that "network packets indicating a network connection request would be the natural

source to use" for the detection.  (*Id.* at 12-13)

Based on the record presented, the court concludes that no reasonable jury

could find that EMERALD 1997 discloses all the limitations arranged as in the asserted

claims.  As noted above, the court starts with the premise that the very case law cited

by Cisco is distinguishable on its facts in a dramatic way.  Without EMERALD 1997

expressly (or inherently) disclosing all of the limitations of the asserted claims,[16] the rest

of *Kennametal*'s teaching must be tempered with the reality that anticipation cannot be

based on the multiple layers of supposition created by Cisco to construct its theory of

---

[16] Which was also the starting point for the court's anticipation analysis in the prior case.
In that case, SRI did not argue that EMERALD 1997 failed to disclose each of the
limitations of the asserted claims of U.S. Patent 6,708,212 (the '212 patent"), instead,
SRI contended that EMERALD 1997 was not an enabling disclosure with respect to the
'212 patent.  The court determined that EMERALD 1997 enabled statistical profiling of
network traffic, therefore, anticipated the '212 patent, in part based on the similarities
between the '212 specification and EMERALD 1997.  *SRI*, 456 F. Supp. 2d at 632-35;
*SRI*, 511 F.3d at 1192-94.

19

anticipation[17] and still meet the requirement that the claimed limitation be immediately apparent. Although Cisco has attempted to package its anticipation argument in slightly different language than litigants have in prior litigation,[18] the argument fails as a matter of law. The court denies Cisco's motion for summary judgment in this regard and grants, *sua sponte*, summary judgment of no anticipation by EMERALD 1997.[19] *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence."); *see also Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*, 510 F. Supp. 2d 356, 362 (D. Del. 2007) (This court has held that when one party moves for summary judgment against an adversary, Fed.R.Civ.P. 54(c) and 56, when read together, give the court the power to render a summary judgment for the adversary if it is clear that the case warrants that result, even though the adversary has not filed a cross-motion for summary judgment.).

## C. Prior Art

### 1. Standard

The "printed publication" bar of 35 U.S.C. § 102 states:

A person shall be entitled to a patent unless-

. . .

---

[17] Starting with the suggestion that EMERALD 1997 directs monitoring a target specific event stream and including the argument that network packets, rather than, e.g., host audit data, would be the natural source to use.

[18] A jury found that the '615 and '203 patents were not anticipated by EMERALD 1997 and such verdict was upheld by the court, which opinion was affirmed by the Federal Circuit. *SRI*, 647 F. Supp. 2d 323 (opinion after jury trial), 401 Fed App'x 530.

[19] The court does not address the issue of enablement, but notes that its prior finding – that EMERALD 1997 enabled statistical profiling of network traffic generally – does not necessarily mean that it is an enabling disclosure for the limitations at issue.

> (b) the invention was patented or described in a printed publication in this
> or a foreign country ... more than one year prior to the date of the
> application for patent in the United States . . . .

"The bar is grounded on the principle that once an invention is in the public domain, it is

no longer patentable by anyone." *In re Hall*, 781 F.2d 897, 898 (Fed. Cir. 1986) (citing

*In re Bayer*, 568 F.2d 1357, 1361 (C.C.P.A. 1978)). The touchstone in determining

whether a reference constitutes a "printed publication" under 35 U.S.C. § 102(b) is

"public accessibility." *Id.* at 899 (citing *In re Bayer*, 568 F.2d at 1359; *In re Wyer*, 655

F.2d 221, 224 (C.C.P.A. 1981)).

> A given reference is "publicly accessible" upon a satisfactory showing that
> such document has been disseminated or otherwise made available to the
> extent that persons interested and ordinarily skilled in the subject matter or
> art exercising reasonable diligence, can locate it and recognize and
> comprehend therefrom the essentials of the claimed invention without
> need of further research or experimentation.

*Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citing *In re*

*Wyer*, 655 F.2d at 226); *see also Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d

1560, 1568 (Fed. Cir. 1988) ("Accessibility goes to the issue of whether interested

members of the public could obtain the information if they wanted to."). The

determination of whether a reference is a "printed publication" under § 102(b) involves a

case-by-case inquiry into the facts and circumstances surrounding the reference's

disclosure to persons of skill in the art. *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir.

1989) (citing *In re Hall*, 781 F.2d at 899; *In re Wyer*, 655 F.2d at 227).

"The law has long looked with disfavor upon invalidating patents on the basis of

mere testimonial evidence absent other evidence that corroborates that testimony."

*Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1366 (Fed. Cir. 1999).

Invalidating "activities are normally documented by tangible evidence such as devices,

21

schematics, or other materials that typically accompany the inventive process."

*Finnigan*, 180 F.3d at 1366 (citing *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d

1368, 1373 (Fed. Cir. 1998)).  Corroboration applies to any subsections of § 102:

> [A] witness's uncorroborated testimony is equally suspect as clear and
> convincing evidence if he testifies concerning the use of the invention in
> public before invention by the patentee (§ 102(a)), use of the invention in
> public one year before the patentee filed his patent (§ 102(b)), or invention
> before the patentee (§ 102(g)).

*Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1375 n.4 (Fed. Cir. 2009).

"When determining whether [a witness'] testimony is sufficiently corroborated, we apply

a rule-of-reason analysis and consider all pertinent evidence" to determine whether the

story is credible. *Martek*, 579 F.3d at 1374 (citing *Sandt Tech., Ltd. v. Resco Metal &

Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001)).

### 2. NetRanger

To establish that the NetRanger Guide for Version 1.3.1[20] ("NetRanger 1.3.1") is

prior art, Cisco offers the following evidence.[21]  NetRanger 1.3.1 has a copyright date of

1997 and includes an example of an "interactive component of an event query" wherein

---

[20] NetRanger is the user's guide covering installation, configuration, and operation of the
NetRanger System.

[21] Daniel Teal ("Teal"), co-founder of WheelGroup, provided a declaration in the ex-
parte reexamination stating that version 1.3.1 was released prior to version 2.0, which
was released on August 25, 1997.  Teal also stated that the user's guide "was provided
along with each sale of the NetRanger product version 1.3.1" or if requested by a
potential customer.  (D.I. 238, ex. 47 at ¶¶ 14-15)  He stated that a sales list from
WheelGroup showed that there were numerous customers of WheelGroup that had
"maintenance" contracts in place in the summer of 1997.  (*Id.* at ¶ 15 and ex. C)  Teal
testified that the majority of customers had maintenance contracts, whereby they would
receive the latest version and user guide automatically when released.  (D.I. 238, ex. 48
at 201:21-202:2)  SRI points out that Teal is not a witness in the current case and his
"opinion is based on the same speculation and inference as found in the declaration of
Mr. Kasper."  (D.I. 251 at 8 n.4)

the date provided for the event is May 1, 1997.  (D.I. 186, ex. 4 at 1, 5-23)  James

Kasper ("Kasper"), a former employee of WheelGroup who joined the company in 1996

and who worked on the NetRanger technology (including versions 1.0, 1.1, 1.2, 1.3.1),

testified that he was involved "with the tech writers for drafting, editing, and polishing the

material related to the software components [he] worked on."  (D.I. 186, ex. 12 at 25:20-

26:10, 28:3-20)  Kasper testified that NetRanger 1.3.1 was prepared "as a reference for

. . . customers" and was provided to the customers in the "summer [of 19]97, but before

the 2.0 release which was later, maybe fall [of 19]97."  (*Id.* at 28:21-29:2, 70:8-10,

112:3-10)  He stated that the software versions would be released consecutively and

customers received the software version along with the corresponding user guide.

Maintenance contract customers received the latest version of the software and the

corresponding user guide automatically.  (*Id.* at 23:25-24:22; D.I. 239 at ¶¶ 4-5)  He

further testified that the user guide was created in 1997 by employees of WheelGroup

as part of its regular business.  (D.I. 186, ex. 12 at 30:2-21)  He testified that he was

"not really sure," but thought the tech writers would send the user guides out to Kinkos

to print.  (*Id.* at 120:13-122:18)  He testified (based on presentation slides[22] "probably

[created by] a collaboration of marketing and tech writing with review by engineering")

that version 2.0 was released on or about August 1, 1997.  (*Id.* at 114:20-117:23)

Kasper's declaration includes a WheelGroup price list dated September 11, 1997 listing

a user guide for sale and stating that one guide is included with the product.  (D.I. 239 at

---

[22] A business plan presentation titled "1997 Business Plan Overview."  Page 18 is titled
"Development Schedule – 1997" and provides a list of dates including May 16, 1997,
version 1.3, "Enhanced default signatures, NetView Support, digital licensing" and
August 1, 1997, version 2.0.  (D.I. 223, ex. F)

¶ 15, ex. F)  A report from the U.S. Air Force Information Warfare Center in February 1997 described its assessment of NetRanger version 1.1.  (D.I. 186, ex. 23)  A press release on August 25, 1997 issued by WheelGroup announced the release of version 2.0.  (*Id.*, ex. 24)  SRI questions the authenticity of the WheelGroup documents on which Kasper relies.  Moreover, SRI points out that Kasper relies on documents which he himself seeks to authenticate.

The record at bar contains no direct evidence that a member of the public actually received NetRanger 1.3.1.  Indeed, the sales list showing maintenance customers does not indicate which versions of software and the corresponding user guide were actually distributed to such customers.  The price list does not state a particular version of the user guide for sale.  While the versions of NetRanger software (like any software) would typically be released in numerical order (and allegedly be accompanied by a user guide), the record at bar does not establish that version 1.3.1 was actually disseminated.  On the record at bar, the court concludes that NetRanger 1.3.1 was not "publically accessible" and grants SRI's motion that NetRanger 1.3.1 is not prior art.[23]

### 3. Hunteman

Cisco contends that Hunteman[24] was presented at the Proceedings of the 20th National Information Systems Security Conference in October 1997.  Hunteman is listed in the table of contents for the conference[25] at page 394 and Cisco has provided the

---

[23] As such, Cisco's motion that the combination of EMERALD 1997 and NetRanger renders the asserted claims obvious is denied.

[24] William Hunteman, *Automated Information System – (AIS) Alarm System.*

[25] As is EMERALD 1997.

paper incorporated into the conference materials with corresponding pagination.  (D.I. 223, ex. J at 3; D.I. 238, ex. 51 at 394)  SRI contends that Cisco has not provided evidence that William Hunteman "attended the conference, if he presented at the conference, what he presented at the conference, or when the papers were distributed following the conference."  (D.I. 251 at 17)

"The publication requirement may . . . be satisfied by distributing or making the paper available at a conference where persons interested or skilled in the subject matter of the paper were told of the paper's existence and informed of its contents." *Friction Div. Products, Inc. v. E.I. DuPont de Nemours & Co.*, 658 F. Supp. 998, 1008 (D. Del. 1987) aff'd sub nom. *Friction Div. Products, Inc. v. E.I. du Pont de Nemours & Co.*, 883 F.2d 1027 (Fed. Cir. 1989) (citing *Massachusetts Institute of Technology v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985)); *cf. Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004) ("Although there was testimony that it was the general practice at IADR meetings for presenters to hand out abstracts to interested attendees, the lack of substantial evidence of actual availability of the Abstract adequately supports the court's conclusion that dissemination of the Abstract was not established.").  The court concludes that the inclusion of Hunteman in the conference materials (independent from whether William Hunteman attended the conference) is sufficient to make it "publically accessible."

## V. NON-INFRINGEMENT

### A. Standard

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if one or more limitations of the claim in question does

not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is ... appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the Court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

### B. Analysis

#### 1. "Network traffic data" limitation

SRI accuses two of Cisco's product lines of infringing the asserted claims – stand-alone Cisco IPS Sensors ("IPS Sensors") and Sourcefire Sensors in combination with a Defense Center ("Sourcefire Sensors") (collectively, "the accused sensors"), as well as ancillary services for these products. The accused sensors' functionality is largely undisputed. The accused sensors obtain certain data from the network packet. The data is pre-processed. The pre-processed data is then put into a data structure and analysis is performed on the data structure. Specifically, the IPS Sensor captures network packets from a network interface and stores these in a packet buffer. The header portion of the stored packet is decoded, and relevant information is extracted, converted into host-byte order and stored in a new data structure called the "CIDS Header." The content portion of the stored packet is then subject to various pre-

processing steps (reassembly, defragmentation, normalization and deobfuscation), and the resulting data derived from this pre-processing is stored in a separate data structure called the "CIDS Buffer." The CIDS Header and CIDS Buffer data structures are inspected and analyzed by a series of signature engines in order to detect undesirable network activity. Similarly, the Sourcefire Sensors capture network packets from a network interface and store them in memory. The stored network packets then have their header decoded, and the packet content is subjected to similar pre-processing steps. The decoded header data and the pre-processed packet data are stored in a synthetic packet data structure. The Sourcefire Sensors then run signature engines applying "Snort" rules against the synthetic packet data structure in order to detect undesirable network activity. (D.I. 208 at 11-13; D.I. 240 at 8-12)

The parties dispute whether the accused sensors meet the limitation "detecting suspicious network activity based on analysis of network traffic data."[26] The court construed "network traffic data" as "data obtained from direct examination of network packets." In prosecution, the patentee argued that "direct examination of network packets" was required and distinguished such examination from examining "logs or other information generated . . . or otherwise gleaned" from "analysis of the network packets" or from analysis of a proxy of the network packets. The court concluded that the "disclaimer of claim scope, therefore, is broader than excluding host-based monitoring of audit logs, and explicitly extends to proxy information or 'other information generated therefrom or otherwise gleaned.'" (D.I. 138 at 2-3; D.I. 96 at JA3489)

---

[26] Found in claim 13 of the '615 patent and claim 12 of the '203 patent. Claim 1 of the '615 patent and claim 1 of the '203 patent similarly recite "detecting, by the network monitors, suspicious network activity based on analysis of network traffic data."

The parties' experts apply the claim construction differently. SRI's expert, Dr. Lee, opines that the accused sensors "analyze data obtained from direct examination of network packets," by "captur[ing] each packet and then perform[ing] 'deep packet inspection.'" The accused sensors "obtain data from the headers and payload of each packet by directly examining each packet and its contents. For each packet, this data may then be stored in data structures in memory but the analysis is still performed on data that has been obtained from directly examining the received packets themselves." (D.I. 243, ex. A at ¶¶ 160, 199) According to Dr. Lee, Cisco's argument that "the analysis must occur directly upon network packets themselves" is incorrect. Dr. Lee opines that applying the court's construction, "the limitation does not exclude analysis of network traffic data that has been obtained from direct examination of network packets and then stored in memory." (*Id.* at ¶¶ 167-68, 206) He explains that the patents at issue "embrace that a network monitor may normalize, reassemble, defragment, or deobfuscate packets because SRI's patents teach that the network monitor may be deployed at a gateway and may perform 'application-layer monitoring.'" (*Id.* at ¶¶ 169, 207-208)

Cisco's expert, Dr. Clark, disagrees with Dr. Lee's analysis and opines that the accused sensors "analyze information derived from network packets that has been translated, reassembled, defragmented, normalized, and de-obfuscated." (D.I. 211, ex. A at ¶¶ 88, 303) Dr. Clark explains that such steps are necessary to avoid "evasion techniques." Without these pre-processing steps, the IPS sensor would not act like the destination device and "malicious actors can easily evade what protections the sensor is intended to provide." He concludes that "the derived information that results from this IP

and TCP defragmentation is not data obtained from direct examination of network packets." (*Id.* at ¶¶ 90-91, 305)  He opines further that "in the 1997-1998 time period, one of skill in the art would not have understood that normalization, deobfuscation, defragmentation, and reassembly were required to obtain meaningful data, because the commercial systems available at that time did not do so." (*Id.* at ¶¶ 95, 310)  Moreover, according to Dr. Clark, the "examination of . . . translated data [from the CIDS header] does not involve direct examination of data obtained from network packets;" such examination is "even further removed from direct examination than the type of analysis discussed" in the prosecution history." (*Id.* at ¶¶ 98-101, 312-13)

Having reviewed the summary judgment record, the court concludes that the construction of "network traffic data" will benefit from clarification.  In essence, Dr. Clark has opined that the current construction - "data obtained from direct examination of network packets" - requires that the analysis of such data take place without any further manipulation.  The court, in its construction, did not mean to so narrowly (and unrealistically) confine the scope of the limitation.  It is the court's understanding that there are many sources of data (besides network packets) that could be analyzed, as noted in the prosecution history[27] and in the prior art.[28]  To say that the data "is obtained from direct examination of network packets" means to differentiate the original source of the data, not how or where the data is analyzed.  As explained by Dr. Lee, the

---

[27] "[T]he claim language requires the suspicious network activity to follow from analysis of the network packets, not logs or other information generated therefrom or otherwise gleaned." (D.I. 96 at JA3489)

[28] "[T]he event stream mentioned in EMERALD 1997 may originate 'from a variety of sources including audit data, network datagrams, SNMP traffic, application logs, and analysis results from other intrusion-detection instrumentation.'" (D.I. 220 at 32, citing EMERALD 1997 at 356, D.I. 186, ex. 3)

accused sensors obtain the data from the headers and payload of each packet and may store such data in data structures in memory.  The data may then be normalized, reassembled, defragmented, or deobfuscated for purposes of analysis to detect suspicious network activity.  (D.I. 243, ex A at ¶¶ 160-69)  In other words, although the data obtained from the network packets is manipulated, each packet is captured in the first instance before it is examined.  The fact that the data may be stored before analysis is performed on the data does not detract from its lineage.

As noted, Dr. Clark has offered an opinion that is inconsistent with the court's clarified construction.  If he did not specifically address Dr. Lee's opinion in the alternative, the court will have to address the issue at the pretrial conference.  The court denies Cisco's motion in this regard. [29]

### 2.  "Hierarchical monitor" limitation

The IPS Sensor uses software, including a SensorApp process, responsible for inspecting traffic flowing on a network and detecting undesirable network activity.  The SensorApp process uses a variety of signature engines that match data from network packets to a set of predefined "signatures."  If a signature engine detects a match, then the IPS Sensor will generate an event, drop the network traffic, modify the network traffic, or take no action at all, depending upon how the device is configured.  The SensorApp process is a multithreaded process with one or more "SensorApp processing threads."  The Meta Event Generator (a particular signature engine) is contained within a "SensorApp processing thread" and inspects events generated by

---

[29] Cisco's argument that the doctrine of equivalents is inapplicable based on prosecution history disclaimer is also informed by the court's analysis above and will be addressed, as needed, at the pre-trial conference if the parties cannot reach agreement.

the other signature engines to determine if they match any Meta Signature. If there is a match, the Meta Event Generator creates a Meta Event that is then forwarded (along with the other events) from the IPS Sensor to management devices such as the Cisco Security Manager. (D.I. 208 at 5-6)

The parties agreed during claim construction that a "network monitor" is "software and/or hardware that can collect, analyze and/or respond to data" and a "hierarchical monitor" is "a network monitor that receives data from at least two network monitors that are at a lower level in the analysis hierarchy." (D.I. 47 at 1-2) Dr. Lee opines that the Meta Event Generator is a hierarchical monitor, which applies meta-signatures to each IPS event. The meta-signatures operate on IPS events rather than on network traffic data. He explains that "any and all of the 'monitors' may be either hardware or software based so long as the hardware or software modules exist in a hierarchy, as required by the claims. One of skill in the art would understand that multiple network monitors and a hierarchical monitor may all be software modules and may all be deployed within the same hardware box." (D.I. 243, ex. A at ¶¶ 311-313) Dr. Clark disagrees and opines that the SensorApp threads are not separate software programs and, therefore, the Meta Event Generator "cannot be a hierarchical monitor because it does not receive events from at least two network monitors that are at a lower level in the analysis hierarchy." (D.I. 211, ex. A at ¶¶ 78, 141) He further explains that "treating individual signature engines as network monitors is inconsistent with the" patents at issue, because the specification "draws a distinction between network monitors and signature engines." Specifically, "[s]ignature engines exist within a network monitor; they are not network monitors themselves." (*Id.* at ¶ 140)

According to Cisco, the Meta Event Generator is an integral part of the

SensorApp processing thread and, therefore, is not at a higher level in the analysis

hierarchy. (D.I. 208 at 16)  In other words, Cisco argues that the SensorApp processing

thread cannot simultaneously be both the alleged "network monitor" and "hierarchical

monitor" under the claims, because they are not "separate and distinct structures." (D.I.

250 at 9-10)  The claim language and the parties' constructions do not require that the

"network monitor" and "hierarchical monitor" be separate structures.  Indeed, as pointed

out by Dr. Lee, all of the "monitors" in the claims could be software.  The court

concludes that the expert opinions present factual disputes on whether the Meta Event

Generator meets the claim limitation.  Such disagreements are issues of material fact

and will be left to a jury.  Cisco's motion is denied in this regard.[30]

### 3.  Direct infringement by Cisco or its customers

The parties agree that not all uses of the accused sensors infringe.  A patentee

must "either point to specific instances of direct infringement or show that the accused

device necessarily infringes the patent in suit." *ACCO Brands v. ABA Locks*

*Manufacturer Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007); *see also Dynacore*

*Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275-76 (Fed. Cir. 2004).  "Direct

infringement can be proven by circumstantial evidence." *Vita–Mix Corp. v. Basic*

*Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009) (citing *Moleculon Research Corp. v.*

*CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)).  Such "[c]ircumstantial evidence must

---

[30] Cisco contends (in its reply brief) that SRI avoided accusing individual signature
engines within a SensorApp processing thread of meeting the "network monitor"
limitation and should be precluded from such argument.  (D.I. 250 at 10)  Such an
evidentiary issue is better addressed at the pre-trial conference if the parties cannot
reach agreement.

show that at least one person directly infringed an asserted claim during the relevant time period." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) ("[A] finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period.").

Cisco disputes whether SRI has provided sufficient evidence of direct infringement, arguing that SRI must show actual use of the accused sensors configured in an infringing manner.  Dr. Lee opines that the IPS Sensors infringe in their default configuration and that Cisco instructs its customers not to disable the Meta Event Generator.  (D.I. 243, ex. A at ¶ 86)  The parties also dispute the meaning of a survey, wherein 60-64% of customers responded that they "currently use[d]" or "enabled" the Meta Event Generator.[31]  That Cisco and its expert disagree with many of Dr. Lee's conclusions does not suffice to negate the evidence that SRI has put forward at the summary judgment stage.

As to the Sourcefire Sensors, the parties generally agree that the compliance engine (configured to provide the claimed integration/correlation functionality) is turned off by default, but some Cisco customers enable it.  In order to infringe the claims, a customer must also write a particular compliance rule.  (D.I. 240 at 30-32; D.I. 250 at 14-15)  SRI provides the following circumstantial evidence of direct infringement:

---

[31] Cisco points to the deposition testimony of the Home Depot corporate representative, agreeing that "Home Depot has not used any IDS functionality" in certain products as evidence that Home Depot "never enabled the IPS functionality of those products."  (D.I. 250 at 11; D.I. 252, ex. 35 at 120:4-9)  Such argument is unhelpful as it equates intrusion defense systems (IDS) and intrusion prevention systems (IPS), which are not the same.  (D.I. 252, ex. 35 at 78:6-9)

Customers enable the compliance engine; the Cisco user guide informs users how to "nest rules" after creating new rules; and, a certain customer, Trans Union, correlates multiple IPS events using the compliance engine. (D.I. 240 at 30-32) (citations omitted) Cisco and its expert disagree with the presentation, explanation, and conclusions drawn by SRI and its expert regarding whether such evidence demonstrates infringement. Such disagreements preclude summary judgment.

SRI contends that the IOC feature of the Sourcefire Managers performs the limitation "integrating the reports of suspicious activity, by one or more hierarchical monitors." (D.I. 243, ex. A at ¶¶ 343-344) While the Sourcefire Sensors are shipped with the feature disabled, customers are instructed that the feature may be enabled and used." (D.I. 241, ex. 9) Moreover, the evidence shows that customers have purchased the specific license required to use such feature. (D.I. 243, ex. A at ¶¶ 343-344) Cisco relies upon the declaration of a principle engineer to argue that the IOC feature does not perform the claim limitation. (D.I. 208 at 24-25; D.I. 210) At the summary judgment stage, the court concludes that SRI's evidence suffices to create genuine issues of material fact. For each of the above arguments, SRI's evidence suffices to go beyond a showing that the accused sensors are "capable" of infringing and is sufficient to create a genuine issue of material fact. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012) (Evidence that an infringing mode "is not disabled by default" and that it is "recommended that customers use the infringing mode," is "evidence [that] goes beyond showing that the accused DVDs are 'capable of' infringing; the evidence is sufficient to create a genuine issue of material fact, thus precluding summary judgment.").

As to the Cisco and Sourcefire services, the parties appear to agree that the services are not "separate technology" from the accused sensors. The court understands that the accused services provide a customer with one of the accused sensors and then either provide management or updates to the accused sensor. Therefore, the infringement of the accused services rises and falls with the infringement of the sensors. (D.I. 240 at 35-40; D.I. 250 at 19)  Having denied Cisco's motion for summary judgment of non-infringement of the accused sensors, the court denies the motion with regard to the services.

## VI. PRE-SUIT DAMAGES – LACHES

### A. Standard

Laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L Chaides Const. Co.,* 960 F.2d 1020, 1028–29 (Fed. Cir. 1992) (*en banc*).  For a defense of laches, defendant has the burden of proving that: (1) plaintiff delayed in filing suit for an unreasonable and inexcusable length of time after plaintiff knew or reasonably should have known of its claim against the defendant; and (2) defendant suffered material prejudice or injury as a result of plaintiff's delay. *Id.* at 1028.

With regard to the first prong of unreasonable delay, "[t]he length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Id.* at 1032.  In determining whether plaintiff's delay in filing suit was unreasonable, the court must look to the period of time beginning when plaintiff knew or reasonably should have known of defendant's alleged infringing activity and ending

35

when plaintiff filed suit. The period does not begin, however, until the patent issues. *Id.*
In addition, the court must consider and weigh any excuses offered by plaintiff for its
delay including, but not limited to: (1) other litigation; (2) negotiations with the accused;
(3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5)
the extent of the alleged infringement; and (6) a dispute over the ownership of the
asserted patent. *Id.* at 1033.

A presumption of laches arises if plaintiff delays filing suit for six years after
actual or constructive knowledge of the defendant's acts of alleged infringement. *Id.* at
1037. "[T]he law is well settled that where the question of laches is in issue . . . plaintiff
is chargeable with such knowledge as he might have obtained upon inquiry, provided
the facts already known by him were such as to put upon a man of ordinary intelligence
the duty of inquiry." *Wanlass v. Gen. Elec. Co.,* 148 F.3d 1334, 1338 (Fed. Cir. 1998).
The period of delay continues if prior products are the same or similar to the alleged
infringing products. *See Symantec Corp. v. Computer Assocs. Int'l, Inc.,* 522 F.3d
1279, 1295 (Fed. Cir. 2008). Once the presumption is met, the burden shifts to plaintiff
to present evidence to create a genuine dispute with respect to the reasonableness of
the delay.[32] *See Aukerman,* 960 F.2d at 1028. However, this presumption may be
rebutted if plaintiff is able to show sufficient evidence to generate a genuine issue of fact

---

[32] In *Aukerman*, the court made clear, however, that "at all times, . . . defendant bears
the ultimate burden of persuasion of the affirmative defense of laches; the burden of
persuasion does not shift by reason of . . . plaintiff's six-year delay. 960 F.2d at 1038.

as to the existence of either one of the factual elements associated with the laches defense.[33] *Id.* at 1038.

Turning to consider the second prong of material prejudice, defendant can establish either evidentiary prejudice or economic prejudice. *Id.* Evidentiary prejudice may arise where the delay has curtailed defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories. *Id.* Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if plaintiff had filed suit earlier. *Id.* In this regard, courts must look for a change in the economic position of the alleged infringer during the period of delay; courts cannot simply infer economic prejudice from the possibility of damages pursuant to a finding of liability for infringement. *Id.*

"The application of the defense of laches is committed to the sound discretion of the district court." *Id.* at 1032. Because it is equitable in nature, "mechanical rules" do not govern its application. *Id.* at 1032. Instead, the court must consider all of the facts and circumstances of the case and weigh the equities of the parties. "The issue of laches concerns delay by one party and harm to another. Neither of these factors implicates the type of special considerations which typically trigger imposition of the clear and convincing standard." Consequently, the defendant must establish the elements for the laches defense by the preponderance of the evidence, consistent with

---

[33] If the presumption of laches is rebutted, the defense of laches is not eliminated. Rather, defendant can still establish laches by establishing the elements for this defense based upon the totality of the evidence presented. *Aukerman,* 960 F.2d at 1038.

the burden of proof in equitable laches and estoppel cases. *Intuitive Surgical, Inc. v. Computer Motion, Inc.,* Civ. No. 01-203, 2002 WL 31833867, *5 n.4 (D. Del. 2002). When laches is applied, the plaintiff may not recover any damages for the period of time prior to filing suit. *Aukerman,* 960 F.2d at 1028.

### B. Analysis

Cisco asserts that SRI knew about Cisco's alleged infringement of the patents by no later than 2003-2004, approximately ten years before SRI filed suit; therefore, the doctrine of laches is presumed to apply. (D.I. 183 at 6) SRI contends that: (1) genuine issues of material fact exist as to whether SRI can be charged with constructive knowledge of Cisco's infringement; and (2) genuine issues of fact exist as to whether Cisco was prejudiced either through loss of evidence or economically due to SRI's delay. (D.I. 197 at 1)

Cisco contends that, while SRI asserts that it did not have actual knowledge of infringement, this is insufficient to defeat summary judgment, for SRI had a duty to police its patent rights and the court should impose constructive knowledge based on the required reasonable, diligent inquiry. (D.I. 183 at 5) The court agrees. SRI admits that it was aware of Cisco's product offerings such as "CiscoWorks," "Cisco Integrated Router 7301," and "Cisco IDS" sensor products around 2004 and knew there was a possibility of infringement. (D.I. 197 at 2) Therefore, SRI reasonably should have known of its claims against Cisco. A presumption of laches applies.

Because the presumption is met, the two facts of unreasonable delay and prejudice **must** be inferred, absent rebuttal evidence. *Aukerman,* 960 F.2d at 1037. SRI bears the burden only of coming forward with sufficient evidence to raise a genuine

38

factual issue respecting the reasonableness of its conduct, that defendant suffered no prejudice, or both. *Id.*; *see also TWM Mfg. Co. v. Dura Corp.,* 592 F.2d 346, 349 (6th Cir. 1979); *Maloney–Crawford Tank Corp. v. Rocky Mountain Natural Gas Co.,* 494 F.2d 401, 404 (10th Cir. 1974). The court finds that SRI has met this burden. SRI presents evidence that, during the delay, it was engaged in other litigation.[34] (D.I. 197 at 2) Courts have routinely held that this type of excuse may be considered and weighed as a justification for the delay, and rebuts the presumption of laches. *See, e.g., Aukerman,* 960 F.2d at 1033, 1038; *Jamesbury Corp. v. Litton Indus. Prods.,* 839 F.2d 1544, 1552-53 (Fed. Cir.), *cert. denied,* 488 U.S. 828 (1988); *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1572-73 (Fed. Cir. 1987); *American Home Prods. v. Lockwood Mfg. Co.,* 483 F.2d 1120, 1123 (6th Cir. 1973). Cisco's assertion that for other litigation to excuse a delay there must be adequate notice of the proceedings to defendant is incorrect. (D.I. 183 at 8) The court in *Aukerman* made clear that the district court's rejection of plaintiff's excuse of other litigation because they did not give notice to defendant was erroneous, "for there can be no rigid requirement in judging a laches defense that such notice **must** be given." 960 F.2d at 1039 (emphasis in original). The court concludes that SRI has raised genuine issue of fact regarding whether an unreasonable delay can be shown due to SRI's alleged excuses and, therefore, denies Cisco's motion for summary judgment of laches.[35]

---

[34] SRI provides information that from 2004 until SRI provided notice to Cisco on May 8, 2012, SRI filed two infringement actions that involved two appeals to the Federal Circuit and a jury trial, and also prosecuted four ex parte reexaminations. (D.I. 197 at 12)
[35] By raising a genuine issue respecting either factual element of a laches defense, the presumption of laches is overcome. *Aukerman,* 960 F.2d at 1038; *see also Watkins v. Northwestern Ohio Tractor Pullers,* 630 F.2d 1155, 1159 (6th Cir. 1980). Because the court finds that SRI has raised a genuine issue of fact regarding the reasonableness of

## VII.  MOTIONS TO EXCLUDE

Rule 702 of the Federal Rules of Civil Procedure allows a qualified witness to testify in the form of an opinion if the witness' "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and if his/her testimony is the product of reliable principles and methods which have been reliably applied to the facts of the case.

### A.  Dr. Prowse's Opinions

Cisco moves to exclude certain opinions of SRI's damages expert, Dr. Prowse, regarding royalty rates as lacking the required "sufficient facts or data." *Whitserve LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012) ("[L]ump sum payments . . . should not support running royalty rates without testimony explaining how they apply to the facts of the case."). Specifically, Cisco moves to exclude Dr. Prowse's opinions based on "seven non-comparable lump sum settlement agreements." (D.I. 263 at 3) Dr. Prowse has opined, based in part on a number of license agreements that SRI has entered into, that damages should be based on a reasonable royalty rate on the apportioned value of the accused products of at least 7.5%. (D.I. 215, ex. 2 at ¶ 152) Several of the licenses disclose such a rate. (D.I. 215, exs. 3, 4, 6, 10) Dr. Prowse also cites to deposition testimony and other documents. (D.I. 245, ex. 4 at ¶¶ 55, 57, 59-60, 63, 66 70-73, 75, 77) SRI points out that certain of the licenses did not arise in the context of litigation. (D.I. 244 at 7 n.5) Cisco argues that, because the court does not

---

the delay and, thus, defeated the presumption of laches, it declines to address SRI's argument that there exists a material issue of fact regarding prejudice.

allow discovery or testimony into a negotiation process, the settlement agreements (a product of such negotiations) should be excluded. (D.I. 214 at 7-8)

The court, consistent with the policies of Rule 408 of the Federal Rules of Evidence and its practice, will exclude those settlement agreements (and the opinions based thereon) that are a product of litigation, as such settlements reflect the parties' consideration of multiple factors unrelated to valuation issues. *PharmaStem Therapeutics, Inc. v. Viacell Inc.*, Civ. No. 02-148 GMS, 2003 WL 22387038, at *2 (D. Del. Oct. 7, 2003) ("Specifically, a license agreement may be excluded from evidence under Rule 408 where it (1) was reached under a threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation infringement."). The licenses entered into as a product of business negotiations outside the context of litigation are properly considered. To the extent the parties cannot reach agreement on the IBM and McAfee licenses,[36] the parties may present such issues at the pre-trial conference. The motion to exclude is granted in part and denied in part.

## B. Dr. Lee's Testimony

Cisco moves to exclude the opinions of Dr. Lee regarding apportionment, arguing that he is unqualified to provide such economic expert opinion. SRI responds that Cisco's expert, Dr. Leonard, arrived at many of the same apportionment numbers. Moreover, Dr. Lee's opinions are technically based and should be allowed. (D.I. 246) Dr. Leonard's "methodology for determining the properly apportioned royalty base"

---

[36] SRI states that these two licenses are not the product of litigation. (D.I. 244 at 7 n.5) Cisco disagrees. (D.I. 263 at 4)

relies either on Dr. Lee's apportionment figures or on figures derived from speaking with Dr. Clark (Cisco's technical expert). (D.I. 247, ex. 1 at ¶¶ 176-78 & n.382-83) Cisco is free to challenge the conclusions and analysis provided by Dr. Lee on cross-examination. The court denies the motion to exclude.

## VIII. CONCLUSION

For the foregoing reasons, the court denies Cisco's motion for summary judgment of invalidity under 35 U.S.C. § 101 (D.I. 158); denies Cisco's motion for summary judgment of invalidity under 35 U.S.C. § 102(b) and § 103 (D.I. 182); denies Cisco's motion barring SRI from recovery of pre-suit damages based on the equitable doctrine of laches (D.I. 182); denies Cisco's motion for summary judgment for non-infringement (D.I. 182); grants in part and denies in part Cisco's motion to exclude certain opinions of Dr. Stephen Prowse regarding SRI's lump settlement agreements (D.I. 213); denies Cisco's motion to exclude the testimony of Dr. Wenke Lee regarding apportionment (D.I. 216); and grants in part and denies in part SRI's motion for summary judgment that Netranger and Hunteman are not prior art (D.I. 219); and *sua sponte* grants summary judgment of no anticipation by EMERALD 1997. An appropriate order shall issue.