IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SRI INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 13-1534 (SLR) (SRF) |
| v. | ) | |
| | ) | **REDACTED -** |
| CISCO SYSTEMS, INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

**CISCO'S OPPOSITION TO SRI'S MOTION FOR A FINDING
OF EXCEPTIONAL CASE, RECOVERY OF ATTORNEYS' FEES
AND RELATED EXPENSES, ENHANCED DAMAGES,
<u>COMPULSORY LICENSE, AND PRE-JUDGMENT INTEREST</u>**

OF COUNSEL:

Steven Cherny
Oliver C. Bennett
Sarah K. Tsou
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
(212) 446-4800

Michael W. De Vries
KIRKLAND & ELLIS LLP
333 Hope Street
Los Angeles, CA 90071
(213) 680-8400

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
(415) 439-1500

Jason M. Wilcox
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000

Original filing date: August 5, 2016
Redacted filing date: August 12, 2016

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.      THE JURY'S DAMAGES AWARD SHOULD NOT BE ENHANCED.........................2

        A.      Cisco Has Not Engaged In Any Egregious Misconduct. .......................................2

                1.      Cisco immediately investigated SRI's infringement claim and
                        presented strong defenses. .........................................................3

                2.      Cisco has either stopped selling the accused products and services
                        or is implementing design-arounds to remove the accused features...........4

        B.      The Jury's Willfulness Verdict Does Not Warrant Enhancement. ........................7

                1.      A finding of willfulness does not mandate enhancement...........................7

                2.      *Halo* did not increase the significance of the jury's willfulness
                        verdict. ..................................................................8

                3.      The willfulness verdict is not supported by substantial evidence. ..............9

        C.      The *Read* Factors Do Not Support Enhancement. ..............................................10

                1.      Factor 1: deliberate copying...................................................11

                2.      Factor 2: investigation and good-faith defenses.....................................11

                3.      Factor 3: litigation behavior...................................................12

                4.      Factor 4: size and financial condition.......................................13

                5.      Factor 5: closeness of the case ..............................................13

                6.      Factor 6: duration of misconduct ...........................................14

                7.      Factor 7: remedial action ...................................................15

                8.      Factor 8: motivation for harm ...............................................15

                9.      Factor 9: concealment.......................................................16

II.     ANY POST-VERDICT INFRINGEMENT SHOULD BE COMPENSATED AT
        THE JURY'S RATE. ....................................................................................17

A.      Infringement Prior To The Entry Of Final Judgment Should Be
        Compensated As Supplemental Damages Using The Jury's Methodology..........17

B.      The Court Should Deny An Ongoing Royalty Or, Alternatively, Set The
        Ongoing Royalty At The Jury's Rate Of 3.5%....................................................19

III.    THERE IS NO BASIS FOR AN AWARD OF ATTORNEYS' FEES. ..........................21

A.      This Case Is Not Exceptional. ...........................................................................21

        1.      The jury's willfulness determination......................................................22

        2.      Cisco's defenses ...................................................................................23

        3.      Litigation conduct.................................................................................25

B.      SRI's Requested Fees Are Excessive.................................................................25

        1.      SRI failed to establish that the requested hourly rates are
                reasonable. ............................................................................................26

        2.      SRI failed to establish that the hours expended were reasonable. ............27

        3.      The maximum lodestar award is approximately $2.6 million. .................30

        4.      SRI cannot recover for fees charged by graphic artists. ..........................30

IV.     PREJUDGMENT INTEREST SHOULD BE DENIED DUE TO SRI'S DELAY
        IN FILING SUIT, OR ALTERNATIVELY, AWARDED AT THE 52-WEEK T-
        BILL RATE, COMPOUNDED ANNUALLY. ...........................................................31

A.      SRI Should Receive No Prejudgment Interest Because It Delayed Filing
        Suit For Nearly A Decade. .................................................................................31

B.      SRI's Proposed Method Of Calculating Prejudgment Interest Is Not
        Supported On This Record. .................................................................................32

        1.      The 52-week T-Bill rate is the appropriate interest rate in this case........32

        2.      Any prejudgment interest award should be compounded annually. ..........34

CONCLUSION....................................................................................................................35

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
  1998 WL 151411 (D. Del. Mar. 13, 1998) ........................................................................33

*Apple Inc. v. Samsung Elecs. Co.*,
  2014 WL 6687122 (N.D. Cal. Nov. 25, 2014) ............................................................ 19, 20

*Ariba, Inc. v. Emptoris, Inc.*,
  567 F. Supp. 2d 914 (E.D. Tex. 2008) .............................................................................21

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*,
  605 F.3d 1305 (Fed. Cir. 2010)........................................................................................11

*August Tech. Corp. v. Camtek, Ltd.*,
  2010 WL 5560088 (D. Minn. Nov. 17, 2010) ...................................................................18

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*,
  807 F.2d 964 (Fed. Cir. 1986)...........................................................................................31

*Bywaters v. United States*,
  670 F.3d 1221 (Fed. Cir. 2012)........................................................................................26

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  2014 WL 1320154 (W.D. Pa. Mar. 31, 2014), *rev'd on other grounds*,
  807 F.3d 1283 (Fed. Cir. 2015)........................................................................................15

*Central Soya Co. v. Geo. A. Hormel & Co.*,
  723 F.2d 1573 (Fed. Cir. 1983).........................................................................................31

*Chalumeau Power Sys. LLC v. Alcatel-Lucent USA Inc.*,
  2014 WL 5814062 (D. Del. Nov. 6, 2014) ........................................................................25

*Cornell Univ. v. Hewlett-Packard Co.*,
  2009 WL 1405208 (N.D.N.Y. May 15, 2009) ...................................................................34

*Creative Compounds, LLC v. Starmark Labs., Inc.*,
  2010 WL 2757196 (S.D. Fla. July 13, 2010)............................................................... 11, 13

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001).................................................................................... 31, 32

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  2016 WL 3880774 (N.D. Cal. July 18, 2016) ...................................................................... 13

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) .......................................................................................... 19

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
  593 F. Supp. 2d 1088 (N.D. Cal. 2009) .............................................................................. 15

*General Motors Corp. v. Devex Corp.*,
  461 U.S. 648 (1983) ............................................................................................................. 31

*Gevo, Inc. v. Butamax Advanced Biofuels LLC*,
  2014 WL 4247735 (D. Del. Aug. 26, 2014) ......................................................................... 22

*Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*,
  897 F.2d 508 (Fed. Cir. 1990) ......................................................................................... 9, 15

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016) ................................................................................................ *passim*

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ............................................................................................................. 27

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  609 F. Supp. 2d 951 (N.D. Cal. 2009) ................................................................................ 14

*IMX, Inc. v. LendingTree, LLC*,
  469 F. Supp. 2d 203 (D. Del. 2007) .................................................................................... 34

*Intendis GMBH v. Glenmark Pharms. Ltd.*,
  117 F. Supp. 3d 549 (D. Del. 2015) .................................................................................... 22

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  426 F.3d 694 (3d Cir. 2005) ................................................................................................ 28

*Internet Machines LLC v. Alienware Corp.*,
  2013 WL 4056282 (E.D. Tex. June 19, 2013) ..................................................................... 19

*Intex Plastic Sales Co. v. Hall*,
  1991 WL 270167 (N.D. Cal. July 10, 1997) ........................................................................ 33

*IPPV Enters., LLC v. EchoStar Commc'ns Corp.*,
  2003 WL 723260 (D. Del. Feb. 27, 2003) ............................................................................ 34

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
  2016 WL 1267159 (D. Del. Mar. 31, 2016) .............................................................. 25, 27, 30

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  136 S. Ct. 1979 (2016) ..........................................................................................8

*Laitram Corp. v. NEC Corp.*,
  115 F.3d 947 (Fed. Cir. 1997)....................................................................... 33, 34

*Local 32B-32J, Serv. Employees Int'l Union v. Port Auth. of N.Y. & N.J.*,
  180 F.R.D. 251 (S.D.N.Y. 1998) ...........................................................................28

*Mars, Inc. v. Coin Acceptors, Inc.*,
  513 F. Supp. 2d 128 (D.N.J. 2007) ............................................................ 32, 33, 34

*Mathis v. Spears*,
  857 F.2d 749 (Fed. Cir. 1988)...............................................................................26

*Mr. & Mrs. B. v. Weston Bd. of Educ.*,
  34 F. Supp. 2d 777 (D. Conn. 1999) ....................................................................28

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ...................................................................... 21, 22, 23

*Orion IP, LLC v. Mercedes-Benz USA, LLC*,
  2008 WL 8856865 (E.D. Tex. Mar. 28, 2008) ....................................................20

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
  2016 WL 3365437 (N.D.N.Y. June 16, 2016)........................................................9

*Paice LLC v. Toyota Motor Corp.*,
  504 F.3d 1293 (Fed. Cir. 2007)............................................................................17

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
  2004 WL 1622442 (D. Del. July 12, 2004) ..........................................................34

*Phillips Elecs. N. Am. Corp. v. Compo Micro Tech, Inc.*,
  2006 WL 3624022 (D. Del. Dec. 12, 2006) .........................................................29

*Phillips Petroleum Co. v. Rexene Corp.*,
  1997 WL 781856 (D. Del. Sept. 4, 1997)..............................................................33

*Presidio Components, Inc. v. American Tech. Ceramics Corp.*,
  2013 WL 4068833 (N.D. Cal. Aug. 12, 2013) ............................................. 17, 18

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992)......................................................................*passim*

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  2015 WL 5787019 (D. Conn. Sept. 30, 2015).....................................................27

*Schering Corp. v. Precision-Cosmet Co.*,
   614 F. Supp. 1368 (D. Del. 1985) ................................................................ 32, 33, 34, 35

*Small v. Implant Direct Mfg. LLC*,
   2014 WL 5463621 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 609 F. App'x 650 (Fed.
   Cir. 2015) ......................................................................................................................22

*Smart SMR of N.Y., Inc. v. Zoning Comm. of Town of Stratford*,
   9 F. Supp. 2d 143 (D. Conn. 1998) ...............................................................................28

*Spectralytics, Inc. v. Cordis Corp.*,
   834 F. Supp. 2d 920 (D. Minn. 2011), *aff'd*, 485 F. App'x 437 (Fed. Cir.
   2012).................................................................................................................................6

*Stragent, LLC v. Intel Corp.*,
   2014 WL 6756304 (E.D. Tex. Aug. 6, 2014) .................................................................22

*Symbol Techs., Inc. v. Proxim Inc.*,
   2004 WL 1770290 (D. Del. July 28, 2004) ..............................................................33, 34

*TiVo Inc. v. Echostar Commc'ns Corp.*,
   2006 U.S. Dist. LEXIS 64291 (E.D. Tex. Aug. 17, 2006) .............................................18

*Trustees of Boston Univ. v. Everlight Elecs. Co.*,
   2016 WL 3976617 (D. Mass. July 22, 2016)..............................................................7, 10

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
   2004 WL 1305849 (D. Del. June 9, 2004), *vacated in part on other grounds*,
   425 F.3d 1366 (Fed. Cir. 2005)......................................................................................34

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
   130 F. Supp. 3d 1331 (C.D. Cal. 2015)..........................................................................30

*Vehicle Interface Techs., LLC v. Jaguar Land Rover N. Am., LLC*,
   2016 WL 3436396 (D. Del. June 15, 2016) ...................................................................26

*WBIP, LLC v. Kohler Co.*,
   2016 WL 3902668 (Fed. Cir. July 19, 2016).....................................................................7

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) ....................................................................................17, 19

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
   2013 WL 6118447 (D. Del. Nov. 20, 2013).....................................................................19

**STATUTES**

28 U.S.C.

   § 1961 ...................................................................................................................................32

35 U.S.C.

   § 112 .....................................................................................................................................24

   § 283 .....................................................................................................................................17

   § 284 ............................................................................................................................ 1, 8, 17

   § 285 ....................................................................................................................... 22, 25, 31

   § 287 .....................................................................................................................................32

## INTRODUCTION

SRI's motion for enhanced damages and attorneys' fees should be denied.  It is undisputed that Cisco independently developed its accused products, without knowledge of SRI's patents.  After being confronted by SRI, Cisco immediately investigated SRI's infringement claims and presented good-faith, reasonable defenses, which led SRI to repeatedly shift its infringement theories and to ultimately withdraw its infringement allegations against numerous products.  During trial, the Court recognized that Cisco's non-infringement defense was "reasonable."  (Trial Tr. 1899:20-21, 1900:8-9.)  And since the jury's verdict—notwithstanding Cisco's belief that it should be overturned—Cisco has focused its efforts on ending the conduct that was found to infringe.  In fact, Cisco has already discontinued several products and services that were adjudicated to infringe and is diligently working to implement design-arounds to remove the accused features from the products and services it still provides.  This case is thus neither "egregious" nor "exceptional," as would be required to warrant a punitive sanction of enhanced damages or attorneys' fees.

SRI's request for a 10.5% ongoing royalty should also be rejected.  SRI's request for a single "ongoing royalty" conflates two distinct categories of relief.  The period from the verdict until the entry of final judgment should be compensated as supplemental damages under 35 U.S.C. § 284.  Cisco's conduct during this supplemental damages period is at most a temporary continuation of the conduct for which the jury already calculated damages while Cisco implements its design-arounds, and the Court should therefore award damages arising during that brief period at the jury's 3.5% rate.  By contrast, an ongoing royalty is an equitable remedy available only after the entry of final judgment.  The Court in its discretion should deny an ongoing royalty altogether because there will be no continuing infringement, as Cisco expects to finish implementing its design-arounds with its next software release.  But regardless of whether categorized as supplemental damages or an ongoing royalty, any post-verdict relief should be no greater than the jury's 3.5% rate because the

relevant *Georgia-Pacific* factors do not support an increased rate, and Cisco's good-faith efforts to cease the conduct that the jury found to infringe confirms that no enhancement is warranted.

Finally, SRI's request for pre-judgment interest should be denied because SRI significantly delayed in approaching Cisco about any alleged infringement and then further delayed suing as it shifted its infringement positions.  SRI's delay, coupled with its shifting positions, prejudiced Cisco by allowing the damages at stake to accumulate over a longer period of time.  In any event, SRI has not even attempted to justify its request for interest at the prime rate compounded quarterly based upon the facts here.  The T-Bill rate compounded annually is a far more appropriate methodology, if SRI should receive any prejudgment interest at all.

## ARGUMENT

### I.   THE JURY'S DAMAGES AWARD SHOULD NOT BE ENHANCED.

#### A.   Cisco Has Not Engaged In Any Egregious Misconduct.

"Awards of enhanced damages … are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).  "The sort of conduct warranting enhanced damages has been variously described … as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.*

Enhanced damages are thus available only in "egregious cases of misconduct beyond typical infringement." *Id.* at 1935.  But this case is at most a typical case of infringement, as the Court itself acknowledged.  (*See* Trial Tr. 1901:10-22 ("[T]his case in terms of infringement has been like virtually every other case.  There's nothing remarkable about this case when it comes to infringement.").)  As explained below, Cisco had a good-faith basis for believing its conduct was not infringing and acted reasonably at every stage of this case—including now by diligently working to end the conduct that the jury founding infringing.  Accordingly, no enhancement is warranted.

### 1.   Cisco immediately investigated SRI's infringement claim and presented strong defenses.

Cisco developed its accused products and services years ago—long before it had even heard of SRI's patents.  Indeed, SRI admits there is no evidence "that Cisco or Sourcefire deliberately copied the claimed invention."  (D.I. 354 at 8.)  Cisco first learned of SRI's patents in May 2012 when it received a letter asserting that SRI "believe[s] that Cisco infringes SRI's IDS Patents" and seeking to initiate licensing discussions.  (PTX-21R.)  Cisco retained Baker Botts to investigate SRI's infringement allegations.  Baker Botts promptly responded to SRI's letter (Ex. 1 at EPI000859-60),[1] and the parties engaged in discussions concerning SRI's infringement allegations over the next several months.

After investigating SRI's infringement allegations, Cisco responded by presenting several defenses to SRI.  (*E.g.*, Ex. 2 at EPI001132; Trial Tr. 400:18-22, 1233:15-1234:1.)  SRI's own conduct confirms that Cisco presented meritorious defenses.  For example, in light of Cisco's response, SRI chose not to pursue its initial theory of infringement and instead developed "a new theory."  (Ex. 2 at EPI001132-33.)[2]  SRI shifted its infringement theory several other times during this case.  Less than two weeks after Cisco served its non-infringement contentions, SRI informed Cisco that it had "significantly narrowed the categories of products that it contends infringe the Patents-in-Suit."  (Ex. 3.)  A month later, SRI served amended contentions altering its infringement theory for the Cisco IPS products and narrowing its infringement theory for the Sourcefire products.  (D.I. 353-1, Ex. A.)  SRI's infringement theory continued to change even during trial when, for example, SRI decided not to pursue its argument that the Sourcefire products' "indications of

---

[1]      Exhibits are attached to the Declaration of Michael Flynn, filed herewith.

[2]      In fact, SRI abandoned the infringement theory that it had advanced during the parties' pre-suit discussions after Cisco served non-infringement contentions.  (*Compare* Ex. 4 (accusing Cisco IPS Devices combined with Cisco Managers), *with* D.I. 353-1, Ex. B (withdrawing allegations).)

compromise" feature infringed. (Trial Tr. 834:17-835:2.)[3] That SRI "significantly narrowed" its infringement allegations after Cisco disclosed its defenses confirms that Cisco's defenses were well-founded and that Cisco's reliance on them was in good faith and reasonable.

Although unsuccessful before the jury, the defenses that Cisco presented at trial confirm that this case does not stand out as one where Cisco lacked a good-faith defense or acted in any way akin to a "pirate" or an "egregious" infringer. (*See* D.I. 334 at 3-12; D.I. 352 at 3-18.) This case thus falls squarely outside the type of conduct that the Supreme Court has held might warrant enhancement. *See Halo*, 136 S. Ct. at 1932 ("Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior.").

### 2. Cisco has either stopped selling the accused products and services or is implementing design-arounds to remove the accused features.

SRI's motion rests in large part on the (incorrect) assumption that Cisco has not taken and will not "take steps to eliminate its infringement going forward." (D.I. 354 at 1; *see also id.* at 10.) But in fact, Cisco began working immediately after the jury's verdict to end the conduct that was found to infringe, notwithstanding Cisco's belief that the verdict should be set aside.

Cisco has already stopped selling the Cisco IPS products and services that the jury found to be infringing. (Michaelis Decl. ¶ 3.) Cisco has also taken the additional step to retire and disable the accused meta-signatures from future signature update releases across all Cisco IPS products. (*Id.* ¶¶ 7, 15, 20, 23.)[4] There can thus be no new acts of infringement by Cisco with respect to those

---

[3] SRI's abandonment of that theory occurred so late in the case that SRI had designated several trial exhibits that relate solely to the "indications of compromise" feature (PTX-498, PTX-698).

[4] Cisco does not believe that removing the meta-signatures from its future signature updates is necessary to avoid infringement, since customers already have meta-signatures from prior signature updates which have been compensated under the jury's damages award. Nevertheless, to avoid any doubt, Cisco has retired and disabled the meta-signatures from its future signature updates.

products and services.  (Clark Decl. ¶ 8.)

Cisco is also implementing a design-around for the accused Sourcefire IPS products and services.  At trial, SRI emphasized that its infringement theory for those products rested on the use of a "nested rules" feature in the Sourcefire management console.[5]  (Trial Tr. 1827:7-16; *see also id.* at 1084:8-1085:19.)  SRI's post-trial motion reiterates that "nested rules" were the basis for its infringement theory.  (D.I. 354 at 20 ("[A]s Dr. Lee repeatedly testified, the product employed rule nesting to infringe.").)  Cisco is now removing the "nested rule" feature from the accused Sourcefire products.  (Bedwell Decl. ¶ 7.)  That design-around has three parts.

- *First*, Cisco is changing the user interface for the Sourcefire Firepower Management Center (the accused "hierarchical monitor") to eliminate the capability of creating and manipulating nested rules.  Once Cisco changes the user interface in that manner, it will not be possible to create nested rules in the accused Sourcefire products.  (*Id.* ¶ 11; Clark Decl. ¶¶ 14, 16.)

- *Second*, Cisco is ███████████████████████████████████████████ ███████.  Without the source code necessary to process nested rules, the accused feature will be disabled for this additional reason.  (Bedwell ¶ 10; Clark Decl. ¶¶ 12-14, 16.)

- *Third*, although the jury's damages award already compensates SRI for customers who purchased products before the verdict, Cisco is taking additional steps to remove the nested rules feature from any future software upgrades provided to those existing customers.  Specifically, if customers with existing nested rules desire to upgrade to the new product release, the product update will automatically remove nested rules, replacing them with valid single rules where possible.  That approach avoids infringement because, without nested

---

[5]     The accused Sourcefire management console has been referred to by several names.  It was originally called the "Defense Center."  It was later renamed the "FireSIGHT Management Console."  And it is now called the "Firepower Management Center."  (Bedwell Decl. ¶ 4.)

rules, the Sourcefire products do not "integrate the reports of suspicious activity" under SRI's infringement theory.  (Bedwell ¶ 15; Clark Decl. ¶¶ 15-16; Trial Tr. 1082:20-1083:5.) Cisco is diligently working toward and expects this three-part design-around to be implemented in its next-available product release, which is scheduled for November 2016.  (Bedwell Decl. ¶¶ 13-14.)

Finally, Cisco is implementing several measures to ensure that Cisco Remote Management Services ("RMS") does not infringe, even under SRI's infringement theory.  SRI accused RMS of infringement based upon Cisco's "ticketing" process, which SRI alleged automatically combines alerts from multiple events into a single ticket.  (Trial Tr. 928:5-929:5.)  Cisco, however, is now in the process of eliminating any automatic correlation across multiple IPS events or devices.  (Parrott Decl. ¶ 4.) ████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (*Id.* ¶ 6)  Cisco expects these measures to be implemented by the end of October 2016.  (*Id.* ¶ 8.)  After that, any correlation that combines multiple intrusion detection system sensors or IPS events into a single event will be performed manually, using system logs, by one of Cisco's security analysts, as part of Cisco's investigation of the event.  (*Id.* ¶ 7.)  That manual process cannot infringe SRI's patents, which require "***automatically*** receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors."  ('615 patent, claim 1 (emphasis added); '203 patent, claim 1; *see* Clark Decl. ¶ 19.)

Cisco's efforts to cease the conduct that the jury found to be infringing are a significant factor weighing against enhancement.  *See, e.g.*, *Spectralytics, Inc. v. Cordis Corp.*, 834 F. Supp. 2d 920, 928 (D. Minn. 2011) (finding that the defendant's efforts to cease infringement post-verdict weighs against enhancement), *aff'd*, 485 F. App'x 437 (Fed. Cir. 2012).

**B.     The Jury's Willfulness Verdict Does Not Warrant Enhancement.**

Because the history of this case overwhelmingly shows that Cisco committed no egregious misconduct, SRI's motion instead relies heavily upon the jury's willfulness verdict as a basis for enhancement.  That argument, however, is both legally flawed and factually unsupported.

**1.     A finding of willfulness does not mandate enhancement.**

SRI attempts to cast the jury's willfulness verdict as sufficient on its own to warrant enhancement.  (*See, e.g.*, D.I. 354 at 4.)  But enhancement is a separate question from willfulness, and a finding of willfulness does not automatically lead to enhanced damages.  *See, e.g.*, *Halo*, 136 S. Ct. at 1936 (Breyer, J., concurring) ("[W]hile the Court explains that 'intentional or knowing' infringement 'may' warrant a punitive sanction, the word it uses is *may*, not *must*."); *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 2016 WL 3976617, at *3 (D. Mass. July 22, 2016) (denying enhancement post-*Halo* despite jury's willfulness verdict).

SRI's attempt to conflate the jury's willfulness verdict with the standard for enhancement is also improper because the decision whether to enhance damages is committed solely to the discretion of the Court.  *WBIP, LLC v. Kohler Co.*, 2016 WL 3902668, at *15 n.13 (Fed. Cir. July 19, 2016) ("[T]his is not to say that a jury verdict of willful infringement ought to result in enhanced damages.  Whether the conduct is sufficiently egregious as to warrant enhancement and the amount of the enhancement that is appropriate are committed to the sound discretion of the district court.").  To be sure, the Federal Circuit recently held that "the factual components of the willfulness question should be resolved by the jury."  *Id.* at *15.[6]  But SRI's statement that "[the jury's] factual determination of willfulness … under *Halo* is alone sufficient to support an award of enhanced

---

[6]     *WBIP*'s holding that the jury has any role in deciding willfulness is contrary to the Supreme Court's rejection of "the Federal Circuit's tripartite framework for appellate review" of enhancement determinations.  *Halo*, 136 S. Ct. at 1934.  But in any case, the jury's verdict here is both factually unsupported and insufficient to warrant enhancement in view of the totality of the circumstances.

damages" (D.I. 354 at 4) improperly seeks to shift the decision of enhancement from the Court to the jury.  And as discussed below, the jury's willfulness verdict is both unsupported and insufficient under the totality of the circumstances to warrant enhancement here.

### 2.    *Halo* did not increase the significance of the jury's willfulness verdict.

SRI's motion also suggests that *Halo* "multiplied" the significance of the jury's willfulness verdict and lowered the legal requirements for enhanced damages.  (D.I. 354 at 4.)  But, importantly, *Halo* reaffirmed that enhanced damages are appropriate only in limited circumstances.  *Halo*, 136 S. Ct. at 1932 (acknowledging the Federal Circuit's "sound recognition that enhanced damages are generally appropriate under § 284 only in egregious cases").

To be sure, *Halo* eliminated *Seagate*'s objective prong as an "unduly rigid" prerequisite to enhancement that could shield "the most culpable offenders, such as the 'wanton and malicious pirate' who intentionally infringes another's patent—with no doubts about its validity or any notion of a defense—for no purpose other than to steal the patentee's business." *Id.*  But that does not mean that the objective reasonableness of a party's defenses is irrelevant to enhancement in an ordinary case, such as this.  On the contrary, *Halo* emphasized that "courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Id.* at 1933.  That includes the objective reasonableness of a party's position.  Indeed, in considering an analogous provision in copyright law, the Supreme Court explicitly held that courts "should give substantial weight to the objective reasonableness of the losing party's position." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1983 (2016) (addressing the discretionary standard for awarding attorneys' fees in copyright cases).

The objective reasonableness of Cisco's defenses weighs against enhancement.  As the Court acknowledged, "from a consistent, objective basis, … Cisco has a good case in connection with infringement."  (Trial Tr. 1899:15-23.)  When considered in the totality of the circumstances, the

objective reasonableness of Cisco's defenses confirms that no enhancement is warranted.  *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 2016 WL 3365437, at *6 (N.D.N.Y. June 16, 2016) (explaining that although "meritorious defenses no longer guarantee an alleged infringer can overcome a willfulness finding," the reasonableness of a party's defenses remains relevant to the decision whether to enhance damages).

### 3.    The willfulness verdict is not supported by substantial evidence.

There was no evidence at trial from which the jury could reasonably find willful infringement.  (*See* D.I. 352 at 26-27.)  The only evidence SRI points to is the testimony of two engineers:  Martin Roesch and James Kasper.  But SRI mischaracterizes their statements to present a willfulness argument that is not supported by the full record.  For example, SRI quotes a portion of Mr. Roesch's testimony stating that he had not read the patents-in-suit prior to his deposition.  (D.I. 354 at 5-6.)  SRI cites similar testimony from Mr. Kasper.  (*Id.* at 6.)  Of course, neither Mr. Roesch nor Mr. Kasper is an attorney, and it is incorrect to assume (and misleading to argue) that they or Cisco took no action in response to SRI's infringement allegations.  As discussed above (pp. 3-4), Cisco promptly retained outside counsel to investigate SRI's infringement allegations and identified to SRI good-faith, reasonable defenses in response to SRI's assertion, which caused SRI to shift theories and abandon its infringement allegations for many products altogether.  Further, the jury was presented with evidence of Cisco's response and the parties' pre-suit discussions, including the admitted fact that "Cisco denied infringement and the validity of the patents during subsequent discussions with SRI."  (Trial Tr. 400:18-22, 1233:15-1234:1.)  Contrary to SRI's argument, that is not "reckless behavior" or "willful blindness."  (D.I. 354 at 6.)  Cisco did precisely what a responsible party accused of infringement is supposed to do.  There is no "universal rule that to avoid willfulness one must *cease manufacture* of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit."  *Gustafson, Inc. v.*

*Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) (emphasis added).

SRI's argument that Cisco was a willful infringer because two engineers did not themselves evaluate the legal merits of SRI's infringement allegations rests on the (incorrect) assumption that no one else did.[7] Here, SRI knows that Cisco retained experienced patent counsel to investigate SRI's infringement allegations, and in turn developed and provided substantive responses to SRI refuting infringement. SRI's suggestion that Cisco should be found to be willful simply because two engineers were not responsible for developing the legal positions Cisco presented in good faith in response to SRI's licensing correspondence is without merit.

In any case, the Court can now evaluate the jury's willfulness verdict in the context of the entire history of dealings between the parties, including the parties' pre-suit discussions, SRI's abandonment of many of its infringement allegations in response to Cisco's defenses, and Cisco's diligent efforts to stop the conduct found to infringe immediately following the jury's verdict. In that full context, Cisco's conduct cannot be described as "willful, wanton, malicious, bad faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo*, 136 S. Ct. 1932. The jury's willfulness determination thus cannot support enhancement and, as noted above, a willfulness finding alone does not equal enhancement in any event.

### C.   The *Read* Factors Do Not Support Enhancement.

Because there is no basis for enhancing damages under the *Halo* standard requiring "egregious" misconduct, there is no need for the Court to consider the factors listed in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992). *See Boston Univ.*, 2016 WL 3976617, at *2 ("While the

---

[7]     SRI's argument with respect to Mr. Roesch is also improper because Mr. Roesch was precluded at SRI's request from addressing the technical details of the Sourcefire products, which would have demonstrated Cisco's non-infringement. (Trial Tr. 1104:11-20, 1105:7-19, 1341:2-8; *see also* D.I. 352 at 27, 30-31.) SRI may not now suggest that Mr. Roesch's testimony supports Cisco's willfulness when it successfully excluded testimony that would have rebutted that argument.

*Read* factors remain helpful to this Court's analysis, the touchstone for awarding enhanced damages after *Halo* is egregiousness."). If, however, the Court does consider the *Read* factors, they overwhelmingly confirm that enhancement is not warranted in this case.

### 1.    Factor 1: deliberate copying

The first *Read* factor asks "whether the infringer deliberately copied the ideas or design of another." 970 F.2d at 827. SRI admits that Cisco did not copy the patented invention. (D.I. 354 at 8.) In fact, SRI made a "conscious decision" not to share information regarding its patented technology with Cisco (PTX-980), and Cisco developed many of the accused products before it even learned of SRI's patents (*see supra* p. 3). This factor weighs against enhanced damages.

### 2.    Factor 2: investigation and good-faith defenses

The second *Read* factor asks "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." 970 F.2d at 827. Contrary to SRI's assertion, Cisco did not "maintain[] an active and willful blindness to its own infringement." (D.I. 354 at 8.) As described above (pp. 3-4), upon learning of SRI's patents, Cisco immediately retained experienced counsel to investigate SRI's allegations and developed sensible defenses, which is strong evidence of the reasonableness of Cisco's conduct. *See Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1313 (Fed. Cir. 2010) ("timely consultation with counsel" suggests that a defendant acted reasonably).

Based upon its investigation, Cisco presented good-faith defenses to SRI's infringement allegations. That Cisco was not ultimately successful on its defenses does not retroactively render its beliefs to be in bad faith. Cisco's prompt retention of outside counsel, investigation, and good-faith defenses all suggest this factor weighs against enhancement. *See Creative Compounds, LLC v. Starmark Labs., Inc.*, 2010 WL 2757196, at *6 (S.D. Fla. July 13, 2010) (second *Read* factor weighed against enhancement where the defendant "took affirmative steps to investigate the [patent]

and formed a good-faith belief of its invalidity based on the opinion of patent counsel").

### 3. Factor 3: litigation behavior

The third *Read* factor is "the infringer's behavior as a party to the litigation."  970 F.2d at 827.  SRI accuses Cisco of "unreasonable and egregious" behavior (D.I. 354 at 8), but none of what SRI addresses rises to that level—at most, it is evidence of a hard-fought case on both sides.

For example, SRI argues that Cisco improperly identified numerous invalidity defenses in its contentions that it did not ultimately pursue at trial.  (D.I. 354 at 22.)  But Cisco initially developed a broad range of defenses, which it narrowed as the case progressed.  SRI speculates that "Cisco may have always known that it would essentially abandon all but one of its numerous invalidity defenses" (*id.*), but that is incorrect.  Cisco's invalidity defenses were the subject of a number of summary judgment and pretrial motions.  Given the uncertainty of which issues would remain at trial, Cisco reasonably maintained those defenses in good faith despite its ultimate decision not to pursue them.

In any case, the mere fact that Cisco chose not to pursue certain arguments at trial does not demonstrate bad faith.  As discussed above (pp. 3-4), SRI itself abandoned many of its infringement theories that were presented during discovery, even during the middle of trial.  SRI cannot fairly say that Cisco's narrowing of its invalidity defenses was improper when SRI wholesale abandoned its infringement theories for numerous products.

SRI also argues that Cisco filed an unreasonable number of pretrial motions and letter briefs. (D.I. 354 at 23-25.)  Contrary to SRI's characterizations, Cisco's summary judgment motions were well-supported.  That a summary judgment motion is denied does not render it frivolous.  For example, although the Court ultimately denied Cisco's motion for summary judgment of laches because it found disputed fact issues, the Court ruled in Cisco's favor that a presumption of laches applies, and the issue of laches still remains to be resolved.  (D.I. 301 at 39.)  Similarly, Cisco's non-infringement summary judgment motion presented close questions that led to a clarification of the

Court's claim construction.  (*Id.* at 29, 32.)  SRI also ignores that the supposedly excessive pretrial

letter briefs were specifically requested by the Court to address pending issues.  (*See* Pretrial Hearing

Tr. 25:14-21 (requesting submission on signature engines), 29:18-24 (requesting submission on IBM

and McAfee licenses), 31:3-32:17 (allowing submission on network traffic data).)

Finally, SRI claims that Cisco engaged in litigation misconduct by over-designating

deposition testimony.  (D.I. 354 at 25.)  But Cisco's designations were not excessive especially given

that Cisco, as the defendant, had no control over the issues it might need to address following SRI's

presentation of evidence as the plaintiff.  Moreover, SRI's pretrial designations were no more

refined:  SRI designated over 1000 exhibits (D.I. 323) but offered only 107 into evidence (D.I. 340).

There is no evidence that Cisco maliciously increased the cost of litigating this case,

particularly as compared with SRI's own conduct.  This factor weighs against enhancement.

### 4.      Factor 4: size and financial condition

The fourth *Read* factor is the "[d]efendant's size and financial condition."  970 F.2d at 827.

Cisco was a large and successful company before it began selling the accused products, and its

success is unrelated to SRI's patented technology.  Moreover, this is not a case where a "small

independent" faces off against a "giant."  *Id.* (internal quotation marks omitted).  SRI has revenues

of over half-a-billion dollars per year (*see* Ex. 5 at 2) and is a savvy, frequent litigant.  SRI also has

not even attempted to show that Cisco somehow used its size to obtain an unfair advantage in this

litigation.  (D.I. 354 at 9.)  Accordingly, this factor should carry little weight in the enhancement

analysis.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 2016 WL 3880774, at *17 (N.D. Cal. July 18,

2016) (holding that the defendant's size did not favor enhancement where the plaintiff did "not rely[]

on Blue Coat's size to argue that Blue Coat's large size somehow enabled it to act egregiously").

### 5.      Factor 5: closeness of the case

The fifth *Read* factor is the "[c]loseness of the case."  970 F.2d at 827.  SRI focuses entirely

on the jury's verdict (D.I. 354 at 9), but ignores the numerous issues on which Cisco prevailed throughout this case. For example, Cisco prevailed on the construction of "adapted to" over SRI's vigorous opposition. (D.I. 138 at 4.) SRI "significantly narrowed the categories of products that it contends infringe" after Cisco disclosed in its non-infringement defenses. (Ex. 3.) As the Court acknowledged, Cisco presented "a good case in connection with infringement" at trial. (Trial Tr. 1899:15-23, 1901:10-22.) SRI abandoned its claim for pre-May 2012 damages. (Trial Tr. 1247:10-20.) The Court found a presumption of laches based upon SRI's pre-suit delay. (D.I. 301 at 38.) The Court excluded the majority of licenses offered by SRI for its damages claim. (*Id.* at 40-41.) And the jury awarded damages that were less than half of what SRI sought. (D.I. 338 at 8.) Thus, this case was close, which weighs against enhancement.

### 6.      Factor 6: duration of misconduct

The sixth *Read* factor is the "[d]uration of [the] defendant's misconduct." 970 F.2d at 827. Although SRI asserts that the duration of Cisco's infringement should be measured from 2005 (for Cisco's products and services) or 2007 (for Sourcefire products) (D.I. 354 at 10), the duration of the infringement ***post-verdict*** is the more relevant consideration. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 958 (N.D. Cal. 2009) ("Critically, when considering the 'duration of misconduct,' the court must parse the infringement for significant milestones, like the entry of judgment or affirmance on appeal."). Here, as explained above (pp. 4-6), Cisco either has stopped selling the accused products and services or is in the process of implementing design-arounds to SRI's patents. The duration of infringement after the jury's verdict is thus minimal.

Even if the Court were to consider the duration of infringement before the verdict, SRI's reach back to 2005 and 2007—when Cisco began selling the accused products—cannot be the correct time frame. It is undisputed that Cisco did not even know about SRI's patents until 2012 (*see supra* p. 3), and any infringement without knowledge of the patents cannot be willful or support

enhancement.  *See Gustafson*, 897 F.2d at 511 ("[A] party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge.").  Further, after receiving notice of SRI's infringement allegations in May 2012, Cisco responded in good faith which led SRI's infringement theories to take many twists and turns and resulted in discussions and litigation spanning several years.  The date of the jury's verdict is thus a far better guidepost, and, in any event, the duration of "misconduct" is limited on the record here.  This factor weighs against enhancement.

### 7.    Factor 7: remedial action

The seventh *Read* factor is "[r]emedial action by the defendant."  970 F.2d at 827.  SRI argues that Cisco has not taken any remedial measures.  (D.I. 354 at 10)  As discussed above (pp. 4-6), however, Cisco has discontinued the products and services found to infringe or is redesigning them to remove the accused features as soon as is practicable.  Cisco cannot be faulted for failing to undertake more dramatic measures before the jury's verdict, particularly because Cisco advanced "a good case in connection with infringement" (Trial Tr. 1899:15-23), and SRI repeatedly shifted its theory as to what conduct infringed its patents.  This factor weighs heavily against enhancement.

### 8.    Factor 8: motivation for harm

The eighth *Read* factor is the "[d]efendant's motivation for harm," which seeks to punish a competitor for infringing to secure market advantage.  *See Funai Elec. Co. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116-17 (N.D. Cal. 2009) (applying this factor where "the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market").  Here, the parties are not competitors, and SRI admits Cisco took no "active steps to harm SRI."  (D.I. 354 at 10.)

Lacking any evidence traditionally relevant to this factor, SRI attempts to concoct a theory of motivation to harm based upon Cisco's supposed "callous disregard for the value of research."  (*Id.*)  But this factor is not aimed at supposed animus between the parties.  *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2014 WL 1320154, at *21 (W.D. Pa. Mar. 31, 2014) ("Absent such direct

competition between the parties, this eighth Read factor does not support enhancing damages.") (collecting cases), *rev'd on other grounds*, 807 F.3d 1283 (Fed. Cir. 2015).   In any event, SRI's claim is unfounded.   Cisco is a technology company that values and makes significant investments in research and respects legitimate intellectual property claims.   (*See, e.g.*, Trial Tr. 173:1-12.)   There is thus no basis for SRI to assert that Cisco treated SRI unfairly because it is a research institution.

SRI also argues that Cisco had "a strong desire to deny SRI even a reasonable royalty on its research."   (D.I. 354 at 10.)   But that assertion is completely unsupported.   Cisco had no desire to pay for technology that it reasonably and in good faith believed it was not using.   Moreover, SRI's requested royalties were excessive—as the jury's verdict at a substantially lower rate than SRI sought confirms.   SRI argues that Cisco's conduct will somehow encourage others to refuse take a license from SRI.   (*Id.*)   But SRI's efforts to commercialize and license its technology were unsuccessful long before Cisco's alleged infringement began.   (*See* Trial Tr. 312:10-318:5, 324:22-325:10.)   If others decline to license, it is because they believe they have no need for the technology, not because of anything Cisco has done.   Accordingly, this factor weighs against enhancement.

### 9.   Factor 9: concealment

The final *Read* factor is "[w]hether [the] defendant attempted to conceal its misconduct." 970 F.2d at 827.   SRI concedes that there is no evidence of concealment here.   (D.I. 354 at 11.)   In fact, as discussed above (p. 3), Cisco did not even have knowledge of the patents until 2012.   This factor thus weighs against enhancement.

* * *

Viewed together, the *Read* factors overwhelmingly weigh against enhancement and confirm that Cisco committed no egregious misconduct.   The Court accordingly should deny enhancement.

## II.     ANY POST-VERDICT INFRINGEMENT SHOULD BE COMPENSATED AT THE JURY'S RATE.

SRI's request that the Court impose an ongoing royalty at the rate of 10.5% is legally flawed and excessive.  There are two distinct time categories of post-verdict relief.  First, any infringement occurring after the jury's verdict and before the entry of final judgment should be compensated as supplemental damages pursuant to 35 U.S.C. § 284 at the jury's rate of 3.5%.  Second, an ongoing royalty is an equitable remedy available during the period after the entry of final judgment.  Here, the Court should deny the equitable remedy of an ongoing royalty because Cisco expects that there will be no continuing infringement after the entry of final judgment, as Cisco has either discontinued the accused products and services or is implementing design-arounds.  If, however, the Court chooses to award an ongoing royalty, it should be no greater than the jury's rate of 3.5%.

### A.     Infringement Prior To The Entry Of Final Judgment Should Be Compensated As Supplemental Damages Using The Jury's Methodology.

SRI requests an "ongoing royalty" for all post-verdict infringement, regardless of whether it occurs before or after the entry of final judgment.  (D.I. 354 at 12.)  An ongoing royalty, however, is an equitable remedy pursuant to 35 U.S.C. § 283, which applies only after the entry of final judgment.  *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).  The appropriate remedy for infringement occurring post-verdict and prior to the entry of final judgment is supplemental damages pursuant to 35 U.S.C. § 284, not the equitable remedy of an ongoing royalty.  *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012) (explaining that courts should generally perform an "accounting of damages flowing from post-verdict and pre-judgment infringement"); *Presidio Components, Inc. v. American Tech. Ceramics Corp.*, 2013 WL 4068833, at *9 (N.D. Cal. Aug. 12, 2013) ("The court may award supplemental damages for infringement between a jury verdict and the entry of judgment.").

Supplemental damages are an extension of the jury's verdict for time periods the jury did not

address. *See TiVo Inc. v. Echostar Commc'ns Corp.*, 2006 U.S. Dist. LEXIS 64291, at *6 (E.D. Tex. Aug. 17, 2006) (noting that supplemental damages "are compensatory in nature" and "are calculated consistent with the damages awarded in the jury verdict"). Courts thus often award supplemental damages at the same rate as the jury. *See August Tech. Corp. v. Camtek, Ltd.*, 2010 WL 5560088, at *3 (D. Minn. Nov. 17, 2010) ("Where there is a jury finding concerning the rate of royalty, courts often apply that rate.") (compiling cases). The Court should follow the same approach here.

SRI argues that the jury's verdict makes post-verdict damages "'fundamentally different'" from the damages awarded by the jury. (D.I. 354 at 12 (quoting *Boston Scientific Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 275 (D. Del. 2012)).) But the jury's verdict is not a changed circumstance that warrants enhancing supplemental damages on its own. Infringement of a valid patent was an assumption already built into the jury's award. (*See* D.I. 336 at 36 (instructing the jury to calculate a royalty assuming "both parties believed the patent was valid and infringed").)

SRI also characterizes Cisco's post-verdict conduct as "a deliberate choice to continue to willfully infringe." (D.I. 354 at 13.) To the contrary, Cisco has made the deliberate choice to cease the activity that was found to infringe. Any post-verdict infringement is a result of the fact that it takes time to review, implement, and test a redesign, and Cisco's post-verdict situation is at most a temporary continuation of the same conduct for which the jury awarded damages. Under these circumstances, awarding supplemental damages at the jury's rate is appropriate. *See Presidio Components*, 2013 WL 4068833, at *10 (in calculating supplemental damages, "the rationale for continuing the jury's award, rather than using some other method, is that there is an absence of any meaningful distinction between pre-verdict and post-verdict infringement"); *see also August*, 2010 WL 5560088, at *5 (awarding supplemental damages at approximate rate that jury awarded).

**B.     The Court Should Deny An Ongoing Royalty Or, Alternatively, Set The Ongoing Royalty At The Jury's Rate Of 3.5%.**

Ongoing royalties are equitable relief within the Court's discretion, and the Federal Circuit has held that trial courts are not required to enter an ongoing royalty as a matter of course. *Whitserve*, 694 F.3d at 35 (explaining that a court "can exercise its discretion to conclude that no forward-looking relief is appropriate in the circumstances"). Here, the Court should decline to enter an ongoing royalty because Cisco expects that its infringement will completely cease by the time the Court rules on post-trial motions and enters final judgment, or soon thereafter. *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 6118447, at *14 (D. Del. Nov. 20, 2013) (denying ongoing royalty where defendant had stopped selling the accused products or designed around the patents).[8]

If the Court chooses to enter an ongoing royalty, however, it should be at a rate no greater than the jury's rate of 3.5%. Ongoing royalties are determined based on the assumption that the parties engage in a post-verdict hypothetical negotiation. *See, e.g.*, *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) (instructing district court on remand to determine a royalty that would result from a post-verdict hypothetical negotiation between the parties). The jury's verdict is the "starting point for determining post-judgment damages."[9] *Internet Machines LLC v. Alienware Corp.*, 2013 WL 4056282, at *19 (E.D. Tex. June 19, 2013). Courts then evaluate the relevant *Georgia-Pacific* factors in the post-verdict setting to determine what the appropriate ongoing royalty should be. *See Apple Inc. v. Samsung Elecs. Co.*, 2014 WL 6687122, at *13 (N.D. Cal. Nov. 25, 2014) ("Courts have used the *Georgia-Pacific* factors to evaluate a post-verdict hypothetical negotiation for ongoing royalties.").

---

[8]     As discussed above (pp. 4-6), Cisco expects to have design-arounds for all products adjudicated to infringe implemented by November 2016.

[9]     Cisco disputes the jury's damages award, and if Cisco is successful in challenging the damages award, the issue of damages for any post-verdict infringement will have to be reassessed.

Here, the post-verdict hypothetical negotiation would result in an ongoing royalty rate no greater than the jury's rate of 3.5%. As explained in the accompanying declaration of Dr. Gregory Leonard, many of the relevant *Georgia-Pacific* factors are unchanged from the hypothetical negotiation as of the date of first infringement considered by the jury. (Leonard Decl. ¶¶ 4-10.) For example, there are no new relevant licensing agreements (Factor 2). The nature and scope of the license are unchanged (Factor 3). SRI's policies concerning licensing are unchanged (Factor 4). And the commercial relationship of the parties is unchanged (Factor 5). (*Id.*)

The only new circumstances arising post-verdict would tend to push the royalty rate downward. Most notably, Cisco has discontinued its sale of several accused products and services, and is in the process of implementing design-arounds to remove the accused features from the remaining products and services. The fact that Cisco has no future need for SRI's patented technology confirms that SRI's patents have no value to Cisco or its customers. That is a significant consideration under *Georgia-Pacific* Factor 8 (success and popularity of the invention), Factor 9 (utility and advantages of the patented invention), Factor 10 (benefits of the patented technology to users), and Factor 11 (value of the patented technology to the defendant). (*Id.* ¶¶ 5-6.)

SRI has not supported its requested ongoing royalty with any analysis of the outcome of a post-verdict hypothetical negotiation. SRI simply contends that the jury's verdict alone justifies an increased royalty rate, implying that ongoing royalty rates should always be higher than the jury's rate. Yet there are numerous cases where ongoing royalties are set at the jury's rate. *See, e.g.*, *Apple*, 2014 WL 6687122, at *20 ("[T]he Court determines that the proper ongoing royalty rates are those reflected in the jury verdict."); *Orion IP, LLC v. Mercedes-Benz USA, LLC*, 2008 WL 8856865, at *5 (E.D. Tex. Mar. 28, 2008) (setting ongoing royalty at the jury's rate because the patentee "has not shown how the situation now is any different than that presented at trial").

20

Contrary to SRI's assertion (D.I. 354 at 12), the jury's verdict is not a changed circumstance that warrants increasing the royalty rate on its own. The hypothetical negotiation analysis at the time of first infringement already assumes infringement of a valid patent, as the jury here was instructed (D.I. 336 at 36). *Cf. Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 917-18 (E.D. Tex. 2008) ("[I]t is logically inconsistent to argue that a calculation based upon assumptions of infringement and validity would change when those assumptions are replaced by jury findings of the same facts.").

SRI also contends that Cisco's "high profit margins" support an increase over the jury's rate. (D.I. 354 at 14.) But SRI offers no evidence that Cisco's products are profitable because they contain the technology from SRI's patents rather than a myriad of other features in Cisco's security products unrelated to SRI's patents. On the contrary, the fact that Cisco is removing the accused features from its products (and has discontinued the others) indicates that the profitability of Cisco's products is not attributable to SRI's patents. SRI also cites no authority that a defendant's profit margins would support a higher ongoing royalty rate. The only case that SRI cites simply states that lower profit margins may warrant a lower ongoing royalty rate, not that higher profits support increasing the ongoing royalty rate. (D.I. 354 at 14 (citing *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 630 (E.D. Tex. 2009)).) And in any case, the jury had evidence concerning the profitability of Cisco's products before it (Trial Tr. 1262:5-1263:6), such that the jury's award already reflects whatever relevance the profitability of Cisco's products has to the royalty rate.

## III.   THERE IS NO BASIS FOR AN AWARD OF ATTORNEYS' FEES.

### A.   This Case Is Not Exceptional.

Attorneys' fees may be awarded only in an "exceptional" case, which is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *see*

*also* 35 U.S.C. § 285.   Although no single element is dispositive, "predominant factors to be considered, though not exclusive, are … bad faith litigation, objectively unreasonable positions, inequitable conduct before the PTO, litigation misconduct, and … willful infringement." *Stragent, LLC v. Intel Corp.*, 2014 WL 6756304, at *3 (E.D. Tex. Aug. 6, 2014).   The fact that a party does not prevail is insufficient by itself to warrant a fee award. *Octane*, 134 S. Ct. at 1753 (fees are not "a penalty for failure to win").

This case is not exceptional.  As the Court recognized, "this case in terms of infringement has been like virtually every other case.  There's nothing remarkable about this case when it comes to infringement."  (Trial Tr. 1901:10-22.)   Cisco advocated good-faith, reasonable defenses and prevailed on a number of issues.  Nothing that SRI points to alters that conclusion. *See Intendis GMBH v. Glenmark Pharms. Ltd.*, 117 F. Supp. 3d 549, 581 (D. Del. 2015) (denying fees where defendant presented good-faith non-infringement defenses because the plaintiff had not shown "the case was so one-sided or unreasonable as to rise to the level of 'exceptional'"); *Small v. Implant Direct Mfg. LLC*, 2014 WL 5463621, at *3-4 (S.D.N.Y. Oct. 23, 2014) (explaining that "where a party has set forth some good faith argument in favor of its position, it will generally not be found to have advanced 'exceptionally meritless' claims" and that "most cases awarding fees continue to involve substantial litigation misconduct"), *aff'd*, 609 F. App'x 650 (Fed. Cir. 2015); *Gevo, Inc. v. Butamax Advanced Biofuels LLC*, 2014 WL 4247735, at *1-2 (D. Del. Aug. 26, 2014) (declining to find case exceptional despite adverse summary judgment rulings on infringement and validity).

### 1.   The jury's willfulness determination

SRI argues that "the jury's finding of willful infringement under the old, much higher legal and evidentiary standard already marks this case as an exceptional one." (D.I. 354 at 15.)   As discussed above (pp. 9-10), however, the jury's willfulness finding cannot be reconciled with Cisco's actual conduct.  In any event, a finding of willfulness—under any standard—does not

automatically make a case exceptional.  Here, Cisco independently developed the accused products, promptly sought the advice of outside counsel to investigate SRI's infringement allegations, presented reasonable and good-faith defenses, and immediately took remedial steps to end its infringement after the jury's verdict.  (*See supra* pp. 3-6.)  That conduct is not willful and certainly does not meet the exacting standard of "exceptionality" required for awarding attorneys' fees.

### 2.    Cisco's defenses

Many of the arguments that SRI presents with respect to attorneys' fees mirror its arguments with respect to enhancement, and SRI has not shown that this case is "exceptional" for the same reasons discussed above (pp. 3-16).  SRI repeatedly characterizes Cisco's non-infringement defenses as "frivolous" (D.I. 354 at 15-21), but that is inconsistent with the Court's own statements that Cisco presented "good" and "reasonable" non-infringement defenses at trial.  (Trial Tr. 1899:20-21, 1900:8-9).  It is also irreconcilable with the substance of Cisco's defenses and SRI's own actions. Indeed, less than two weeks after Cisco served non-infringement contentions, "SRI significantly narrowed the categories of products that it contends infringe the Patents-in-Suit."  (Ex. 3.)  SRI cannot now characterize Cisco's defenses as "frivolous" when it abandoned several of its infringement theories in the face of those defenses.

Nor do Cisco's non-infringement defenses presented at trial make this case "one that stands out from others," *Octane*, 134 S. Ct. at 1756, as the Court acknowledged.  (*See* Trial Tr. 1901:10-22.)  On the contrary, as explained in Cisco's motion for JMOL, Cisco had strong non-infringement defenses for all of the accused products; indeed, Cisco believes that no reasonable jury could have found infringement on this record.  (*See* D.I. 352 at 3-18.)

SRI argues that Cisco's non-infringement defenses were contrary to both the Court's claim construction and Cisco's own positions (D.I. 354 at 17-21), but SRI mischaracterizes those positions. For Cisco's IPS products and services, Cisco's defense was that the plurality of monitors required by

the claims was absent.  In contending that Cisco's position is contrary to the Court's claim construction (*id.* at 17-18), SRI appears to confuse Cisco's argument that the patent requires "a plurality of network monitors" (*i.e.*, more than one) with whether the hierarchical monitor and network monitor must be in separate devices.  Even if the hierarchical monitor and network monitor can be co-located, it does not mean that a single hierarchical monitor/network monitor can satisfy the requirement of a plurality of "network monitors."  (*See* D.I. 352 at 7-9.)

For the accused Sourcefire products, Cisco's defense was that the accused "nested rules" feature does not correlate reports of multiple events as required by the claims, not that the Sourcefire products cannot perform "event chaining."  (D.I. 352 at 3-7.)  SRI selectively quotes evidence it claims to be in conflict with this position (D.I. 354 at 19-20), but SRI's own expert admitted that the claims require integrating reports of multiple events (*see* Trial Tr. 1082:13-1083:5) and Cisco's expert testified that "rule nesting" only evaluates a single event at a time (*id.* at 1574:25-1577:14).  Cisco thus had a good-faith basis to pursue that defense.  Indeed, Cisco contends that no reasonable jury could have found for SRI on this record (*see* D.I. 352 at 3-7), but certainly Cisco's position is not a frivolous or exceptional one.

Similarly, SRI's arguments regarding Cisco's invalidity positions fall far short of demonstrating frivolousness.  SRI criticizes Cisco for relying on the DIDS paper, which was the subject of prior litigation and proceedings before the Patent Office.  (D.I. 354 at 16-17.)  But the fact that the same paper was presented in prior proceedings confirms that it is a highly relevant piece of prior art, and there is nothing unreasonable in Cisco seeking to be heard on those issues.  SRI also criticizes Cisco for failing to devote more time at trial to its defenses under 35 U.S.C. § 112.  (D.I. 354 at 17.)  But trial time was limited, and Cisco's ultimate decision to focus its allotted time on other issues does not mean that its § 112 defenses lacked merit.  In any case, as discussed above, SRI

abandoned infringement theories and significantly altered others throughout this case, including through the date of trial.  SRI can hardly claim that Cisco's strategic choice to focus on certain invalidity defenses, but not others, demonstrates that its defenses were frivolous when there were numerous infringement theories that SRI disclosed but ultimately abandoned.

### 3.    Litigation conduct

There is no basis for SRI to contend that Cisco "needlessly multiplied" the cost and complexity of the case.  (D.I. 354 at 21-25.)  This case involved a complex technology, and SRI asserted broad infringement allegations.  As discussed above (pp. 12-13), the litigation conduct that SRI identifies merely suggests that the case was hard fought by both sides, not that Cisco engaged in any misconduct.  Indeed, SRI's criticisms of Cisco's conduct could equally be leveled against SRI, which itself ultimately abandoned many of its infringement theories and advanced numerous unsuccessful arguments.  There is no basis for finding this case exceptional on this record.

### B.    SRI's Requested Fees Are Excessive.

Even if this case were "exceptional," SRI could only recover "***reasonable*** attorney fees." 35 U.S.C. § 285 (emphasis added).  "To determine reasonable attorneys' fees, courts generally use the 'lodestar' approach, where the number of hours reasonably spent is multiplied by a reasonable hourly rate." *Chalumeau Power Sys. LLC v. Alcatel-Lucent USA Inc.*, 2014 WL 5814062, at *1 (D. Del. Nov. 6, 2014).  SRI "bears the burden of establishing the reasonableness of both the time expended and the hourly rates." *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, 2016 WL 1267159, at *3 (D. Del. Mar. 31, 2016).  It has not met that burden here.  The request for nearly $8 million in fees and over $100,000 in additional "related expenses" relies on hourly rates that far exceed the prevailing Delaware rates, and seeks compensation for work that was excessive, insufficiently documented, and/or otherwise not recoverable under § 285.

1.   **SRI failed to establish that the requested hourly rates are reasonable.**

SRI asks the Court to award fees using the "usual and customary" hourly rates of its largely out-of-state attorneys at Fish & Richardson.  (*See* D.I. 354 at 26; D.I. 355, Ex. 3.)  However, a court awarding attorneys' fees must determine the reasonable hourly rate by looking to the prevailing rate in the forum of the litigation—here, Delaware.  *Bywaters v. United States*, 670 F.3d 1221, 1232-33 (Fed. Cir. 2012).  An exception to the forum rule permits a court to look to the prevailing rates in the attorney's home state only if the prevailing party provides "specific evidence that no local attorneys possess the 'special expertise' necessary to take the case or that no local attorneys were willing to take the case." *Id.* at 1233-34.  SRI has not even attempted to make this showing.

Any award of attorneys' fees should therefore be calculated based on "the prevailing market rates of Delaware intellectual property attorneys," *Vehicle Interface Techs., LLC v. Jaguar Land Rover N. Am., LLC*, 2016 WL 3436396, at *3 (D. Del. June 15, 2016), which can be determined from surveys published by the American Intellectual Property Law Association ("AIPLA"), *see Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988).  According to AIPLA's 2015 survey, the average hourly billing rate in Delaware in 2014 was $427 for a partner and $298 for an associate. (*See* Wilcox Decl., Ex. 8 at I-25, I-36.)  Fish & Richardson charged substantially higher rates:

█████████████████████████████████████████████████████████

████████████████████████████████████. (*See* D.I. 355, Ex. 2.)  SRI provides no evidence or argument to support the reasonableness of those rates, and therefore has failed "to produce satisfactory evidence … that the requested rates are in line with those prevailing in the forum for similar services by lawyers of reasonably comparable skill, experience and reputation." *Bywaters*, 670 F.3d at 1234 (internal quotation marks omitted).

## 2.   SRI failed to establish that the hours expended were reasonable.

SRI seeks fees for ███████████ expended by Fish & Richardson, but does not offer any explanation as to their reasonableness.  (*See* Wilcox Decl. ¶ 3; D.I. 354 at 26.)[10]  SRI is not presumptively entitled to recover for all hours recorded; it has the burden of establishing that the hours are reasonable.  The Court may exclude "unnecessary hours [and] hours that lack proper documentation," *Joao Bock*, 2016 WL 1267159, at *3, as well as hours for which a client would not generally be held responsible, *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).  Fish & Richardson's billing records include thousands of hours that were excessive, unnecessary, or expended on tasks for which fees are not recoverable.

### a.   The Court should exclude hours with improper time entries.

The fee that will ultimately be paid by SRI to Fish & Richardson is governed by a contingency agreement.  (D.I. 354 at 26 n.10.)  As this case amply demonstrates, a client that agrees to a contingency fee does not have the incentive to review its attorneys' hourly rates and time entries during the litigation, *cf. Romag Fasteners, Inc. v. Fossil, Inc.*, 2015 WL 5787019, at *2 (D. Conn. Sept. 30, 2015), resulting in hours that are excessive, redundant, and insufficiently documented.

Here, SRI did not contemporaneously approve or even review the invoices that it has now submitted to the Court.  (*See* D.I. 355, Coletti Decl. ¶ 5 & n.1.)  Had it reviewed Fish & Richardson's billing records throughout the litigation, it likely would have refused to pay for many of the accrued fees.  Many time entries are too vague to determine what the task at hand was, let alone whether it added any value to the litigation.  ███████████████████████

---

[10]    SRI relies only on attorney Susan Morrison Coletti's "opinion" that "the fees and related expenses described herein were reasonably and necessarily incurred in pursuing this case."  (D.I. 355, Coletti Decl. ¶ 7.)  But the billing records indicate that Ms. Coletti spent only ████████ on the case (*see* Wilcox Decl. ¶ 7), and SRI has not established that she otherwise gained sufficient familiarity with the litigation to evaluate the reasonableness of the fees incurred.

█████████████████████████████████████████████████████████████

██████████████████ *see Mr. & Mrs. B. v. Weston Bd. of Educ.*, 34 F. Supp. 2d 777, 781 (D. Conn. 1999) ("Entries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter.").) Other time entries are for frivolous or clerical tasks that would generally not be charged to a client. █████████████████████████████████████████████████████ And still other time entries are clear mistakes for which Cisco should certainly not be required to pay. ████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████ This Court has considerable discretion in determining the appropriate amount of attorneys' fees, and should reduce SRI's total hours by at least 25% to account for the extent of the improper billings by Fish & Richardson. *See, e.g.*, *Mr. & Mrs. B.*, 34 F. Supp. 2d at 782 (reducing fee award by 30% due to vague and inconsistent records); *Smart SMR of N.Y., Inc. v. Zoning Comm. of Town of Stratford*, 9 F. Supp. 2d 143, 152 (D. Conn. 1998) (same); *Local 32B-32J, Serv. Employees Int'l Union v. Port Auth. of N.Y. & N.J.*, 180 F.R.D. 251, 253 (S.D.N.Y. 1998) (reducing fee award by 20% due to vague time entries).

      **b.**    **The Court should exclude hours expended on attorney travel.**

SRI's counsel billed approximately ██████████ to travel.  (Wilcox Decl. ¶ 4.)  Because SRI failed to show that its attorneys were working while they traveled, Cisco should not be required to pay fees incurred during their travel time.  *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 710 (3d Cir. 2005) ("[U]nder normal circumstances, a party that hires counsel from outside the forum of the litigation may not be compensated for travel time [or] travel costs …."). The Court should reduce the total number of hours by ██████ to exclude travel time.

c.      **The Court should exclude hours expended on a full mock trial.**

SRI's attorneys spent approximately ▮▮▮▮▮ on a mock trial, or ▮▮▮ of the total number of hours.  (Wilcox Decl. ¶ 5.)  SRI has not provided any explanation for undertaking the significant expense of a full mock trial.  Indeed, SRI's motion for fees rests on the notion that Cisco had insubstantial defenses, and there is no reason that SRI would have had to conduct a mock trial if it truly believed those defenses lacked merit.  Because SRI has not met its burden to establish that the hours expended on the mock trial were reasonable or necessary, the Court should exclude any recovery of fees relating to the mock trial and reduce the total number of hours expended by ▮▮▮

d.      **The Court should exclude hours expended on issues where SRI did not prevail.**

"[W]hen a party achieves partial or limited success on claims involving a common core of facts and shared related legal theories, the court has discretion in either identifying specific hours that should be eliminated or simply reducing the award to account for the limited success." *Phillips Elecs. N. Am. Corp. v. Compo Micro Tech, Inc.*, 2006 WL 3624022, at *3 (D. Del. Dec. 12, 2006). Here, SRI expended many hours on arguments that were ultimately dropped or rejected by the Court, including: (i) infringement contentions against many products and services that were dropped after the close of discovery; (ii) a motion for summary judgment that NetRanger is not prior art, which the Court denied in part; (iii) an opposition to Cisco's motion for summary judgment on the issue of laches, on which Cisco prevailed in part; and (iv) a motion for judgment on the pleadings that was never even filed.  The billing records make clear that SRI's counsel spent ▮▮▮▮▮ of its total hours on these issues (Wilcox Decl. ¶ 6), and SRI has made no attempt to establish the number of hours that were expended on arguments on which it prevailed.  SRI therefore has not met its burden of establishing the reasonableness of the hours expended on these issues.  The Court should reduce the total number of hours expended by ▮▮▮ to account for SRI's limited success on these issues.

### e.    The Court should exclude hours from low-billing timekeepers.

The Court may reduce the number of total hours to exclude time that was spent inefficiently. One court recently recognized that "transient involvement" by attorneys in complex litigation is inherently inefficient, and excluded all hours billed by attorneys who spent fewer than 100 hours on the case.  *See Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 130 F. Supp. 3d 1331, 1338-39 (C.D. Cal. 2015).  Here, ████████████ attorneys and ████████████ paralegals each billed fewer than 100 hours over the course of the entire litigation (Wilcox Decl. ¶ 7), and their time should be excluded as inefficient.  Accordingly, the total number of hours should be reduced by ████

### 3.    The maximum lodestar award is approximately $2.6 million.

As explained above, the reasonable hourly rates for intellectual property attorneys in Delaware in 2014 were $427 for a partner and $298 for an associate—substantially lower than the average hourly rates of Fish & Richardson principals and associates ██████████ respectively).  Applying a corresponding reduction to the rates charged by Fish & Richardson paralegals, the appropriate hourly rate for a paralegal in Delaware is ████.  (Wilcox Decl. ¶ 10.)  *Cf. Joao Bock*, 2016 WL 1267159, at *3 (approving paralegal rates between $110 and $175).  After accounting for the reductions explained above, the total number of hours reasonably expended on this matter is at most ████████████████████████████████████████.  (Wilcox Decl. ¶¶ 9-10.)  Applying the lodestar calculation to these figures yields $2,586,120.97 in attorneys' fees.  (Wilcox Decl. ¶ 10.)  That is consistent with the $2.8 million average total cost of litigating a patent case in Delaware when the amount at risk is $10 to $25 million; here, the jury awarded $23 million.  (*See* Wilcox Decl., Ex. 8 at I-107; *id.* at 3 (noting that "total cost" includes expenses not included in attorneys' fees, *e.g.*, expert witness fees, photocopies, travel and living expenses).)

### 4.    SRI cannot recover for fees charged by graphic artists.

Finally, SRI seeks ████████ in "related expenses," nowhere specifying the nature of those

expenses.  (*See* D.I. 354 at 26.)  Upon review of SRI's billing entries, the fees charged by SRI's two graphic artists for ████████ of work amount to ██████.  (Wilcox Decl. ¶ 3.)  Their work apparently consisted of preparing graphic slides for the claim construction hearing, technology tutorial, mock trial, and trial.  Such fees are not compensable as attorneys' fees under § 285, which is meant to compensate parties only for amounts "incur[red] in the preparation for and performance of *legal* services related to the suit."  *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) (emphasis added).  There is accordingly no basis for granting SRI's request for an additional ██████.

## IV.   PREJUDGMENT INTEREST SHOULD BE DENIED DUE TO SRI'S DELAY IN FILING SUIT, OR ALTERNATIVELY, AWARDED AT THE 52-WEEK T-BILL RATE, COMPOUNDED ANNUALLY.

### A.   SRI Should Receive No Prejudgment Interest Because It Delayed Filing Suit For Nearly A Decade.

Prejudgment interest is not mandatory and is within the discretion of the trial court.  *See General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983); *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967, 969 (Fed. Cir. 1986).  "[I]t may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit."  *General Motors*, 461 U.S. at 657; *see also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361-62 (Fed. Cir. 2001) (denying prejudgment interest due to the patentee's two-year delay in filing suit).  Here, the Court in its discretion should deny all prejudgment interest because SRI admittedly "was aware of Cisco product offerings such as CiscoWorks in 2004" and "knew that there was a possibility of infringement."  (D.I. 197 at 2.)  SRI nevertheless "did not investigate further," delayed eight years before discussing its patents with Cisco, and waited until September 2013 to file this lawsuit.  (*Id.*)

SRI's delay was highly prejudicial to Cisco.  Over $8 million of the jury's damages award is

attributable to Cisco's pre-suit sales.[11] (*See* Leonard Decl. Ex. 2a.)  SRI's delay allowed SRI to run up its damages and requested prejudgment interest to Cisco's detriment. *See Crystal Semiconductor*, 246 F.3d at 1362 (denying prejudgment interest where delay "caused the damages owed by [the defendants] to escalate").  The Court thus should deny SRI's request for prejudgment interest.

> **B.   SRI's Proposed Method Of Calculating Prejudgment Interest Is Not Supported On This Record.**

If the Court nevertheless concludes that prejudgment interest is warranted, it should not adopt SRI's proposed methodology of calculating prejudgment interest using the prime rate, compounded quarterly.  SRI has offered no explanation why its methodology is appropriate based upon the facts of this case.  If the Court awards any prejudgment interest at all, it should apply the commonly used T-Bill rate, compounded annually.  That methodology is adequate compensation on this record.

> **1.   The 52-week T-Bill rate is the appropriate interest rate in this case.**

Where, as here, the patentee (at most) lost the opportunity to invest the damages amount during the prejudgment period, courts generally have found the T-Bill rate to be the appropriate prejudgment interest rate.  *See, e.g.*, *Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 136 (D.N.J. 2007) (collecting cases).  That interest rate mirrors the statutory rate for post-judgment interest under 28 U.S.C. § 1961, and there is no reason to deviate from that approach here.  Prejudgment interest at the higher prime rate would further inflate the amount by which SRI would improperly benefit from its own delay in filing suit.

It is SRI's burden to justify an increase over the T-Bill rate based upon the facts of this case. *See Schering Corp. v. Precision-Cosmet Co.*, 614 F. Supp. 1368, 1384 (D. Del. 1985).  Yet SRI has

---

[11]     Further demonstrating SRI's efforts to increase the damages through its own delay, SRI initially sought damages on products sold and services provided before Cisco received notice of the patents-in-suit.  (Ex. 6 at 4 ("SRI seeks damages starting six years before this lawsuit.").)  SRI, however, abandoned its claim of pre-notice damages (*see* Trial Tr. 1247:10-11) after Cisco raised SRI's failure to comply with the marking requirement under 35 U.S.C. § 287.

not even attempted to justify its request for the higher prime rate.  SRI vaguely asserts that it could have spent licensing revenues from Cisco to support "its ongoing research efforts."  (D.I. 354 at 27.)  But SRI has not identified any specific research that it would have supported, and the suggestion that SRI would have obtained a return on its research investment above the T-Bill rate is pure speculation.  *See Mars*, 513 F. Supp. 2d at 136-37 (applying the T-Bill rate "to avoid the speculation involved with determining whether possibly higher-yielding, but riskier, investments would have been successful for the patent holder").  Indeed, by Dr. Lincoln's own admission, not all of SRI's research is successful.  (Trial Tr. 302:15-24.)  That is certainly true of the network intrusion detection technology at issue in this case, which resulted in SRI losing over $1 million when the company it formed to commercialize the technology failed.  (Trial Tr. 314:7-318:5.)  There is no basis for awarding more than the T-Bill rate when SRI's own track record demonstrates that it could have invested its licensing revenues "in some spectacularly unsuccessful venture and lost every penny."  *Intex Plastic Sales Co. v. Hall*, 1991 WL 270167, at *5 (N.D. Cal. July 10, 1997).

SRI contends that the prime rate is supposedly "preferred" in Delaware.  (D.I. 354 at 27.)  But numerous cases in this district have awarded prejudgment interest at the T-Bill rate.  *E.g.*, *Symbol Techs., Inc. v. Proxim Inc.*, 2004 WL 1770290, at *10 (D. Del. July 28, 2004); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 1998 WL 151411, at *54 (D. Del. Mar. 13, 1998); *Phillips Petroleum Co. v. Rexene Corp.*, 1997 WL 781856, at *28 (D. Del. Sept. 4, 1997); *Schering*, 614 F. Supp. at 1384.  And precedent in this district makes clear that the T-Bill rate applies **unless** the patentee offers "evidence which would support an award above" that rate—which SRI has not even attempted to do.  *Schering*, 614 F. Supp. at 1384; *see Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming interest at T-Bill rate where "there was no evidence [the patentee] borrowed money at a higher rate, what that rate was, or that there was a causal connection between

any borrowing and the loss of the use of the money awarded as a result of NEC's infringement").

Even the case that SRI cites (D.I. 354 at 27) emphasizes that the prime rate was appropriate there because it "represent[ed] the cost of borrowing money." *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007). But SRI has not argued or presented any evidence that it borrowed funds during the prejudgment period. There is thus no basis for awarding prejudgment interest at the prime rate, and the Court should apply the T-Bill rate instead. *See Mars*, 513 F. Supp. 2d at 136 ("[S]ome courts, including the Federal Circuit, have applied the sensible approach that the T-Bill rate should be used as a baseline investment rate, absent evidence that the patent holder is entitled to a better rate, either because it had to borrow at a higher rate to cover the lost funds, or because it would have invested at a better rate.").

### 2.    Any prejudgment interest award should be compounded annually.

If the Court awards prejudgment interest, it should order compounding annually, not quarterly. Annual compounding is a standard approach. *See, e.g.*, *Laitram*, 115 F.3d at 955 (affirming prejudgment interest "at the U.S. Treasury bill rate, compounded annually"); *Cornell Univ. v. Hewlett-Packard Co.*, 2009 WL 1405208, at *4 (N.D.N.Y. May 15, 2009); *Mars*, 513 F. Supp. 2d at 137 ("The Federal Circuit has repeatedly affirmed annual compounding."). SRI has not offered any reason why quarterly compounding is appropriate based upon the facts of this case.

SRI's only argument for quarterly compounding is that it is supposedly "the methodology ordered in numerous cases in this district." (D.I. 354 at 28.) But SRI ignores the many Delaware cases ordering annual compounding. *E.g.*, *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 2004 WL 1622442, at *2 (D. Del. July 12, 2004); *IPPV Enters., LLC v. EchoStar Commc'ns Corp.*, 2003 WL 723260, at *3 (D. Del. Feb. 27, 2003); *Schering*, 614 F. Supp. at 1384. In fact, some Delaware cases have awarded no compounding at all. *E.g.*, *Symbol*, 2004 WL 1770290, at *10; *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 2004 WL 1305849, at *20 (D. Del. June 9, 2004),

*vacated in part on other grounds*, 425 F.3d 1366 (Fed. Cir. 2005).

It is SRI's burden to show why more frequent compounding is appropriate based upon the facts. *See Schering*, 614 F. Supp. at 1384. Because SRI has not even attempted to justify quarterly compounding, the Court should apply the common approach of annual compounding instead.

* * *

Dr. Leonard has calculated the amount of prejudgment interest applying the commonly used 52-week T-Bill rate, compounded annually. The total amount of prejudgment interest is $115,757 through May 2, 2016, with a daily rate of $387 thereafter. (Leonard Decl. Ex. 2b.)[12] If the Court awards any prejudgment interest, those amounts are the maximum warranted on this record.

**CONCLUSION**

For the foregoing reasons, Cisco respectfully requests that the Court deny SRI's motion. The jury's damages award should not be enhanced, and this case is not exceptional for purposes of awarding attorneys' fees. The Court should award supplemental damages for any infringement prior to the entry of final judgment at the jury's rate of 3.5%. Cisco expects that there will be no need for an ongoing royalty after the entry of final judgment because it has either stopped selling the products and services accused of infringement or is implementing design-arounds to avoid future infringement. However, if the Court orders an ongoing royalty, it should be no greater than the jury's rate of 3.5%. Finally, the Court should deny prejudgment interest due to SRI's delay in filing suit, or at most, award prejudgment interest at the 52-week T-Bill rate compounded annually.

---

[12]     For the Court's convenience, Dr. Leonard also calculated prejudgment interest combining the various proposed rates and compounding methods. (*See* Leonard Decl. Exs. 1a, 1b, 2a.)

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

Steven Cherny
Oliver C. Bennett
Sarah K. Tsou
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022-4611
(212) 446-4800

Michael W. De Vries
KIRKLAND & ELLIS LLP
333 Hope Street
Los Angeles, CA  90071
(213) 680-8400

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
(415) 439-1500

Jason M. Wilcox
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000

August 5, 2016

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 12, 2016 upon the following in the manner indicated:

Thomas L. Halkowski, Esquire                                       *VIA ELECTRONIC MAIL*
Susan Morrison Coletti Esquire
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

David M. Hoffman Esquire                                           *VIA ELECTRONIC MAIL*
David S. Morris, Esquire
FISH & RICHARDSON P.C.
111 Congress Avenue, Suite 810
Austin, TX  78701
*Attorneys for Plaintiff*

Phillip Goter, Esquire                                             *VIA ELECTRONIC MAIL*
FISH & RICHARDSON P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
*Attorneys for Plaintiff*

Frank Scherkenbach, Esquire                                        *VIA ELECTRONIC MAIL*
David B. Kuznick, Esquire
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA  02110-1878
*Attorneys for Plaintiff*

Howard G. Pollack, Esquire                                         *VIA ELECTRONIC MAIL*
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA  94063
*Attorneys for Plaintiff*

Joanna Fuller, Esquire                                        *VIA ELECTRONIC MAIL*
Frank J. Albert, Esquire
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA  92130
*Attorneys for Plaintiff*


/s/ *Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)