# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SRI INTERNATIONAL, INC., ) | |
| ) | |
| Plaintiff, ) | ▇▇▇▇▇ |
| ) | |
| v. ) | Civ. No. 13-1534-SLR |
| ) | |
| CISCO SYSTEMS, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

Thomas L. Halkowski, Esquire and Susan E. Morrison, Esquire of Fish & Richardson P.C., Wilmington, Delaware. Of Counsel: Frank Scherkenbach, Esquire, Joanna M. Fuller, Esquire, Philip W. Goter, Esquire, David M. Hoffman, Esquire, David Kuznick, Esquire, David S. Morris, Esquire, Howard G. Pollack, Esquire, and Michael Sobolev, Esquire of Fish & Richardson P.C. Counsel for Plaintiff.

Jack B. Blumenfeld, Esquire and Michael J. Flynn, Esquire of Morris, Nichols, Arsht & Tunnell L.L.P., Wilmington, Delaware. Of Counsel: Adam R. Alper, Esquire, Oliver C. Bennett, Esquire, Steven Cherny, Esquire, Michael W. De Vries, Esquire, Sarah K. Tsou, Esquire, and Jason M. Wilcox, Esquire of Kirkland & Ellis, L.L.P. and William F. Lee, Esquire of Wilmer Cutler Pickering Hale and Dorr L.L.P. Counsel for Defendant.

## MEMORANDUM OPINION

Dated: May 25, 2017
Wilmington, Delaware

**ROBINSON, Senior District Judge**

## I. INTRODUCTION

On September 4, 2013, plaintiff SRI International, Inc. ("SRI") filed suit against defendant Cisco Systems Inc. ("Cisco"), alleging infringement of U.S. Patent No. 6,711,615 ("the '615 patent") and 6,484,203 ("the '203 patent") (collectively, "the patents"). (D.I. 1) On December 18, 2013, Cisco answered the complaint and counterclaimed for non-infringement and invalidity. (D.I. 9) SRI answered the counterclaims on January 13, 2014. (D.I. 11) The court issued a claim construction order on May 14, 2015. (D.I. 138) In a memorandum opinion and order dated April 11, 2016, the court resolved several summary judgment motions. (D.I. 301; D.I. 302)

The court held an eight-day jury trial from May 2-11, 2016 on infringement, validity, willfulness, and damages of claims 1, 2, 13, and 14 of the '615 patent and claims 1, 2, 12, and 13 of the '203 patent ("the asserted claims"). On May 12, 2016, the jury returned a verdict that Cisco intrusion protection system ("IPS") products, Cisco remote management services, Cisco IPS services, Sourcefire IPS products, and Sourcefire professional services directly and indirectly infringe the asserted claims of the '615 and '203 patents. (D.I. 337 at 1-4) The jury determined that the asserted claims are not invalid. (D.I. 337 at 6-7) As a consequence of this infringement, the jury awarded SRI a 3.5% reasonable royalty amounting to $8,680,000 for sales of Cisco products and services and $14,980,000 for sales of Cisco/Sourcefire products and services, for a total of $23,660,000. (D.I. 337 at 8) The jury also found that SRI had established, by clear and convincing evidence, that Cisco's infringement was willful. (D.I. 337 at 5)

Presently before the court are the following motions: (1) Cisco's motion for judgment as a matter of law, new trial, and remittitur (D.I. 351); (2) SRI's motion for

attorney fees (D.I. 349); and (3) Cisco's motion to supplement the record (D.I. 385).
The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

### A. The Parties

SRI is an independent, not-for-profit research institute incorporated under the
laws of the State of California, with its principal place of business in Menlo Park,
California. (D.I. 1 at ¶ 1) SRI conducts client-supported research and development for
government agencies, commercial businesses, foundations, and other organizations.
(Id. at ¶ 6) Among its many areas of research, SRI has engaged in research related to
computer security and, more specifically, to large computer network intrusion detection
systems and methods. (Id.) Cisco is a corporation organized and existing under the
laws of the State of California, with its principal place of business in San Jose,
California. (Id. at ¶ 2) Cisco provides various intrusion prevention and intrusion
detection products and services. (Id. at ¶ 14)

### B. The Technology

The patents relate to the monitoring and surveillance of computer networks for
intrusion detection. In particular, the patents teach a computer-automated method of
hierarchical event monitoring and analysis within an enterprise network that allows for
real-time detection of intruders. Upon detecting any suspicious activity, the network
monitors generate reports of such activity. The claims of the patents focus on methods
and systems for deploying a hierarchy of network monitors that can generate and
receive reports of suspicious network activity.

The '615 patent (titled "Network Surveillance") is a continuation of the '203 patent
(titled "Hierarchical Event Monitoring and Analysis"), and the patents share a common

2

specification and priority date of November 9, 1998. (D.I 179 at 1)  The asserted claims include independent claims 1 and 13 of the '615 patent, which claims read as follows:

> 1. A computer-automated method of hierarchical event monitoring and analysis within an enterprise network comprising:
>
> deploying a plurality of network monitors in the enterprise network;
>
> detecting, by the network monitors, suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> generating, by the monitors, reports of said suspicious activity; and
>
> automatically receiving and integrating the reports of suspicious activity, by one or more hierarchical monitors.

('615 patent, 15:1-21)

> 13. An enterprise network monitoring system comprising:
>
> a plurality of network monitors deployed within an enterprise network, said plurality of network monitors detecting suspicious network activity based on analysis of network traffic data selected from one or more of the following categories: {network packet data transfer commands, network packet data transfer errors, network packet data volume, network connection requests, network connection denials, error codes included in a network packet, network connection acknowledgements, and network packets indicative of well-known network-service protocols};
>
> said network monitors generating reports of said suspicious activity; and
>
> one or more hierarchical monitors in the enterprise network, the hierarchical monitors adapted to automatically receive and integrate the reports of suspicious activity.

('615 patent, 15:56-16:6)

## III. STANDARD OF REVIEW

### A. Renewed Motion for Judgment as a Matter of Law

The Federal Circuit "review[s] a district court's denial of judgment as a matter of law under the law of the regional circuit. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1325 (Fed. Cir. 2016) (citation omitted). In the Third Circuit, a "court may grant a judgment as a matter of law contrary to the verdict only if 'the record is critically deficient of the minimum quantum of evidence' to sustain the verdict." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (citing *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995)); *see also McKenna v. City of Philadelphia*, 649 F.3d 171, 176 (3d Cir. 2011). The court should grant judgment as a matter of law "sparingly" and "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007)). "In performing this narrow inquiry, [the court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury. *Id.* (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). Judgment as a matter of law may be appropriate when there is "a purely legal basis" for reversal "that does not depend on rejecting the jury's findings on the evidence at trial." *Acumed*, 561 F.3d at 211.

### B. Motion for a New Trial

Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed. R. Civ. P. 59(a). The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (citing *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282 (3d Cir. 1993)); *LifeScan Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 350 (D. Del. 2000) (citations omitted); *see also* 9A Wright & Miller, *Federal Practice and Procedure* § 2531 (2d ed. 1994) ("On a motion for new trial the court may consider the credibility of witnesses and the weight of the evidence."). Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow–Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584-85 (D.N.J. 1997) (citations omitted). The court must proceed cautiously, mindful that it should not simply substitute its own judgment of the facts and the credibility of the witnesses for those of the jury. Rather, the court should grant a new trial "only when the great weight of the evidence cuts against the verdict and a miscarriage of justice would result if the verdict were to stand." *Leonard*, 834 F.3d at 386 (citing *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006) and *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352-53 (3d Cir. 1991)) (internal quotation marks omitted).

## C. Attorney Fees

Section 285 provides, in its entirety, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "When deciding whether to award attorney fees under § 285, a district court engages in a two-step

inquiry." *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012). The court first determines whether the case is exceptional and, if so, whether an award of attorney fees is justified. *Id.* at 915-16 (citations omitted). The Supreme Court has defined "an 'exceptional' case [as] simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness LLC v. Icon Health & Fitness, Inc.*, __ U.S. __, 134 S. Ct. 1749, 1756 (2014).

District courts should consider the "totality of the circumstances" and use their discretion to determine on a case-by-case basis whether a case is "exceptional." *Id.* "[A] 'nonexclusive' list of 'factors,' [to consider] includ[es] 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at n.6. Cases which may merit an award of attorney fees include "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees" or "a case presenting either subjective bad faith or exceptionally meritless claims." *Id.* at 1757. A party seeking attorney fees under § 285 must prove the merits of their contentions by a preponderance of the evidence. *Id.* at 1758.

## IV. DISCUSSION

### A. Cisco's Renewed JMOL – Liability

Cisco renews its motion for judgment as a matter of law as to infringement, arguing that "[t]he record lacks substantial evidence to support the jury's verdict of direct infringement, inducement, and contributory infringement." (D.I. 352 at 1)

6

### 1. Standard

#### a. Direct Infringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). To prove direct infringement, the patentee must establish that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). A two-step analysis is employed in making an infringement determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). First, the court must construe the asserted claims to ascertain their meaning and scope, a question of law. *Id.* at 976-77; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, __ U.S. __, 135 S. Ct. 831, 837 (2015). The trier of fact must then compare the properly construed claims with the accused infringing product. *See Markman*, 52 F.3d at 976. This second step is a question of fact. *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337 (Fed. Cir. 2015) (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

"Direct infringement requires a party to perform each and every step or element of a claimed method or product." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) (quoting *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007)). "If any claim limitation is absent . . ., there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1411 (Fed. Cir. 2014) (citing *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the

limitations of) that claim.")). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552) (internal quotations omitted). The patent owner has the burden of proving literal infringement by a preponderance of the evidence. *Octane Fitness*, 134 S. Ct. at 1758.

### b. Indirect Infringement

To establish indirect infringement, a patent owner has available two theories: active inducement of infringement and contributory infringement. 35 U.S.C. § 271(b) & (c). Liability for indirect infringement may arise "if, but only if, [there is] . . . direct infringement." *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, __ U.S. __, 134 S. Ct. 2111, 2117 (2014) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961) (emphasis omitted)). The patent owner has the burden of proving infringement by a preponderance of the evidence. *Octane Fitness*, 134 S. Ct. at 1758.

Under 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." "To prove induced infringement, the patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) (quoting *i4i Ltd. P'ship. v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010)) (internal quotation marks omitted). "[I]nduced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). The knowledge requirement can be met by a showing of either actual knowledge or willful blindness. *See id.* "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 769 (citation omitted). "[I]nducement requires evidence of culpable conduct, directed to encouraging another's

8

infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part) (citations omitted).

To establish contributory infringement, the patent owner must demonstrate the following: (1) an offer to sell, a sale, or an import into the United States; (2) a component or material for use in a patented process constituting a material part of the invention; (3) knowledge by the defendant that the component is especially made or especially adapted for use in an infringement of such patents; and (4) the component is not a staple or article suitable for substantial non-infringing use. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) (citing 35 U.S.C. § 271(c)). Defendant "must know 'that the combination for which his component was especially designed was both patented and infringing.'" *Global-Tech*, 563 U.S. at 763 (citing *Aro Mfg.*, 377 U.S. at 488).

## 2. Sourcefire IPS products and services

### a. Direct infringement – "automatically receiving and integrating the reports of suspicious activity"

The jury found that the accused Sourcefire IPS products directly infringe the asserted claims. (D.I. 337 at 2) Cisco argues that no reasonable jury could have found that the Sourcefire IPS products "integrate reports of suspicious activity"[1] as required by the asserted claims. (D.I. 352 at 3) Cisco contends that, "[u]nder the court's claim construction," the claims require "integrating reports of multiple events, not merely evaluating a report of a single event."[2] (D.I. 352 at 3) SRI does not dispute the

---

[1] Found in claims 1 and 13 of the '615 patent, and claims 1 and 12 of the '203 patent.
[2] The parties agreed to construe these terms as "[w]ithout user intervention, receiving reports of suspicious activity and combining those reports into a different end product; i.e., something more than simply collecting and reiterating data." (D.I. 47 at 2)

9

"multiple event" limitation and argues that substantial evidence supports the jury's finding of infringement. (D.I. 370 at 2)

### i. SRI's evidence

SRI's expert, Wenke Lee, PhD ("Dr. Lee"), referenced an internal Sourcefire document entitled "Compliance Rule Overview" and opined that the Sourcefire IPS products integrate reports of suspicious activity using rule nesting. (D.I. 396 at 959:22-961:9) For example, the referenced document states that:

> For each kind of event, the rule can be constrained by related conditions. . . .Different conditions for a compliance rule can be combined with an AND or OR operator. One or more conditions can also be subordinated to another condition, also combined with an AND or OR operator. All this together allows complex rules to be built.

(PTX 787 at 7) Dr. Lee explained that "these compliance rules can work together to achieve the result of correlation. . . . the firing of one compliance rule can become a condition into another compliance rule." (D.I. 396 at 960:24-961:2; PTX 787 at 7) Dr. Lee opined that "with this nesting ability, . . . [one can] write very complex logic to implement very comprehensive correlation analysis." (D.I. 396 at 961:2-5; PTX 787 at 7) Referencing the Sourcefire 3D System User Guide, Dr. Lee explained that the product literature teaches users and deploying organizations how to combine rules. (D.I. 396 at 961:10-962:6; DTX 840 at 1228)

In his rebuttal testimony, Dr. Lee repeated that rule nesting works by creating a new rule that includes "the condition [] that another rule has to already be satisfied." (D.I. 399 at 1793:17-18) He explained that rule nesting enables combination of multiple events because rule nesting "means that you combine . . . the events described by these two rules" into a single event. (D.I. 399 at 1793:18-23) Dr. Lee showed where, in the Sourcefire source code, rule nesting happens. (D.I. 399 at 1797:1-21)

Dr. Lee explained that his infringement opinion was based, in part, on an independent test of Sourcefire's IPS products by NSS Labs. (D.I. 396 at 963:22-964:17; PTX 707 at 5, 20-21) Martin Roesch ("Roesch"), Sourcefire's founder and now Cisco's vice president and chief security architect, testified that NSS Labs is a well-known "third-party testing service" that does "functional analysis of things like intrusion prevention systems, firewalls, advanced malware protection systems and things like that." (D.I. 398 at 1477:19-1478:5) The NSS Labs report states that the Sourcefire IPS products "provide the means to infer connections between multiple alerts and group them together as incidents automatically." (PTX 707 at 17) Dr. Lee opined that this means that the "correlation engine" within the accused Sourcefire products can "infer connections between multiple alerts." (D.I. 396 at 964:12-13; 964:22-965:7)

SRI presented deposition testimony from end users such as Kurt Truxal ("Truxal"), manager of global security at TransUnion, a Sourcefire and Cisco user. When asked "what a correlation rule does," Truxal said that "[i]t allows you to correlate multiple events and call it a specific singular event." (D.I. 395 at 799:7-8; PTX 774) Truxal verified that TransUnion uses Sourcefire products to "combine and nest conditions." (D.I. 395 at 800:3-4) TransUnion, Truxal explained, also generates correlation events which are used to take "multiple events that happen in a sequence and rout[e] them together to create one unique individual event . . . [so that] they add up to something that could be more interesting." (D.I. 395 at 807:21-808:4)

## ii. Cisco's evidence

Cisco's expert, Paul C. Clark, PhD ("Dr. Clark"), explained the operation of the "compliance engine feature" of the Sourcefire Defense Center product. (D.I. 398 at 1574:25-1575:1) Dr. Clark opined that the "compliance engine feature" processes events from sensors serially, "[a]s you'll see here, we're going to take the next event and match it with the policy just like we did the first event, and then we're going to fire

one or more rules. But firing one or more rules is not combining multiple events." (D.I. 398 at 1575:24-1576:3; PTX 787 at 7; See also D.I. 398 at 1600:8-13) Dr. Clark explained that, in rule nesting, a base event is "going to be processed the same way [as rules in series], [by] tak[ing] it across, correlat[ing] with a rule one in the policy, trigger[ing] that rule, and then mov[ing] it along. And now you correlate it with Rule 2, same event, and just fire a second rule." (D.I. 398 at 1577:11-14; PTX 787 at 7, 21) Cisco elicited cross examination testimony from Dr. Lee in which he agreed that the accused Sourcefire IPS products process rules "one event at a time."[3] (D.I. 399 at 1841:20-21)

### iii. Analysis

The jury was asked to consider whether SRI presented a preponderance of evidence to demonstrate that Cisco's Sourcefire IPS products directly infringed the asserted claims, either literally or under the doctrine of equivalents. (D.I. 336 at 23-25) Cisco argues that no reasonable jury could find infringement of the "automatically receiving and integrating the reports of suspicious activity" limitation found in the asserted claims, either literally or under the doctrine of equivalents.[4] (D.I. 352 at 6)

---

[3] Cisco presented attorney argument that Dr. Lee's claim that "Cisco's 'nested rules' could combine more than one event" is "inaccurate." (D.I. 352 at 5) This is one of several arguments related to the "nested rules feature" that Cisco asserts must be present, independent of the correlation engine. During trial, the so-called "nested rules feature" was mentioned twice in testimony from Cisco's Edward Bedwell ("Bedwell"). (D.I. 398 at 1493:24; 1498:9) In its briefs, Cisco argues that SRI failed to demonstrate infringement with respect to this so-called "nested rules feature" on more than a dozen occasions. (D.I. 352 at 5, 6, 12, 13, 14, 24 & n.4; D.I. 379 at 3, 5, 7, 12, and 13) There is no evidence in the record that Cisco made any of these arguments to the jury.

[4] Cisco argues that "no reasonable jury could have found that the Sourcefire products satisfy the claim requirement of integrating reports of multiple events under the doctrine of equivalents." (D.I. 352 at 6) Cisco avers that "SRI offered no evidence that Sourcefire's accused single-event correlation is insubstantially different from the integration of multiple events required by all asserted claims." (Id.) There is no evidence in the record that SRI asserted an equivalents argument with respect to this claim limitation. Therefore, the court denies Cisco's motions with respect to equivalents.

12

Cisco contends that Dr. Lee's testimony under cross examination leads to the conclusion that "the claims undisputedly require[] integrating reports of multiple events, not merely evaluating a report of a single event."[5] (D.I. 352 at 3, citing D.I. 396 at 1082:20-1083:5)

The court instructed the jury that "automatically receiving and integrating the reports of suspicious activity" means "[w]ithout user intervention, receiving reports of suspicious activity and combining those reports into a different end product; i.e., something more than simply collecting and reiterating data." (D.I. 336 at 21) Dr. Lee opined that correlation rules, combined with rule nesting, receive reports of suspicious activity and combine those reports into a different product. (D.I. 396 at 960:24-961:2; PTX 787 at 7; DTX 840 at 1228) Truxal expressed a similar opinion. (D.I. 395 at 807:21-808:4) Dr. Clark opined that this was not possible, because the Sourcefire products process events serially. (D.I. 398 at 1577:11-14; PTX 787 at 7, 21)

On the record at bar, SRI's expert provided more than conclusory testimony in order to explain his conclusions to the jury. SRI also presented a fact witness to corroborate SRI's expert. The jury credited such testimony over that of Cisco's expert. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### b. Indirect infringement – induced infringement

The jury found that Cisco induced infringement of the asserted claims by Sourcefire IPS products and services. (D.I. 337 at 4) Cisco argues that no reasonable jury could have found that Cisco induced infringement of the Sourcefire IPS products and services. (D.I. 352 at 13) Cisco contends that SRI failed to demonstrate direct

---

[5] This proposed construction was not presented to the jury.

infringement, either through customers Home Depot and TransUnion or through survey results. (*Id.*) Cisco asserts that a jury could not have concluded the teaching or encouragement factor because "SRI failed to present substantial evidence that Cisco actively encouraged its customers to enable or use any allegedly infringing nested rules." (*Id.* at 14) Cisco argues that, SRI did not provide evidence that "Cisco 'knew the acts' of its customers 'were infringing.'" (*Id.*) SRI responds that it "presented extensive evidence that Cisco induced infringing deployment and use of the Sourcefire IPS Products and Services by its customers." (D.I. 370 at 12)

### i. SRI's evidence

SRI presented evidence of direct infringement by the accused Sourcefire IPS products as discussed above. For example, when asked "what a correlation rule does," TransUnion's Truxal said that "[i]t allows you to correlate multiple events and call it a specific singular event." (D.I. 395 at 799:7-8; PTX 774) Truxal verified that TransUnion uses the accused Sourcefire products to "combine and nest conditions." (D.I. 395 at 800:3-4) TransUnion, Truxal explained, also generates correlation events which are used to take "multiple events that happen in a sequence and rout[e] them together to create one unique individual event . . . [so that] they add up to something that could be more interesting." (D.I. 395 at 807:21-808:4)

SRI presented circumstantial evidence of direct infringement in the form of the NSS Labs report. (PTX 707 at 5, 17, 20-21) Dr. Lee's aforementioned analysis of Cisco source code was also directed at the question of direct infringement by Sourcefire IPS products. (D.I. 399 at 1793:17-23, 1797:1-21) SRI's survey expert, Ken Van Liere, PhD ("Dr. Van Liere"), presented the results of a survey of Cisco customers and opined that, based upon the survey results, "78 percent of the people who have one [Sourcefire product] in their U.S. network said that [the correlation compliance engine] feature was enabled." (D.I. 395 at 728:20-729:2) Table 10 of the survey results show that 78% of

Sourcefire users selected "Correlation/Compliance Engine" in response to the question: "which of the following, if any, are enabled in one or more of the Sourcefire Products that are currently installed within your organization's United States network?" (PTX 1093 at table 10)

Dr. Lee opined that "using the correlation feature" in the Sourcefire IPS products is "one of the best practices recommended [by Cisco] to customers." (D.I. 396 at 977:1-6) In reference to various Cisco user guides, Dr. Lee testified that these user guides teach Sourcefire customers why, and how, to use correlation rules. (Id. at 978:1-8; PTX 787 at 7 (Compliance Rule Overview); PTX 784 at 62 (Best Practices Guide); DTX 840 at 1228 (Sourcefire 3D System User Guide); PTX 151 at 39-7 (FireSIGHT System User Guide))

SRI elicited testimony, on cross examination, from Cisco's Roesch that he did not analyze infringement or read the patents until his deposition in the fall of 2015, which was two years after the filing of the present suit. (D.I. 398 at 1478:17-1479:13) Roesch opined that "[w]hen there are deeply technical issues on the table and there has been a legal application of understanding to those deep technical issues," his general attitude is that Cisco has not infringed a patent, because people who are bringing suits do not understand the technology. (Id. at 1481:22-1482:2) Roesch also testified that his initial impression about the case at bar was that SRI "[d]idn't understand our technology." (Id. at 1482:10-13) SRI's former vice president of legal and business affairs and general counsel, Richard Abramson ("Abramson"), testified in a deposition that during licensing discussions (before the case at bar had been filed) Cisco had presented noninfringement contentions that SRI had rebutted. (D.I. 397 at 1233:15-22)

## ii. Cisco's evidence

Cisco points to various aspects of SRI's evidence that it contends are a failure of proof of direct infringement. For example, SRI deposed Jeffrey Lee Mitchell ("Mitchell"),

who is the director of IT security at Home Depot. When asked whether Home Depot uses correlation rules in the company's "defense center," Mitchell testified "I don't think so . . . . Because our correlation that we would begin within SOC is not done with the management console. It's done with correlation rules within Splunk." (D.I. 395 at 681:10-17) Mitchell repeated "I don't know if [the correlation rules are] enabled on the defense center. I do know that we are not using it in the SOC for correlation." (D.I. 395 at 682:9-11) Cisco asserts that Mitchell's testimony means that "Home Depot does not use the accused correlation engine and leaves it disabled." (D.I. 352 at 13) Cisco argues that "TransUnion uses the correlation engine but not the nested rules feature." (Id.) In support, Cisco points to Truxal's testimony that TransUnion does not have the defense center configured to "generate reports based on correlated events." (D.I. 395 at 808:5-13) With respect to Dr. Van Liere's survey, Cisco avers that the "survey failed to include any questions about the customers' use of the accused nested rules feature." (D.I. 352 at 13-14, citing PTX 1093 at table 10)

Cisco argues that "SRI failed to present substantial evidence that Cisco actively encouraged its customers to enable or use any allegedly infringing nested rules." (D.I. 352 at 14) For example, Dr. Lee testified that one of the ways Cisco encouraged its customers to infringe was by providing customer support for Sourcefire. (D.I. 396 at 980:6-981:5 (referencing deposition testimony by Cisco employee, Steven Alan Sturges ("Sturges") at D.I. 395 at 759:8-770:2)) Cisco contends that this failure of proof is supported by Dr. Clark's testimony that "the compliance engine is the accused feature in the Defense Center" but that the defense center does "[l]ots of other things."[6] (D.I. 398 at 1571:3-16) Cisco notes that three of the user guides presented by SRI do not mention Sourcefire's correlation engine or the accused nested rules feature. (D.I. 352

_____

[6] In support of this, Cisco cites generally to DTX 840 "Sourcefire 3D System User Guide," which is a 2,000 page document.

at 14) With respect to the user guides that teach rule nesting, Cisco avers that the teaching is limited to a single statement that "You can nest rules." (D.I. 352 at 14; *See also* DTX 840 at 1228, PTX 151 at 39-7). Cisco notes that the relevant Sourcefire User Guide (DTX 840) is dated July 2011, which it argues is "more than a year" before May 2012, when STI sent a letter informing Cisco of the infringement allegations.[7] (D.I. 352 at 14; D.I. 398 at 1247:15-20) Moreover, Cisco contends that the trial transcript demonstrates that SRI "attempt[ed] to establish induced infringement without addressing the reasonableness of Cisco's non-infringement defenses."[8] (D.I. 352 at 14-15, citing D.I. 400 at 1952:6-1957:15) In its closing argument, Cisco made the following statement:

> Indirect infringement. They're right. Dr. Clark said, our products don't infringe. If they don't infringe, then no one else who uses them can infringe. But we also didn't have the intent. They did not show[9] you what Abramson, who was their former general counsel, admitted at deposition: Do you know if Cisco presented any noninfringement positions in those license licensing discussions? At some point they did make some argument as to why they felt they didn't infringe. That shows you we felt we didn't infringe. That does not add up to that we knowingly told people to do things knowing that it would infringe. I don't know why they didn't tell you that. It's their guy. I think you're not going to be terribly surprised, but I really want you to say no to this one, too.

---

[7] May 2012 is less than a year after July 2011.

[8] Cisco argues that "the Federal Circuit recently rejected the notion that 'any time a defendant's products are found to directly infringe, the plaintiff has sufficiently established the defendant's intent to induce infringement.'" (D.I. 352 at 15, citing *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1352 (Fed. Cir. 2016) (Reyna, J., concurring)) The Federal Circuit took a more nuanced approach, "[t]o be clear, we do not suggest that inducement liability is [as] broad [as Judge Reyna suggests in his concurrence]. To show the intent to induce infringement, it is sufficient that the plaintiff establish that a defendant's asserted belief in non-infringement was unreasonable." *Warsaw Orthopedic*, 824 F.3d at 1351 n.2.

[9] Cisco appears to argue that SRI did not address the reasonableness of Cisco's noninfringement belief. (*But see* D.I. 397 at 1233:15-22 ("Question: Do you know if Cisco presented any noninfringement positions in those licensing discussions? Answer: At some point they did make some argument as to why they felt they didn't infringe.")

(D.I. 400 at 1988:21-1989:10)

### iii. Analysis

The jury was asked to consider whether SRI presented a preponderance of evidence to demonstrate that Cisco's induced infringement of the asserted claims by Sourcefire IPS products. (D.I. 336 at 26) The court instructed the jury that SRI bore the burden to prove:

> 1. Defendant took some action intending to encourage or instruct its customers to perform acts that you, the jury, find would directly infringe an asserted claim;
>
> 2. Defendant was aware of the asserted patents at the time of the alleged conduct and knew that its customer's acts (if taken) would constitute infringement of an asserted patent, or the defendant believed there was a high probability that the acts (if taken) would constitute infringement of an asserted patent but deliberately avoided confirming that belief; and
>
> 3. Use by others of the defendant's products or services infringes one or more of the asserted claims.

(*Id.*) As to the first factor, SRI presented evidence that Cisco's user guides and marketing materials teach rule nesting and how to use the correlation engine. (D.I. 370 at 13) Cisco argues that these materials are insufficient to demonstrate that Cisco encouraged or instructed its customers to enable or use rule nesting or the correlation engine.[10] (D.I. 352 at 14) Cisco argues that the "Best Practices Guide" (PTX 784) predates May 2012 (when SRI informed Cisco of its infringement contentions) and cannot form a basis for inducement, because Cisco could not have had knowledge of the potential infringement when it made the statement.[11] However, even if Cisco had made this argument to the jury (which the record shows it did not), Cisco did not address (either in its briefs or to the jury) the timeliness of the other evidence presented by SRI. The jury was presented with sufficient evidence to determine whether Cisco

---

[10] There is no evidence that Cisco made this argument to the jury.

[11] *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1234 (C.D. Cal. 2007), is inapposite.

took some action to encourage or instruct its customers to use the Sourcefire IPS products in an infringing manner.

With respect to the intent factor, for the relevant time period, SRI presented evidence that Cisco knew about the patents and SRI's belief that Cisco infringed the patents. SRI also presented evidence that Cisco's Roesch did not read the patents until his deposition (a period of nearly two years after filing suit) and James Kasper ("Kasper"), a software engineering technical leader at Cisco, was not asked to investigate the possibility of infringement. (D.I. 398 at 1479:9-13; D.I. 400 at 1953:10-1957:15) Cisco argues that its denial of infringement during "[t]he parties' pre-suit discussions confirm[s] Cisco's reasonable belief in non-infringement."[12] (D.I. 352 at 15) The parties presented sufficient evidence for a jury to conclude that either Cisco knew that its customers' acts (if taken) would constitute infringement of the asserted claims or Cisco believed there was a high probability that its customers' acts (if taken) would constitute infringement of an asserted claim but that Cisco deliberately avoided confirming that belief.

On the third factor, direct infringement, SRI presented evidence of infringement through Cisco customers at Home Depot and TransUnion. Cisco argues that these customers cannot directly infringe the asserted claims, because they do not use the relevant aspects (rule nesting and compliance engine) of the accused Sourcefire IPS products.[13] SRI presented additional evidence of infringement through Dr. Van Liere's survey, including table 10, which (according to Dr. Van Liere) supports the conclusion that 78% of Sourcefire IPS customers use the "Correlation/Compliance Engine" feature.

---

[12] See supra, note 10. Moreover, Cisco argues that the exclusion of testimony by Roesch as to his opinion of noninfringement would have overcome the willful blindness theory SRI presented in closing arguments. The court declines to reconsider its decision.

[13] See supra, note 10. For example, in its closing argument, Cisco did not mention Truxal, Mitchell, TransUnion or Home Depot.

(PTX 1093 at table 10) Cisco argues that the survey does not address the rule nesting feature. (D.I. 352 at 13-14) SRI argued to the jury that rule nesting is implicit to the correlation engine. (*See, e.g.*, D.I. 400 at 1947:10-1948:22) Cisco appears to argue that rule nesting and the correlation engine are two separate features that must both be separately shown in order to demonstrate direct infringement.[14] (D.I. 352 at 13-16) Sufficient evidence was presented to enable the jury to decide whether Cisco's customers directly infringe the asserted claims by using the Sourcefire IPS products.

On the record at bar, SRI presented more than conclusory evidence of inducement to the jury. The jury credited the testimony of SRI's witnesses and exhibits over that of Cisco. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict that Cisco induced infringement of the asserted claims by its customers using Sourcefire IPS products. For these reasons, Cisco's renewed motion for JMOL is denied.

### 3. Cisco IPS products

Cisco argues that the asserted claims contain the "hierarchical monitor" limitation and that no reasonable jury could have found that the accused Cisco IPS products satisfy this claim limitation. (D.I. 352 at 7) Cisco avers that "[d]espite the express claim requirement of multiple (i.e., at least two) monitors in a hierarchy, SRI nevertheless based its infringement theory on the features inside a single Cisco IPS product as being both the lower-level monitors and the hierarchical monitor required by the claims." (*Id.*)

At summary judgment, Cisco presented a similar argument "that the SensorApp processing thread cannot simultaneously be both the alleged 'network monitor and

---

[14] *See supra*, note 10. Cisco mentioned rule nesting once in its closing argument, "[c]an a nested rule in a correlation engine be evaluated against multiple intrusion events? It cannot. How do you know? I [Cisco's Ted Bedwell] have actually reviewed the source code." (D.I. 400 at 1982:5-7) *See supra*, note 3.

20

'hierarchical monitor' under the claims because they are not 'separate and distinct structures.'" (D.I. 301 at 32) The court denied summary judgment of noninfringement and clarified that "[t]he claim language and the parties' constructions do not require that the 'network monitor' and 'hierarchical monitor' be separate structures." (Id.) The court found genuine issues of material fact as to "whether the Meta Event generator meets the ['hierarchical monitor'] claim limitation." (Id.)

Cisco makes two arguments in support of its motion for JMOL: (1) a single Cisco IPS product cannot satisfy the "plurality of network monitors"[15] limitation;[16] and (2) Dr. Lee's testimony cannot support a jury finding of infringement of the "hierarchical monitor"[17] limitation. (D.I. 352 at 7-8)

### a. Reconsideration

A motion for reconsideration is the "functional equivalent" of a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). See Jones v. Pittsburgh Nat'l Corp., 899 F.2d 1350, 1352 (3d Cir. 1990) (citing Fed. Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 348 (3d Cir. 1986)). The standard for obtaining relief under Rule 59(e) is difficult to meet. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999). A court should exercise its discretion to alter or amend its judgment only if the movant demonstrates one of the following: (1) a change in the controlling law; (2) a need to

---

[15] Found in the '615 patent at column 15, lines 5 and 57, and the '203 patent at column 14, line 22 and column 15, line 2.

[16] Cisco's argument appears to involve a claim construction in which the "accused lower-level monitors . . . [must] be independently configured or installed." (D.I. 352 at 7) This claim construction was not presented to the jury. For reasons to be discussed below, the court addresses these arguments as a motion for reconsideration.

[17] Found in the 615 patent at column 15, lines 20-21 and column 16, line 3, and the '203 patent at column 14, lines 34-35 and column 15, line 13.

21

correct a clear error of law or fact or to prevent manifest injustice; or (3) availability of new evidence not available when the judgment was granted. *See id.* A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made and may not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles USA, Inc. v. Blocker*, 735 F. Supp. 1239, 1240 (D. Del. 1990); *see also Glendon Energy Co. v. Borough of Glendon*, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993).

In support of its request for reconsideration of the denial of summary judgment of noninfringement, Cisco presents attorney argument related to the "plurality of monitors" limitations, but these are the same arguments Cisco made at summary judgment, and Cisco has not presented additional facts or law to support its noninfringement position.[18] (D.I. 352 at 7-8; *See also* D.I. 301 at 32) Therefore, the court denies Cisco's request for reconsideration.

### b. Direct infringement – "hierarchical monitor"

Cisco argues that "SRI failed to prove that Cisco's IPS Products satisfy the claim requirement of a 'hierarchical monitor' that integrates reports from two or more lower-level monitors," alleging that "Dr. Lee [] changed his infringement theory" during the trial. (D.I. 352 at 8) SRI agrees that "Dr. Lee misstated . . . which box drawn in a marketing diagram represented the meta event generator," but argues that the location of the meta

---

[18] Cisco cited to testimony from Dr. Lee (SRI's expert), various Cisco employees, and to one question answered by Dr. Clark (Cisco's expert) opining that sensor apps cannot be configured independently. (*See* D.I. 398 at 1593:2-7 ("Q. Okay. Can a sensor app -- can you go in and independently configure or install a sensor app? A. It does not make sense. As I said, it's an execution stream in there. You can't -- you don't even know how many of them there are going to be. It's dependent upon the hardware that you are running.")) It is unclear how this testimony relates to Cisco's argument. Moreover, at summary judgment, the court concluded "that the expert opinions present factual disputes as to whether the Meta Event Generator meets the claim limitation." (D.I. 301 at 32) These disputes are addressed below with respect to the "hierarchical monitor" limitation.

event generator is not important and that the meta event engine (or generator) corresponds to the "hierarchical monitor" in the claims. (D.I. 370 at 7)

### i. SRI's evidence

Dr. Lee opined that the meta event engine (or meta event generator) meets the claim limitation of a "hierarchical monitor," because it receives events "from the lower level sensor app processing thread network monitors" and is "logically separate from the other inspection engines . . . that are in the sensor app threads." (D.I. 396 at 888:6-15; D.I. 397 at 1189:5-12) Dr. Lee discussed source code, which explains that the meta engine "allows for definitions of 'META events' that in effect correlate events automatically . . . . A META event is defined by other signature events occurring in a related manner within a sliding time interval." (PTX 677 at 36; D.I. 396 at 888:16-890:18) With reference to the User Guide for Cisco Security Manager 4.4, Dr. Lee testified that "the lower level sensors take input from network packet produced events and the meta engine takes those events and correlates them. So there is a hierarchy here." (D.I. 396 at 891:15-18; See also PTX 94 at 38-25 ("The Meta engine is different from other engines in that it takes alerts as input where most engines take packets as input."))

On direct examination, Dr. Lee discussed a Cisco marketing presentation. A slide entitled "IPS Sensor Architecture," Dr. Lee explained, is an "architectural diagram of software . . . . [that] tells you what are the components of the software, how [] they work together." (D.I. 396 at 864:5-11) Dr. Lee opined that the meta event engine is located in the "Correlation App" box:

Q. What does this -- to your understanding, there's a box here, correlation app. What is that referring to?

A. So this is the, essentially, the correlation engine or the meta event engine in Cisco's language. That's the upper level hierarchy code monitor.

(D.I. 396 at 864:24-865:3; PTX 109 at 19) On cross examination, Dr. Lee confirmed this opinion. (D.I. 396 at 1048:19-1049:4) After Cisco presented evidence disputing that the meta event engine is located within the "Correlation App" box of the software architecture, on redirect, Dr. Lee explained that the physical location of the meta event generator is not important. (D.I. 397 at 1188:20-22) Dr. Lee explained his opinion, showing the preceding slide from the same presentation and identifying that the "Meta Event Generator for event correlation" is located within the "On-box Correlation Engine" box in that slide. (D.I. 397 at 1188:23-1189:12; PTX 109 at 18)

### ii. Cisco's evidence

On cross examination, Cisco verified Dr. Lee's opinion that the meta event generator is located in the "Correlation App" box in the Cisco marketing presentation. (D.I. 396 at 1048:19-1049:4; PTX 109 at 19) Cisco's Kasper testified that the "Correlation App" box in the marketing presentation does not have anything to do with the meta event generator. (D.I. 398 at 1521:2-4) Kasper explained that the word correlation does not indicate that it has anything to do with the meta event generation, because "[c]orrelation is sort of generally used term. So nothing to do with meta." (D.I. 398 at 15:5-9) Cisco questioned Dr. Lee about this inconsistency:

Q. And when you testified last week --

A. Yes.

Q. -- you testified that the meta event generator was this green box, the correlation app; is that correct?

A. I do recall that.

Q. Okay. And that, sir, you relied on that testimony to establish infringement?

A. No.

Q. Part of your infringement opinion?

A. I disagree.

Q. Okay?

A. Yes.

Q. But that testimony, that was wrong?

A. So --

Q. Can you answer my question? That testimony was incorrect?

A. That particular statement was incorrect, that the correlation app is, yes.

(D.I. 399 at 1810:7-24) Dr. Lee also agreed that "[o]n this particular slide, I think I was wrong in saying the correlation app was the meta event." (D.I. 399 at 1811:17-18)

Cisco elicited additional testimony from Dr. Lee on cross examination in which he explained that some sensor "threads acts as network monitors . . . . [and] [s]ome threads [act] as meta event generators." (D.I. 399 at 1815:8-17) Meanwhile, Kasper testified that "[t]he meta event generator . . . is part of each of those threads." (D.I. 398 at 1532:5-12; 1533:1-16)

### iii. Analysis

The jury was asked to consider whether SRI presented a preponderance of evidence to demonstrate that Cisco's IPS products directly infringed the asserted claims either literally or under the doctrine of equivalents. (D.I. 336 at 23-25) SRI did not assert doctrine of equivalents with respect to the "hierarchical monitor" limitation. (D.I. 396 at 866:20-869:3) The court instructed the jury that "[h]ierarchical monitor" means "a network monitor that receives data from at least two network monitors that are at a lower level in the analysis hierarchy." (D.I. 336 at 20)

SRI's expert, Dr. Lee, opined that the meta event engine (or generator) satisfies the hierarchical monitor claim limitation. The parties disputed the location of the meta event engine in Cisco's marketing materials, and Cisco was able to elicit testimony from Dr. Lee that his opinion in this regard was "incorrect" and "wrong." Cisco did not dispute the existence or role of the meta event engine. Dr. Lee opined that the meta event engine was a software thread distinct from other software threads. Kasper explained

25

that the meta event engine was part of each software thread but that in the context of a virtual sensor, the meta event generator would read events from multiple threads.

On the record at bar, SRI's expert provided more than conclusory testimony in order to explain his conclusions to the jury. The jury credited such testimony over that of Cisco's expert and fact witnesses. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### c. Indirect infringement – induced infringement

The jury found that Cisco induced infringement of the asserted claims by the accused Cisco IPS products and services. (D.I. 337 at 4) Cisco contends that no reasonable jury could have determined that Cisco induced infringement of the asserted claims by Cisco's IPS products and services, because "no reasonable jury could have found that Cisco knew that any use of the accused Cisco IPS Products and Services would be infringing." (D.I. 352 at 16) Addressing the first prong of intent, Cisco argues that its "good-faith, reasonable belief in non-infringement since first learning of SRI's patents defeats the intent requirement for inducement." (*Id.* at 17) As to the second prong, Cisco avers that Kasper's testimony is insufficient to establish willful blindness. (*Id.*)

### i. SRI's evidence

SRI presented testimony from Roesch that he did not review the patents-in-suit until after his deposition in the fall of 2015, some two years after the filing of the complaint. (D.I. 398 at 1479:3-13) SRI also presented the following testimony from Kasper:

> Q. Between the time that Cisco received that notice [of SRI's infringement contentions] mentioned in 2012 and when I took your deposition in 2015,

26

did anyone from Cisco ever approach you and say, take a look at these patents. We want to make sure that we don't infringe them?

A. No, sir.

Q. In fact, even though you just said you were one of the most knowledgeable people at Cisco on its IPS system, and, in fact, the one here testifying, at the time of your deposition in 2015, you had never even seen the patents-in-suit, had you?

A. That is correct.

(D.I. 398 at 1535:3-14)

### ii. Cisco's evidence

Cisco points to the noninfringement defenses it presented at trial as evidence of its "reasonable belief that the accused Cisco IPS Products and Services do not infringe." (D.I. 352 at 16, citing D.I. 394 at 400:18-25; D.I. 397 at 1233:15-22; D.I. 399 at 1899:20-21 and 1900:8-9) Moreover, Cisco argues that the jury had no basis to conclude that Cisco was willfully blind as to infringement, because "Kasper's testimony confirmed the absence of the claimed 'hierarchical' relationship between the accused features in Cisco's IPS Products, which supports Cisco's noninfringement defense." (D.I. 352 at 17, citing D.I. 398 at 1509:7-1512:6, 1516:24-1518:15 and 1545:16-23)

### iii. Analysis

The jury was asked to consider whether SRI presented a preponderance of evidence to demonstrate that Cisco induced infringement of the asserted claims by Cisco's IPS products and services. (D.I. 336 at 26) The court instructed the jury that SRI bore the burden to prove, among other things, that:

2. Defendant was aware of the asserted patents at the time of the alleged conduct and knew that its customer's acts (if taken) would constitute infringement of an asserted patent, or the defendant believed there was a high probability that the acts (if taken) would constitute infringement of an asserted patent but deliberately avoided confirming that belief.[19]

---

[19] Cisco only disputes this second factor (intent) relevant to Cisco's inducement with respect to the Cisco IPS products and services.

27

(D.I. 336 at 26) SRI presented evidence that SRI notified Cisco of infringement in 2012 and that neither Roesch nor Kasper (who are among the most knowledgeable individuals within the company about the operation of Cisco's IPS products and services) read the patents-in-suit until some point in time after their depositions in the fall of 2015. SRI also presented evidence that Cisco did not ask Kasper to investigate the patents-in-suit or potential infringement. SRI argued that these actions establish willful blindness under the intent factor. (D.I. 370 at 15) Cisco argues that the noninfringement arguments that Roesch and Kasper presented at trial establish the company's good faith belief in noninfringement. (D.I. 352 at 16-17) Sufficient evidence was presented to enable the jury to decide whether Cisco's actions satisfied the intent factor.

On the record at bar, SRI presented more than conclusory evidence of inducement to the jury. The jury credited the testimony of SRI's witnesses and exhibits over that of Cisco. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict that Cisco induced infringement of the asserted claims by its customers using Cisco IPS products and services. For these reasons, Cisco's renewed motion for JMOL is denied.

### d. Indirect infringement – contributory infringement

The jury found that Cisco contributed to the infringement of the asserted claims by the accused Cisco IPS products. (D.I. 337 at 5) Cisco argues that "[n]o reasonable jury could have found Cisco liable for contributory infringement with respect to the accused Cisco IPS Products," because SRI failed to demonstrate that "Cisco's IPS Products have 'no substantial non-infringing uses'" and SRI failed to establish the intent requirement. (D.I. 352 at 17)

28

### i. SRI's evidence

"SRI offered testimony and Cisco documents showing that the infringing meta engine and critical signatures are enabled by default, that the meta engine handles all signature events, and that Cisco encourages its customers' use of the features by enabling the features and promoting their value." (D.I. 370 at 16) For example, Cisco's Kasper verified that the meta event generator on Cisco IPS devices is enabled by default. (D.I. 395 at 644:15-18) Dr. Lee explained that Cisco's documentation indicates that the meta event generator is enabled by default. (See D.I. 396 at 898:6-15 (referencing PTX 555 at SRI-CIS0041424); 900:5-10 (referencing PTX 94 at 39-22)) Dr Van Liere presented an opinion (based upon survey evidence) that, of the Cisco IPS customers, "60 to 64 percent are aware of the meta event generator and know that it's enabled in one or more of the devices in their U.S. network." (D.I. 395 at 736:15-23) Dr. Lee opined that this number could be higher "because the default [setting is] on and some customers may not even pay attention to the default setting. They just, you know, leave them on." (D.I. 395 at 911:21-912:5) With respect to intent, SRI relies on the aforementioned statements by Roesch and Kasper.

### ii. Cisco's evidence

Cisco questioned SRI's damages expert Dr. Stephen Prowse ("Dr. Prowse"), who acknowledged that the percentage of users who have the meta event engine enabled is "probably less than a hundred." (D.I. 397 at 1339:5-25) Cisco also elicited testimony from Dr. Van Liere that "36 percent [of users] said they don't enable [the meta event engine] . . . or don't know if they enabled [it]." (D.I. 395 at 743:24-744:2) As to these 36 percent of users, both Dr. Van Liere and Dr. Lee were unable to answer Cisco's question about the precise number of users who said "I don't know" to the question but who actually have the meta event engine enabled. (D.I. 396 at 741:11-25; D.I. 397 at 1165:7-1166:20 (Dr. Lee)) According to Cisco, these statements indicate that "SRI

provided the jury no basis to infer whether those specific users represented a negligible or a substantial portion of the respondents." (D.I. 352 at 17-18)  As to substantial noninfringing uses for Cisco IPS products, Dr. Clark opined that "a lot of what [Cisco] do[es] is not accused."  (D.I. 398 at 1601:4)  At closing, Cisco attempted to focus the jury on the 36 percent number:

> Substantial noninfringing uses.  Their own survey expert, I think he was almost shocked.  I heard Mr. Scherkenbach actually admit, yes, not all do this.  Their own survey guy says 36 percent said they don't enable those features or they don't know if they enable those features.  That's right.  We don't have to get here.  If you find, as I think you will, that the products don't infringe, then we don't have to get to the whole point of whether there's substantial noninfringing uses, because all uses would infringe.  This is only somewhere in the case if you need to get to contributory infringement to find that our customers infringe.  No, please.

(D.I. 400 at 1989:11-22)  On the intent factor, Cisco argues that, as with inducement, it lacked the intent to infringe.  (D.I. 352 at 18)

### iii. Analysis

The jury was asked to consider whether SRI presented a preponderance of evidence to demonstrate that Cisco contributed to infringement of the asserted claims by Cisco's IPS products.  (D.I. 336 at 27)  The court instructed the jury that SRI bore the burden to prove, among other things, that:

> First, that defendant knew of the patents-in-suit.
>
> Second, that the accused product is: (a) for system claims, a material component of the claimed system; or (b) for the method claims, a material component for use in practicing the claimed method.  In other words, that the accused product must be especially made or adapted for use in a manner that infringes the patent.
>
> Third, that defendant knew that the accused product would be used in a manner infringing the patents-in-suit.
>
> Fourth, that the accused product is not a staple or commodity article, in other words, the accused product does not have a substantial non-infringing use.  Providing a staple or commodity article is not contributory infringement.

> Fifth, the accused product was actually used in a manner that you, the
> jury, find infringes the asserted claims.

(*Id.*) The court has addressed the intent factor with respect to inducement.[20] (*See, e.g.*,
D.I. 379 at 10) Cisco argues that SRI has failed to demonstrate that there are no
substantial noninfringing uses. Cisco contends that SRI's expert, Dr. Lee, based his
substantial noninfringing uses opinion on the Cisco IPS products "as a whole" (D.I. 352
at 18, citing D.I. 396 at 918:15-920:12) and that SRI is now arguing that "the particular
tools at issue" (i.e. meta event engine and critical signatures) have no substantial
noninfringing uses. (D.I. 370 at 16, citing *Lucent Techs, Inc. v. Gateway, Inc.*, 580 F.3d
1301, 1320 (Fed. Cir. 2009))

"[N]on-infringing uses are substantial when they are not unusual, far-fetched,
illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix Corp. v. Basic
Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009). Dr. Lee expressed the opinion that
the potential noninfringing uses of the accused Cisco IPS products are impractical and,
therefore, not substantial:

> So, in substantial [sic] use, it would be a customer only uses a single
> hardware interface. As we have discussed before, this is very, very
> unusual. Typically, a customer I would suspect would have at least two
> interfaces in a box, one for incoming, one for outbound traffic, and then
> the default signatures at a sensor level and also the default on meta event
> generator, they infringe.
>
> The vast majority of the customers, the evidence is they actually use the
> default settings.
>
> Really, if a customer goes to the length to disable these [infringing] default
> settings, that would mean that they actually essentially are rendering the
> IPS apps not very useful. That doesn't make sense, after they paid so
> much money. And, you know, also, we actually have not seen any
> evidence that there is a substantial number of customers actually disabling
> these infringing features.

---

[20] As with inducement, sufficient evidence was presented to enable the jury to decide
whether Cisco's actions satisfied the intent factor for contributory infringement.

(D.I. 396 at 919:21-920:12) Dr. Clark disagreed and opined that "a lot of what [Cisco IPS sensors] do is not accused." (D.I. 398 at 1601:4) Cisco argued to the jury that 36% of survey respondents may have turned off the "Correlation/Compliance Engine" or may not have known if the "Correlation/Compliance Engine" was enabled. (D.I. 399 at 1989:11-22) For the Cisco IPS products "as a whole," SRI presented sufficient evidence for a jury to conclude that there are no substantial noninfringing uses.

On the record at bar, SRI presented more than conclusory evidence of contributory infringement to the jury. The jury credited the testimony of SRI's witnesses and exhibits over that of Cisco. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict that Cisco contributed to the infringement of the asserted claims by its customers using Cisco IPS products. For these reasons, Cisco's renewed motion for JMOL is denied.

### 4. Accused services

Cisco repeats its direct infringement arguments from the accused products with respect to the accused services, reasoning that "SRI's infringement theory for those services is derivative of its [direct] infringement claim[s] with respect to the . . . [accused] products."[21] (D.I. 352 at 9) Cisco presents additional attorney argument[22] with respect to SRI's failure to provide substantial evidence of infringement with respect to Sourcefire professional services, Sourcefire's support services (Standard, Gold, and Platinum), Cisco IPS Services, and Cisco Remote Management Services.[23] (D.I. 352 at 10-11)

---

[21] For the reasons stated above, the court denies Cisco's motion on these grounds.
[22] See supra, note 10.

[23] Cisco correctly points out that, at trial, SRI did not address two services (i.e., Cisco IPS Industrial Control Protection, Security IntelliShield Alert Manager). (D.I. 352 at 11) SRI argues that this is moot, because these two services are not included in the damages base. (D.I. 370 at 11 n.11) Cisco did not respond to this argument. (D.I. 379 at 6-7) The court denies Cisco's motion with respect to these two services.

Dr. Lee opined that the accused services infringe whenever a service updates a customer's software and signatures because, "when we update, you essentially redeploy by enabling all these infringing features." (D.I. 397 at 1172:12-18; *See also* D.I. 396 at 922:14-923:22) SRI contends that this aspect of Dr. Lee's opinion is the primary dispute between the parties. (D.I. 370 at 8)

### a. Sourcefire Professional Services

#### i. SRI's evidence

As discussed above, SRI presented evidence that Sourcefire IPS products infringe the asserted claims.[24] Dr. Lee reviewed the Sourcefire 3D System user guide and opined that the Sourcefire IPS products ship with default compliance rules that infringe the asserted claims. (D.I. 396 at 968:24-970:3; DTX 840 at 1267) Dr. Lee evaluated marketing materials for Sourcefire's professional services. (D.I. 396 at 981:6-984:16; PTX 799; PTX 61) For example, Dr. Lee testified that the Pre-Deployment and Kickstart services include a "best practice review." (D.I. 396 at 982:5-6) Dr. Lee opined that "the best practice guide is addressed to" the value demonstrated by the correlation feature and that the professional services would include recommending and implementing the infringing correlation feature. (D.I. 396 at 983:24-984:11)

#### ii. Cisco's evidence

Cisco argues that the Sourcefire Best Practices Guide "never mentions the accused nested rules feature at all, let alone using them to combine multiple events (which is not provided for in the underlying source code[25], as discussed above)." (D.I.

---

[24] The jury found infringement, and the court has denied Cisco's motion for a JMOL.
[25] This is the same argument (that the correlation engine processes only one event at a time) that was presented to the jury and that the jury rejected with respect to direct infringement.

352 at 10, citing PTX 784 at 62-67[26]) Cisco points out that Dr. Lee explained that the "compliance correlation rules" are not enabled by default.[27] (D.I. 396 at 970:4-8) With respect to marketing materials for Sourcefire Pre-Deployment and Kickstart professional services, when asked whether the materials specifically advised or recommended any configuration information "relating to the compliance engine," Dr. Lee testified on cross examination that the materials "didn't specifically say which Sourcefire products" would be included in the professional services. (D.I. 379 at 5, citing D.I. 397 at 1152:21-1153:9)

### iii. Analysis

Dr. Lee opined that the Sourcefire Pre-Deployment and Kickstart services would naturally include configuration of the correlation rules and the compliance engine, which infringe the asserted claims. Cisco cross examined Dr. Lee and identified potential gaps in his testimony. On the record at bar, Dr. Lee provided more than conclusory testimony in order to explain his conclusions to the jury. The jury credited his direct testimony over the testimony Cisco was able to elicit on cross examination. The court declines to re-weigh the evidence or the credibility of the witness. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### b. Sourcefire Standard, Gold, and Platinum support services

Cisco argues that SRI presented no evidence related to these services. (D.I. 352 at 11) These support services were not specifically identified in the jury instructions or

---

[26] *See supra*, note 3. While aspects of this argument are discussed elsewhere in Cisco's brief, Cisco provided no testimony or other evidence to support its specific assertion with respect to PTX 784, the Sourcefire Best Practices Guide. Moreover, it is unclear how Cisco expects a jury (or the court) to identify a critical argument in five pages of a user guide without any examination of a witness on the subject supported by an argument (i.e., a closing argument) in the record.

[27] *See supra*, note 10.

the verdict form, but Cisco contends that a JMOL is appropriate. (D.I. 352 at 11; *See also* D.I. 336 at 13, D.I. 337 at 1)

### i. SRI's evidence

Dr. Lee reviewed Sourcefire 3D System user guide and opined that the Sourcefire IPS products ship with default compliance rules that infringe the asserted claims. (D.I. 396 at 968:24-970:3; DTX 840 at 1267) Truxal testified that TransUnion purchases maintenance services from Sourcefire, which "allows [TransUnion] to get support from Sourcefire and also to get signature updates and access to new code provisions and support manuals." (D.I. 395 at 789:12-790:2; *See also* D.I. 395 at 788:10-17; PTX 305 (documenting invoices to TransUnion for Sourcefire support services[28])) Referencing the "Cisco Services Q&A for Sourcefire Customers" materials, Dr. Lee explained that "a customer typically pays for these maintenance services so they can receive continuous updates to their operating systems, the IPS software and more importantly, the signature rules, basically, you want to keep up with the newer attacks. So you receive updates of signatures." (D.I. 396 at 922:14-21; PTX 35 at 3, 5-6, 8-9) The Q&A materials address, among other things, the "Mapping of Sourcefire services to Cisco Services" which include Sourcefire "Kickstart Service (standard)," "Gold Support," and "Platinum Support" and their corresponding post-acquisition Cisco services. (PTX 35 at 3; *See also* D.I. 397 at 1272:8-21 (discussing Cisco's acquisition of Sourcefire in 2013))

### ii. Cisco's evidence

Cisco argues that SRI did not mention "Sourcefire's Standard, Gold, and Platinum support services" at trial. (D.I. 352 at 11) Cisco contends that Dr. Lee's

---

[28] These invoices appear to be for "Sourcefire Gold" support services, but there is no evidence in the record to explain precisely which support service TransUnion purchases.

opinion that "maintenance services involving reconfiguration of the products" infringe the asserted claims cannot apply to these Sourcefire support services, because this "testimony relates to Cisco's IPS products, not Sourcefire products."[29]  (D.I. 379 at 6, citing D.I. 396 at 922:14-21, 923:17-22; D.I. 397 at 1172:12-18)

### iii. Analysis

The jury was asked to consider whether SRI had proven by a preponderance of the evidence that "Sourcefire Professional Services" infringed the asserted claims.  (D.I. 336 at 13; D.I. 337 at 1)  This is the extent of the instruction, and Cisco now argues that no reasonable jury could have concluded that "Sourcefire Professional Services" infringe the asserted claims, because SRI failed to present detailed argument as to Sourcefire Standard support services, Sourcefire Gold support services, and Sourcefire Platinum support services.  (D.I. 379 at 6)  Cisco has not contested the jury instruction or the verdict form on these grounds.  Meanwhile, SRI presented documentary evidence related to the accused "Sourcefire Professional Services" and evidence of infringement by various Sourcefire professional services, including Sourcefire support services as evidenced by testimony from TransUnion's Truxal and relevant invoices.  The record includes materials related to Sourcefire Pre-Deployment and Kickstart services as well as Sourcefire Standard, Gold, and Platinum support services.  (PTX 35 at 3; PTX 799; PTX 61)

On the record at bar, Dr. Lee provided more than conclusory testimony in order to explain his opinions to the jury.  SRI presented additional documentary evidence and testimony to corroborate Dr. Lee's conclusions.  Cisco presented no evidence and made no arguments to the jury.  The court declines to re-weigh the evidence or the

---

[29] *See supra*, note 10.  The record shows otherwise – that Dr. Lee expressed these opinions specifically with respect to Sourcefire IPS products and Sourcefire Professional Services.

credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### c. Cisco IPS Services

#### i. SRI's evidence

As discussed above, SRI presented evidence that Cisco IPS products infringe the asserted claims.[30] Dr. Lee discussed Cisco's documentation that characterize Cisco's IPS services as relating to maintenance and operation (PTX 587 at 5) and including signature and software updates. (PTX 628 at 4) Dr. Lee opined that services that involve software updates and signature updates infringe the asserted claims each time the software or a signature is updated. (D.I. 396 at 922:14-923:22) He further explained that "typically when you update . . . you . . . restart or reconfigure, in a sense redeploy[] the products. So the product by default has all these meta engines, meta event rules being provided and enabled. The point is [that] when [you] update, you essentially redeploy by enabling all these infringing features." (D.I. 397 at 1172:12-18)

#### ii. Cisco's evidence

Cisco identifies no evidence in the record supporting its position.

#### iii. Analysis

Cisco argues that, as a matter of law, JMOL is appropriate because "SRI introduced no evidence of how providing a signature update could 'redeploy' a sensor, let alone enable any feature covered by the asserted claims." (D.I. 352 at 10) In support, Cisco cites *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (U.S. 1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or

---

[30] The jury found infringement, and the court has denied Cisco's motion for a JMOL.

otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.");[31] *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007) (overturning the trial court's denial of a JMOL because plaintiff's "expert presented little more than conclusory evidence" of lost profit damages); and *Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999) ("To show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim."). (D.I. 352 at 10; D.I. 379 at 5-6) Cisco does not explain its citations or its arguments but, taken together, Cisco appears to argue that SRI failed to prove literal infringement by the services, because Dr. Lee's testimony is conclusory and, therefore, is insufficient as a matter of law.

As SRI has pointed out, the parties have already argued the "hierarchical monitors" limitation with respect to direct infringement, and the operative question is whether or not Cisco's IPS services satisfy the "deploying a plurality of network monitors" limitation found in the asserted method claims and the "plurality of network monitors deployed" limitation found in the asserted system claims. (D.I. 370 at 8) SRI presented testimony from Dr. Lee that a software or signature update is essentially a redeployment of the infringing features. Through these cases, Cisco contends that Dr. Lee's opinion is conclusory. "Conclusory" is defined as "consisting of or relating to a conclusion or assertion for which no supporting evidence is offered." *Merriam-Webster Unabridged* (2016). The record shows that Dr. Lee offered supporting evidence in the form of his detailed arguments as to direct infringement, various Cisco materials relating

---

[31] Cisco only gives a pin cite in its brief (D.I. 352 at 10), and even though the case appears to be inapposite, this quotation appears to be most relevant to the argument Cisco appears to be making.

to services for updating software and signatures, and his explanation of what an update would entail. Cisco was able to examine Dr. Lee, to challenge the sufficiency of his conclusions, and to present evidence to rebut his opinions.[32]

On the record at bar, Dr. Lee provided more than conclusory testimony in order to explain his "redeployment" opinion to the jury. SRI presented additional documentary evidence to corroborate Dr. Lee's conclusions. Cisco presented no evidence and made no arguments to the jury. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### d. Cisco Remote Management Services

#### i. SRI's evidence

SRI presented evidence of infringement by Cisco's Remote Management Services ("RMS"). Dr. Lee discussed various Cisco materials and opined that RMS infringe the asserted claims. (D.I. 396 at 924:9-929:6 (referencing PTX 586 (Cisco Security Remote Management Services for Intrusion Prevention Systems (IPS) At-A-Glance); PTX 755 (Service Description: Cisco Remote Management Services); PTX 810 (Splunk Ticket Integration Document))) Cisco's Kasper (the software engineering technical leader) testified that:

RMS . . . Remote Management Service. So I confirmed that they [Cisco's RMS team] are using Cisco [IPS] sensors on the customer premise and those will send up events to a central monitoring station where a human analyst is watching them, uses some tools to investigate and then will create tickets, just like an action ticket.

So if a customer got attacked the sensor sees it, it's transported up to the central Cisco site, the analyst checks it out, cross-references some things and says, oh, they got attacked. I will make a ticket. The ticket will tell the

---

[32] See supra, note 10.

customer, you got attacked. Here's what happened. Here's what we have got to do to fix it. So it's a full end-to-end service.

(D.I. 395 at 627:21-628:15) Dr. Van Liere surveyed a group of security professionals who "had Cisco or Sourcefire network security products currently in use in their U.S. network." (D.I. 395 at 715:1-5) Of these individuals whose organizations purchase Cisco services, Dr. Van Liere expressed the opinion (based upon his survey) that "Cisco remote management services were reported being used by 72 percent of the respondents." (D.I. 395 at 727:13-22; PTX 1093, table 8)

### ii. Cisco's evidence

Cisco argues that SRI failed to provide substantial evidence of infringement by Cisco Remote Management Services. (D.I. 352 at 11) Cisco contends that RMS supports a variety of third-party (non-Cisco) products and that SRI did not present evidence that any Cisco RMS customers had connected Cisco IPS products connected to the RMS services. (Id.) With respect to the survey, Cisco argues that the survey did not ask whether the "customers . . . used Cisco's IPS products and RMS together." (D.I. 379 at 6)

### iii. Analysis

SRI asserts that it presented circumstantial evidence of direct infringement, which is sufficient under the law. See Lucent, 580 F.3d at 1317-19 (upholding the district court's denial of JMOL with respect to infringement based upon circumstantial evidence of direct infringement of a method claim). Cisco argues that Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1328-29 (Fed. Cir. 2010), requires SRI to "show evidence of specific instances of direct infringement." (D.I. 352 at 11) SRI argues that Fujitsu is inapposite, because the case related to a product for which the infringing feature was turned off by default, and SRI offered evidence from Kasper that the meta event generator is turned on by default in the Cisco IPS devices. (D.I. 370 at 9 n.8; D.I.395 at

40

644:15-18) Cisco counters that "[p]roof that customers use RMS is insufficient to demonstrate infringement because RMS undisputedly can be used with many unaccused products." (D.I. 379 at 6, citing PTX-755 at 41-42, 46) While SRI must "show evidence of specific instances of direct infringement," *Fujitsu*, 620 F.3d at 1329, that evidence of direct infringement may be circumstantial. *Lucent*, 580 F.3d at 1318; *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).

The parties agree that all Cisco IPS devices have the (infringing) meta event engine enabled by default, and that the infringing combination for RMS is when Cisco's RMS manages a Cisco IPS sensor. Cisco contends that SRI's survey does not provide examples of this scenario and that, therefore, a JMOL is appropriate. Dr. Van Liere's survey determined that, of the 595 individuals surveyed, 306 (or 51 percent) have Cisco IPS sensors employed in their organization's U.S. network. (PTX 1093, table 1) The survey also determined that, of the 350 survey respondents who use Cisco services in their organization's U.S. network, 252 (or 72 percent) use Cisco Remote Management Services. (PTX 1093, table 8) Cisco is correct that the survey results do not provide a single example of an organization that has Cisco IPS sensors and that uses Cisco RMS services.[33]

Additional evidence, however, tips the scales. Dr. Lee presented documentary evidence in the form of Cisco's customer-facing materials, and he expressed his conclusion that Cisco RMS infringes. *See Lucent*, 580 F.3d at 1318 ("circumstantial documentary evidence, supplementing the experts' testimony, was just barely sufficient to permit the jury to find direct infringement by a preponderance of the evidence.").

---

[33] In order to reach the conclusion that the survey results in the record give evidence of an infringing combination (Cisco RMS service managing one or more Cisco IPS sensors), the jury would need to speculate.

Moreover, Kasper (a Cisco employee) testified that Cisco employs RMS in conjunction with Cisco IPS sensors for an "end-to-end service."

On the record at bar, SRI presented evidence of Cisco RMS deployed in an infringing combination with Cisco IPS sensors. This evidence included Dr. Lee's testimony, documents, Kasper's testimony, Dr. Van Liere's testimony, and the survey results. Cisco presented no evidence and made no arguments to the jury. The court declines to re-weigh the evidence or the credibility of the witnesses. Viewing the record in the light most favorable to SRI, substantial evidence supports the jury's verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

### 5. Direct infringement by Cisco

Cisco argues that a JMOL is appropriate with respect to direct infringement by Cisco, because "SRI [] failed to present substantial evidence that Cisco actually practiced the claimed methods or configured and deployed a system in an accused manner." (D.I. 352 at 11-12) SRI contends that "certain services Cisco provides include installation, configuration and 'tune-ups,' of the Cisco and Sourcefire IPS Products, through which Cisco is directly configuring an infringing system and performing the infringing method." (D.I. 370 at 12) Cisco avers that, because there is no basis for concluding that the accused services infringe, Cisco cannot directly infringe. (D.I. 379 at 7) Cisco's argument with respect to direct infringement by Cisco hinges on the infringement by the accused services. The court has denied Cisco's renewed motion for JMOL with respect to the accused services; therefore, the court also denies Cisco's renewed motion for JMOL with respect to direct infringement by Cisco.

### 6. New trial – liability

In the alternative, Cisco requests a new trial on liability should the court deny the renewed motion for JMOL. (D.I 352 at 28) Cisco's request is premised on the same

42

arguments as its renewed motion for JMOL with respect to liability. (*Id.*) Cisco asks the court to "exercise[] its own judgment in assessing the evidence," and reach the opposite conclusion as the jury. (*Id.*) For the reasons discussed above, the jury's verdict is not against the clear weight of the evidence; therefore, the court denies Cisco's request for a new trial on liability.

## B. Damages

### 1. Standard

"A party challenging a jury damages verdict must show that the award is, in view of all of the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1345 (Fed. Cir. 2011) (citing *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed.Cir.1995) (en banc) (internal quotation omitted)). This court must "scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied, while keeping in mind that a reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Id.* (citation and internal quotation omitted).

### 2. JMOL

#### a. Running Royalty

At trial, SRI presented testimony from Dr. Prowse in which he discussed licensing agreements with Oki, IBM, and ████. Dr. Prowse expressed the opinion that damages should be calculated at a 7.5% running royalty rate for the time period running from May 2012 until trial, which (based upon the apportioned revenues) would account for damages of $50.7 million. (D.I. 397 at 1250:10-1251:7) Cisco's expert, Dr. Leonard, evaluated these same agreements and explained that damages should take the form of an $8.6 million "paid-up lump sum of royalty." (D.I. 399 at 1694:15-1696:15)

43

The jury awarded SRI damages of $23.66 million, representing a 3.5% running royalty on the accused products and services during the relevant time period. (D.I. 337 at 8) Cisco argues that:

> [T]he jury adopted the running-royalty analysis proposed by SRI's expert, Dr. Prowse, with a downward adjustment of the rate from 7.5% to 3.5%. But SRI's previous licenses do not support the jury's decision to award a running royalty or to set the royalty rate at 3.5% of the apportioned base. On the contrary, the only probative licensing evidence in the record supports granting a lump-sum payment that is substantially lower than the jury's award.

(D.I. 352 at 9) SRI responds that substantial evidence supports the 3.5% running royalty as well as a higher (7.5%) royalty, and that "the jury was free to make up its own mind as to whether to accept [Dr. Prowse's or] Dr. Leonard's analysis."[34] (D.I. 370 at 17-21)

### i. Oki license

SRI presented evidence that, beginning in 2000, it granted Oki Electric Industry Co. ("Oki") a six-year license to distribute SRI's EMERALD software in Japan for "a $250,000 up-front fee, plus a 7.5% royalty rate applied to net sales." (D.I. 397 at 1254:9-10; PTX 30) Dr. Prowse explained that, among other things, the agreement referred to the patents-in-suit as documentation. (D.I. 397 at 1253:23-1254:5 (identifying the '203 patent and U.S. Patent Application No. 10/254,457, which resulted in the '615 patent); PTX 30, ex. A at SRI 018470) Dr. Prowse opined that, under the agreement, "Oki didn't have the right to go make its own products." (D.I. 398 at 1404:11-13)

---

[34] SRI argues that "Cisco ignores significant evidence and instead focuses only on three license agreements; Oki, IBM, and ▇▇▇▇▇▇. The evidence Cisco ignores alone constitutes substantial evidence supporting the verdict, and even the licenses it chooses to discuss support the jury award." (D.I. 370 at 18) SRI does not identify any evidence beyond these license agreements and their comparisons to Cisco. (D.I. 370 at 21)

Dr. Prowse testified that the Oki license is "informative, because . . . while in the hypothetical negotiation Cisco would be getting less than Oki . . . , Oki is actually paying more." (D.I. 397 at 1254:24-1255:5) Dr. Prowse explained that Oki paid more than Cisco would in a hypothetical negotiation, even at the same royalty rate, for several reasons: (1) Oki paid 7.5% royalty on net sales, "not some apportioned value;" (2) Oki paid $250,000 up front in addition to the royalty; (3) Oki's license was limited to the Japanese market, which is smaller and affords much less "scope for sales and profits" in comparison to the U.S. market; and (4) the license did not include a "presumption of validity and infringement" as would exist in a hypothetical negotiation. (D.I. 397 at 1255:6-1256:2) On redirect, Dr. Prowse opined that in comparison with Oki (which was not able to develop its own products under its license), "Cisco would have come out of the hypothetical negotiation with the rights to use the . . . '203 and '615 patent[s], in any way that it wanted to in terms of making products or providing services. . . . [which is] more valuable than the Oki license." (D.I. 398 at 1404:4-25) SRI's Patrick Lincoln, PhD ("Dr. Lincoln"), testified that Oki paid SRI "just under $1.6 million" under the license. (D.I. 394 at 341:13-15)

Cisco presented evidence from Dr. Leonard, who opined that "the substance of the [Oki] agreement is not a patent license. . . . [, instead] SRI . . . provide[d] fully functional software product to Oki." (D.I. 399 at 1699:5-11) Dr. Leonard expressed the opinion that, in a hypothetical negotiation, Cisco would not have received software and would have instead had "a bare patent license, where they only get the rights to practice the claims that are in the patent." (D.I. 399 at 1703:18-23) Cisco elicited testimony from Dr. Prowse on cross examination that the Oki agreement included a software license, trademark rights, and rights to use SRI's name that would not have been included in a hypothetical negotiation with Cisco. (D.I. 397 at 1291:2-18) Dr. Prowse

45

agreed with the statement that, "Oki couldn't go out and develop its own products and sell them." (D.I. 397 at 1294:9-11; 1291:24-1293:17)

Cisco argues that the Oki license is "'radically different from' any patent license agreement Cisco and SRI would have entered into" and is "therefore not comparable to the agreement that Cisco and SRI would have reached in a hypothetical negotiation." (D.I. 352 at 19-20, citing *Lucent*, 580 F.3d at 1327) SRI responds that "Oki received 'rights to the patents under the license.' And the jury even heard evidence that Cisco would have received even more rights under a license at the hypothetical negotiation than Oki received in its actual license, thus making Cisco's license more valuable." (D.I. 370 at 18) SRI contends the Oki license "explicitly mentions both the '203 patent and the application that led to the '615 patent. It is therefore at least related to the patents-in-suit." (*Id.*, citing *Virnetx, Inc. v. Cisco Sys.*, Inc., 767 F.3d 1308, 1330 (Fed. Cir. 2014)) The Oki agreement directly relates to (and references as "documentation") the patents-in-suit.[35] (PTX 30, ex. A at SRI 018470) Moreover, Dr. Prowse explained in detail the differences between the Oki agreement and a hypothetical negotiation over a patent license between Cisco and SRI. Dr. Prowse opined that the hypothetical negotiation would be more valuable than the license to which Oki agreed. Dr. Leonard expressed a contrary opinion and noted the elements present in the license that would not be found in a hypothetical negotiation. Based upon this record, sufficient evidence was presented to the jury to enable it to compare the Oki license to a hypothetical patent license negotiation between Cisco and SRI.

---

[35] Cisco argues elsewhere that the "EMERALD 1997" reference is invalidating prior art to the patents-in-suit. (D.I. 352 at 33-34) SRI's EMERALD software is an outcome of the project initiated as a result of the EMERALD 1997 reference.

### ii. IBM and ▮▮▮

SRI presented deposition testimony from Abramson in which he detailed two
licenses of a portfolio that included the '203 and '615 patents and took the form of lump-
sum payments of ▮▮▮ from ▮▮▮ and ▮▮▮ from IBM. (D.I. 397 at
1217:19-1218:8; PTX 22 (▮▮▮ D.I. 397 at 1225:2-1227:16; PTX 905 (IBM))
Abramson testified that the ▮▮▮ license "reflects a compromise between positions
that started on SRI's side with the assertion that a 7.5 percent royalty ought to apply
and an assertion on ▮▮▮ part that a lower rate ought to apply." (D.I. 397 at 1218:3-
8) Abramson testified that, based upon ▮▮▮ revenues, a 7.5% royalty on net
product revenues would be approximately ▮▮▮ but that ▮▮▮ negotiated a
lump sum payment that "was much less" than the proposed royalty. (D.I. 397 at
1220:24-1224:25; PTX 1092) With respect to IBM, Abramson discussed e-mails
documenting aspects of the negotiation and explained that, while a 7.5% royalty on net
revenues would amount to "something in the range of ▮▮▮," calculating a royalty
would require apportioning revenues to infringing features, calculating U.S.-only
revenues, estimating future revenue growth, and applying a discount rate. (D.I. 397 at
1225:2-1229:1; PTX 1091) When asked how SRI and IBM arrived at "the ▮▮▮
number," Abramson replied:

> I mean, we started with, you know, our usual methodology. We used a
> 7.5 percent royalty rate. We applied that to the revenue. We made some
> very conservative, from IBM's point of view, assumptions. We provided a
> litigation risk discount, and then we negotiated back and forth to arrive at
> an agreed upon number.

(D.I. 397 at 1229:24-1230:6) When comparing the lump sum to a reasonably royalty,
Abramson explained that "one thing you need to understand is that when you're
negotiating on a lump sum, eventually, it just becomes a negotiation over numbers, so
it's a little bit hard to say that it's any particular royalty rate or discount rate or
apportionment rate." (D.I. 397 at 1231:4-8)

47

SRI presented evidence from Dr. Prowse, who explained that his $50.7 million damages number reflects a 7.5% royalty on $676.2 million dollars, which is the "apportioned value of Cisco's revenue . . . from May 2012 to the date of trial." (D.I. 397 at 1250:10-1251:7) As to the IBM license, Dr. Prowse explained that "the takeaway . . . is that the ▮▮▮▮▮ arose in the negotiation around a 7.5% rate applied to apportioned revenue after taking into account a litigation risk discount for the uncertainty about whether the patents were valid and infringed."[36] (D.I. 397 at 1258:6-11) Dr. Prowse expressed a similar opinion related to the ▮▮▮▮ license. (D.I. 397 at 1258:15-1261:1)

Cisco presented evidence from Dr. Leonard in which he explained that his $8.6 million lump sum damages opinion was based upon a series of adjustments made to the IBM and ▮▮▮▮ licenses of 2013 and 2014. Dr. Leonard opined that the IBM and ▮▮▮▮ licenses "were a good starting place" and that he made "adjustments of various types to account for various differences between the economic situation of those agreements on one hand and the hypothetical license on the other." (D.I. 399 at 1724:10-21) Dr. Leonard testified that, in contrast to a lump-sum payment where the parties do not assume that the patents are valid and infringed, in a hypothetical negotiation between Cisco and SRI, the parties would "assume that the patents have been found to be valid and infringed with regard to Cisco." (D.I. 399 at 1726:9-20) Dr. Leonard's adjustments included: removing litigation risk (which increases the lump sum); accounting for the greater risk and uncertainty associated with a hypothetical negotiation that would have taken place in 2005[37] (which decreases the lump sum); and

---

[36] SRI elicited testimony from Dr. Leonard, on cross examination, in which he affirmed that a scaling, by relative market share, of IBM's ▮▮▮▮ lump-sum payment to account for Cisco's greater revenues would amount to a lump-sum payment by Cisco of ▮▮▮▮. (D.I. 399 at 1752:7-1754:1)

[37] The parties agree that the hypothetical negotiation would have taken place in the spring of 2005. (D.I. 399 at 1714:18-23)

scaling by revenues (increase) to reflect that "Cisco and also Sourcefire [] were bigger than both IBM and ▮▮▮▮ in terms of sales or market share." (D.I. 399 at 1726:23-1727:9; 1727:20-1728:2; 1728:17-21; 1730:11-1731:14; DTX 879)

Cisco argues that "[u]nlike the jury's award, [Dr. Leonard's] approach avoids speculative assumptions about royalty rates, the revenue base, and how to apportion between the various features." (D.I. 352 at 21) Cisco contends that the IBM and ▮▮▮▮ licenses cannot support a running royalty, because "the jury [] had almost no testimony with which to recalculate in a meaningful way the value of any of the lump-sum agreements to arrive at the running royalty damages award." (D.I. 379 at 11, citing *Lucent*, 580 F.3d at 1330 (quotation marks omitted)) SRI avers that "the IBM and ▮▮▮▮ licenses [] support a running royalty" and that the jury heard sufficient evidence from Dr. Prowse and Dr. Leonard "to make up its own mind." (D.I. 370 at 19-21)

The jury heard testimony from Abramson on the differences between a reasonable royalty and a lump sum, including the calculations employed in converting from one to another. (D.I. 397 at 1229:24-1230:6) The jury was presented with documentary evidence of those calculations. (PTX 1092) Abramson explained that a running royalty would be based on apportioned U.S. revenues. (D.I. 397 at 1228:2-10) Dr. Prowse testified that a 7.5% royalty on Cisco's apportioned U.S. revenues would amount to $50.7 million. (D.I. 397 at 1250:10-1251:7) Dr. Prowse and Dr. Leonard testified extensively about the IBM and ▮▮▮▮ licenses and their revenues relative to the negotiated licenses. Dr. Leonard detailed the four adjustments he made to convert the IBM and ▮▮▮▮ licenses to reach the $8.6 million damages number he presented. (D.I. 399 at 1724:10-1732:18) Dr. Leonard agreed that, without making any additional discounts, the IBM license (scaled by Cisco's relative revenues) would amount to a lump sum of ▮▮▮▮▮▮. (D.I. 399 at 1752:7-1754:1) The jury was instructed on reasonable royalty calculations, including the factors employed in their calculation. (D.I.

49

336 at 35-39)  Based upon the record, the jury had sufficient evidence to determine a
running royalty based upon the IBM and ████ lump-sum licenses.

### iii. Analysis

Dr. Prowse presented damages, based upon the Oki license, in the form of a
7.5% running royalty for the time from May 2012 until trial. This amounted to $50.7
million in damages.  SRI's witnesses explained that lump-sum license negotiations with
IBM and ████ had begun with a 7.5% royalty as the departure point, with the
counter-party revising the numbers downwards based upon a number of factors.  Dr.
Leonard evaluated the IBM and ████ licenses and made four adjustments to those
numbers to arrive at a lump-sum damages amount for Cisco of $8.6 million.  The jury
was entitled to credit testimony from both experts and arrive at a 3.5% running royalty in
the amount of $23.66 million, which is lower than the 7.5% rate proposed by SRI and
above the $8.6 million lump sum proposed by Cisco.  The court declines to re-weigh the
evidence or the credibility of the witnesses.  Viewing all of the evidence in the light most
favorable to SRI, substantial evidence supports the jury's damages verdict.  Cisco has
not demonstrated that, in view of all the evidence, this verdict is either so outrageously
high or so outrageously low as to be unsupportable as an estimation of a reasonable
royalty.  *Spectralytics*, 649 F.3d at 1345.  For these reasons, Cisco's renewed motion
for JMOL is denied.

### b. Royalty base

SRI's expert, Dr. Prowse, testified that he calculated damages based upon a
running royalty applied to 100% of the apportioned revenues of the accused products
and services.  (D.I. 397 at 1277:19-1280:2; 1337:10-20; 1339:5-25)  Dr. Prowse
explained that this was because "if you have that many meta event generators and the
default is on, then it's very likely all of them are on."  (D.I. 397 at 1339:5-8)

50

Cisco cross examined Dr. Van Liere, who confirmed that, of the Cisco customers he surveyed, "36% said that they don't enable [the meta event] features or they don't know if they enable [the meta event] features."[38] (D.I. 395 at 743:24-744:2) With respect to the Cisco customers in Dr. Van Liere's survey, Dr. Prowse testified, "[i]f you multiply my damages number by 64%, the number would go down."[39] (D.I. 397 at 1336:10-14) Cisco presented evidence in which Dr. Leonard disagreed with Dr. Prowse's royalty base and opined that Dr. Prowse should have taken "the sales and [] multiplied by 60%, **or whatever the right number is**," before apportioning revenues. (D.I. 399 at 1739:12-1740:7 (emphasis added)) At closing, Cisco argued that SRI's royalty base was incorrect. (D.I. 400 at 1992:6-1994:15)

Cisco has asked for remittitur to an $8.6 million lump sum or a new trial, based upon the royalty base. (D.I. 352 at 18) Cisco contends that SRI's survey evidence suggests that the royalty base is "significantly lower than the 100% figure that Dr. Prowse used and that the jury adopted." (D.I. 352 at 22; PTX 1093, table 10) Cisco argues that SRI carries "the burden to establish the appropriate royalty base by reliably identifying the percentage of Cisco's sales that lead to an instance of direct infringement." (D.I. 352 at 21, citing *Lucent*, 580 F.3d at 1334-35) SRI points out that, in a hypothetical negotiation, validity and infringement are presumed. (D.I. 370 at 21 (citing D.I. 397 at 1244:6-1246:2)) SRI contends that Cisco's reading of the case law is "misguided," and that *Lucent* only requires "that the damages award 'be correlated, in

---

[38] SRI presented survey evidence from Dr. Van Liere that, for "Cisco devices, 60% to 64% [of users] are aware of the meta event generator and know that it's enabled in one or more of the devices in their U.S. network. And 78% of the [] people who have Sourcefire devices indicate that the correlation compliance engine is enabled in one or more of the devices in their U.S. network." (D.I. 395 at 736:15-737:2)

[39] When asked about the corresponding 78% of Sourcefire customers in Dr. Van Liere's survey, Dr. Prowse acknowledged that if he had taken this 78% into account, it would decrease his damages number "[b]y 20%, you multiply by 78%." (D.I. 397 at 1336:4-9)

some respect, to the extent the infringing method is used by consumers." (D.I. 370 at

22, citing *Lucent*, 580 F.3d at 1334) In *Lucent*, the Federal Circuit wrote:

> Consideration of evidence of usage after infringement started can, under
> appropriate circumstances, be helpful to the jury and the court in
> assessing whether a royalty is reasonable. Usage (or similar) data may
> provide information that the parties would frequently have estimated
> during the negotiation. Such data might, depending on the case, come
> from sales projections based on past sales, consumer surveys, focus
> group testing, and other sources. . . . This quantitative information,
> assuming it meets admissibility requirements, ought to be given its proper
> weight, as determined by the circumstances of each case.

> On the other hand, we have never laid down any rigid requirement that
> damages in all circumstances be limited to specific instances of
> infringement proven with direct evidence. Such a strict requirement could
> create a hypothetical negotiation far-removed from what parties regularly
> do during real-world licensing negotiations.

*Lucent*, 580 F.3d at 1333-34 (citations omitted). "The damages award ought to be

correlated, in some respect, to the extent the infringing method is used by consumers.

This is so because this is what the parties to the hypothetical negotiation would have

considered." *Id.*

Dr. Prowse opined that a hypothetical negotiation would have relied on a 100%

royalty base of apportioned revenue. Dr. Leonard disagreed with this opinion but did

not express an opinion as to what the percentage should be. Based upon this record,

the court declines to re-weigh the evidence or the credibility of the witnesses. Viewing

all of the evidence in the light most favorable to SRI, substantial evidence exists for the

jury to determine a damages verdict reasonably correlated to the infringement by Cisco

and Cisco's customers. Cisco has not demonstrated that, in view of all the evidence,

this verdict is either so outrageously high or so outrageously low as to be unsupportable

as an estimation of a reasonable royalty. *Spectralytics*, 649 F.3d at 1345. Cisco's

motion for remittitur is denied.

#### c. Apportionment

SRI presented evidence of Dr. Lee's opinion on apportionment, in which he explained his calculation for each accused product and service. (D.I. 396 at 984:17-1006:9) Cisco cross examined Dr. Lee on the subject. (D.I 397 at 1155:16-1160:13) Dr. Prowse applied Dr. Lee's 49.3% apportionment in his damages calculation. (D.I. 397 at 1250:10-1251:7) Dr. Leonard disagreed with one of the apportionment numbers for one group of products in Dr. Lee's apportionment calculation, because for certain firewalls "the amount that's apportioned to IPS and to the patented functionality should get less and less as you get to more and more complex and bigger firewalls." (D.I. 399 at 1735:9-1738:25) Dr. Leonard did not express an opinion as to what the appropriate apportionment percentage should be. At closing, Cisco argued that SRI's apportionment was incorrect and focused its argument on the royalty base. (D.I. 400 at 1992:6-1994:15) Cisco now argues that a JMOL or new trial is appropriate, citing numerous alleged deficiencies in Dr. Lee's apportionment analysis and various legal propositions that support the court's intervention.[40] (D.I. 352 at 23-25)

Dr. Lee provided more than conclusory testimony in order to explain his apportionment calculation to the jury. The jury credited such testimony over that of Dr. Leonard, who expressed no alternative apportionment calculation. Based upon this record, the court declines to re-weigh the evidence or the credibility of the witnesses. Viewing all of the evidence in the light most favorable to SRI, substantial evidence exists for the jury to determine a damages verdict. Cisco has not demonstrated that, in view of all the evidence, this verdict is either so outrageously high or so outrageously

---

[40] Cisco re-argues its position that Dr. Lee is not an economist and, therefore, is not qualified to testify as to apportionment. (D.I. 379 at 13; D.I. 352 at 24) As discussed, below, the court declines to reconsider its decision to allow Dr. Lee to testify.

low as to be unsupportable as an estimation of a reasonable royalty. *Spectralytics*, 649 F.3d at 1345. Cisco's motion for remittitur is denied.

### d. Accounting

Cisco requests "an accounting to subtract from the jury's award any sales to SRI's licensees." (D.I. 352 at 25) SRI argues that "Cisco waived any license defense, and has presented no evidence [] to show that such a defense has any merit, let alone evidence as to any specific 'licensed' sales." (D.I. 370 at 26) Cisco did not raise licensed sales as an affirmative defense, nor did it raise the need for an accounting in the pretrial order or during trial.[41] (D.I. 9 at 6-7; D.I. 292) At trial, Cisco examined Dr. Prowse about whether sales to IBM and the U.S. government were included in his royalty base. (D.I. 379 at 15 n.9, citing D.I. 398 at 1395:22-1396:13, 1397:7-1398:23) Dr. Prowse responded, "I can't remember. But whatever I did, [Dr.] Leonard obviously did, too." (D.I. 398 at 1398:22-23) Earlier, Dr. Prowse had testified that there are "very small differences[42] between myself and Dr. Leonard in calculating the accused product revenue," but that the two experts had otherwise agreed on the revenue numbers. (D.I. 397 at 1276:16-17) On direct examination, Dr. Leonard did not discuss government or licensee sales in his revenue numbers, nor did he substantially disagree with Dr. Prowse's revenue base. Based upon the record, the court concludes that Cisco is raising its license revenues defense for the first time in its post-trial brief. For these reasons, the court denies Cisco's request for an accounting.

---

[41] Cisco claimed "government sales" as an affirmative defense in the pretrial order but did not argue government sales at trial. (D.I. 292 at ¶ 4)

[42] The differences are primarily the date on which calculated damages end (February 2016 for Dr. Leonard, and May 2, 2016 for Dr. Prowse). (D.I. 397 at 1276:9-25)

### 3. New trial – damages

In the alternative, Cisco requests a new trial on damages should the court deny the renewed motion for JMOL or the motion for remittitur. (D.I 352 at 28) Cisco's request is premised on the same arguments as its renewed motion for JMOL with respect to damages and its motion for remittitur. (*Id.*) Cisco asks the court to "exercise[] its own judgment in assessing the evidence," and reach the opposite conclusion as the jury. (*Id.*) For the reasons discussed above, the jury's verdict is not against the clear weight of the evidence, therefore, the court denies Cisco's request for a new trial on damages.

### C. Willfulness

The jury returned a verdict of willful infringement by Cisco under the *Seagate* standard.[43] (D.I. 336 at 28-29; D.I. 337 at 6) Cisco moves for the court to set aside the jury's willfulness verdict or to grant a JMOL of no willfulness. (D.I. 352 at 25-26) Cisco argues that "the Supreme Court recently overturned the Federal Circuit's willfulness standard" and that the "jury now has no role in the determination of willfulness."[44] (*Id.*, citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016)) Cisco contends that a JMOL is appropriate, "because the record contains no evidence on which a jury could reasonably find willful infringement." (D.I. 352 at 26) SRI responds that sufficient evidence of Cisco's acts support a finding of willfulness, because "[a] jury verdict of willfulness under the old, stricter, *Seagate* standard thus plainly satisfies the standard under *Halo*." (D.I. 370 at 27-28, citing *WBIP, LLC v. Kohler Co.*, 2016 WL

---

[43] *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) *abrogated by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

[44] In light of *Halo*, Cisco suggests the court should "set[] aside the willfulness verdict." (D.I. 352 at 26)

3902668, at *15–16 (Fed. Cir. July 19, 2016) (upholding a jury's willfulness finding, under *Halo*, originally reached under the *Seagate* standard))

At trial, Cisco presented testimony from Kasper supporting a noninfringement defense. (D.I. 398 at 1509:7-1512:6, 1516:24-1518:15, 1545:16-23) Under the prior *Seagate* standard, this noninfringement defense would have been sufficient for the court to grant a JMOL of no willfulness. *See Halo*, 136 S. Ct. at 1933 ("The *Seagate* test aggravates the problem by making dispositive [of the willfulness claim] the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial."). However, *Halo* eliminated *Seagate*'s objective prong. *WBIP*, 829 F.3d at 1341 ("[p]roof of an objectively reasonable litigation-inspired defense to infringement is no longer a defense to willful infringement"). "At the same time, *Halo* did not disturb the . . . second prong of *Seagate*, subjective willfulness. . . . *Halo* emphasized that subjective willfulness alone—i.e., proof that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer—can support an award of enhanced damages."[45] *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (quotations and citations omitted).

The record at bar shows that the jury[46] heard evidence (as discussed above with respect to liability) that key Cisco employees did not read the patents-in-suit until their depositions. The jury also heard evidence that Cisco designed the products and services in an infringing manner and that Cisco instructed its customers to use the products and services in an infringing manner. Viewing the record in the light most

---

[45] The subjective prong is evaluated under a preponderance of the evidence standard. *Halo*, 136 S. Ct. at 1934.

[46] *See WBIP*, 829 F.3d at 1341 ("We do not interpret *Halo* as changing the established law that the factual components of the willfulness question should be resolved by the jury.").

56

favorable to SRI, substantial evidence supports the jury's subjective willfulness verdict. For these reasons, Cisco's renewed motion for JMOL is denied.

## D. Other Motions for a New Trial

Cisco moves for new trial "to address several errors that severely prejudiced Cisco and rendered the trial unfair, including: (i) misleading statements during SRI's closing argument [and] (ii) erroneous jury instructions." (D.I. 352 at 28)

### 1. SRI's closing arguments

Cisco moves for a new trial on the basis that "SRI twice made statements in closing that were unfairly prejudicial and misleading . . . [and that] irreversibly tainted the jury's verdict." (D.I. 352 at 29) In the first statement, Cisco argues that "SRI's counsel told the jury in his rebuttal closing that the mere 'capability' to infringe is enough to satisfy the asserted system (but not the method) claims, [which is] . . . an argument this court had rejected during claim construction and during SRI's previous suit against Symantec and ISS." (*Id.*) In response, SRI points to the "installed and deployed" language in the statement. (D.I. 370 at 29) During closing arguments, SRI's counsel discussed claim 12 of the '203 patent and said:

The system claims are infringed when a system with all the required elements is installed in a network and configured. In other words, when it's in place. It does not matter how much a customer uses it. If it has the infringing capability **and it's installed and deployed**, it infringes. That's not disputed, and you are going to see that in the jury instructions.

(D.I. 400 at 1999:14-20 (emphasis added)) Cisco objected to this statement after closing arguments and requested a curative instruction. (D.I. 400 at 2009:9-20) The statement "[i]f it has the infringing capability and it's installed and deployed, it infringes" is neither contrary to the law, nor is it prejudicial.

Cisco argues that, in a second statement, SRI "inappropriately asked the jury to infer that Cisco infringes because Roesch—a fact witness—did not testify about Cisco's

57

non-infringement during the trial." (D.I. 352 at 30) SRI contends that its "closing statement merely recited the undisputed fact that Cisco did not chose to bring to trial any witness—save its expert—to explain why it did not infringe." (D.I. 370 at 29) SRI argues that this is an outgrowth of Cisco's trial strategy, which included not naming Roesch as a 30(b)(6) witness, and which led to the exclusion of his testimony that was "'anything close to expert testimony' including . . . noninfringement." (D.I. 370 at 30 (citing D.I. 397 at 1341:4-8)) Cisco contends that "[b]ecause [] Roesch's testimony on technical issues was excluded on SRI's own motion . . . , it was misleading and unfairly prejudicial for SRI to ask the jury to draw a negative inference from [] Roesch's failure to testify on that subject."[47] (D.I. 379 at 17)

During closing arguments, SRI's counsel made the following statement about Cisco's proof of noninfringement: "Shoe on the other foot. Mr. Roesch, Mr. Kasper, they have all of the information. They, in fact, generated the information. They wrote the code. They know the documents. They could have told you what they thought and they didn't."[48] (D.I. 400 at 2006:14-18) Cisco contends that this "statement made it reasonably probable that the verdict was influenced by prejudicial statements, and by itself justifies a new trial on all liability and damages issues." (D.I. 352 at 31, citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 363-64 (3d Cir. 1999) (quotation marks omitted))

In the Third Circuit, when "a closing address to the jury contains such numerous and serious violations of so many rules of proper argument . . . , [a court] must conclude that it is more than 'reasonably probable' that the verdict was influenced by the

---

[47] The parties document the evidentiary issues in their briefs, but these matters were never before the jury and cannot, therefore, be prejudicial. This reduces the dispute to a single statement made before the jury during closing arguments.

[48] Cisco avers that this statement is prejudicial based upon case law from Missouri. (D.I. 379 at 17, citing *Bair v. Faust*, 408 S.W.3d 98, 103 (Mo. 2013)) Cisco has not explained why this case should be persuasive to the court.

58

prejudicial statements." *Draper v. Airco, Inc.*, 580 F.2d 91, 96-97 (3d Cir. 1978) (citation omitted). Courts should not "rely on any of the individual instances or types of impropriety" and should instead determine whether "the closing argument [], when considered in its entirety, was so constantly and effectively addressed to the prejudices of the jury." *Id.* at 97. For example, the Third Circuit has identified prejudice when counsel:

(1) [] attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; (2) [] asserted his personal opinion of the justness of his client's cause; (3) [] prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, [] made several prejudicial, vituperative and insulting references to opposing counsel.

*Id.* at 95. Aside from this individual instance of alleged impropriety, Cisco has not explained how SRI's entire closing argument constantly and effectively addressed the prejudices of the jury. For the above reasons, the court denies Cisco's motion for a new trial based upon SRI's closing argument.

## 2. Jury instructions

Cisco moves for a new trial and argues that "the jury should have been instructed that if Cisco reasonably believed the acts it induced did not infringe, then it cannot be liable for inducement or contributory infringement." (D.I. 352 at 31) At the second charge conference, Cisco objected to the jury instructions on inducement, which did not include Cisco's alternative construction. (D.I. 399 at 1913:8-13) Cisco avers that "[t]hese instructions fell short of the 'full and complete' instructions necessary to reach a reliable verdict," and Cisco was prejudiced. (D.I. 352 at 31-32) Under Cisco's theory, given the evidence presented, "a properly instructed jury [] likely would have returned a different verdict." (D.I. 352 at 32). SRI contends that "the court's instruction exactly lines up with Supreme Court precedent." (D.I. 370 at 30, citing *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920 (2015)) The court instructed the jury that:

59

Defendant is liable for active inducement only if plaintiff proves by a preponderance of the evidence that:

1. Defendant took some action intending to encourage or instruct its customers to perform acts that you, the jury, find would directly infringe an asserted claim;

2. **Defendant was aware of the asserted patents at the time of the alleged conduct and knew that its customer's acts (if taken) would constitute infringement of an asserted patent**, or the defendant believed there was a high probability that the acts (if taken) would constitute infringement of an asserted patent but deliberately avoided confirming that belief; and

3. Use by others of the defendant's products or services infringes one or more of the asserted claims.

(D.I. 336 at 26 (emphasis added)) The language provided by Cisco in its argument is a restatement of the instruction read to the jury. The court denies Cisco's request for a new trial based upon the inducement instruction.

Cisco also moves for a new trial, because "the jury should not have been instructed on all fifteen *Georgia-Pacific* factors for calculating reasonable royalty damages." (D.I. 352 at 32) At the first charge conference, Cisco asked to reduce the number of *Georgia-Pacific* factors presented to the jury and agreed to "go through the transcript and identify and work with SRI on what we think are the appropriate factors to give to the jury based on Dr. [Prowse's] testimony and what we expect to come from Dr. Leonard." (D.I. 398 at 1658:16-20) The court clarified "I want you all to [under]stand though unless it's clear, the fact [is that] it will stay in." (*Id.* at 1658:21-22) In the second charge conference, all fifteen *Georgia-Pacific* factors remained in the final jury instructions, and Cisco did not seek to correct the *Georgia-Pacific* instruction. (D.I. 399 at 1907:3-1919:11) For this reason, Cisco waived its argument, and the court denies Cisco's motion for a new trial based upon the *Georgia-Pacific* instruction.

### E. Reconsideration

Cisco includes in its JMOL brief several arguments the court addressed at summary judgment. These motions are essentially requests for reconsideration.

#### 1. Dr. Lee's apportionment testimony

At summary judgment, Cisco moved to exclude SRI's technical expert, Dr. Lee, from presenting his survey results for purposes of apportionment. (D.I. 216; D.I. 217 at 3-6) The court denied Cisco's motion, reasoning that "Cisco is free to challenge the conclusions and analysis provided by Dr. Lee on cross examination." (D.I. 301 at 41-42; D.I. 302 at ¶ 4) Cisco now moves for reconsideration and requests a new trial. (D.I. 352 at 32-33) Cisco has failed to demonstrate any grounds sufficient to warrant a reconsideration of the court's April 11, 2016 order. *See Max's Seafood Cafe*, 176 F.3d at 677.

#### 2. Summary judgment of no anticipation

At summary judgment, Cisco moved for summary judgment of anticipation of the asserted claims by the EMERALD 1997 reference. (D.I. 182 at 10) SRI did not file a cross motion for summary judgment of no anticipation by the EMERALD 1997 reference and instead argued that issues of material fact made summary judgment inappropriate. (D.I. 220 at 35-36) The court, *sua sponte*, granted summary judgment of no anticipation, concluding "that no reasonable jury could find that EMERALD 1997 discloses all the limitations arranged as in the asserted claims." (D.I. 301 at 19) Cisco presently requests a new trial, because "Cisco did not receive notice of the court's intention to grant summary judgment . . . and . . . did not have any meaningful opportunity to respond." (D.I. 352 at 33) Cisco contends that "[h]ad SRI moved for summary judgment or had the Court given notice of its intent to consider a *sua sponte* grant of summary judgment, Cisco would have presented additional arguments

establishing the genuine dispute over this factual question and would have pointed to other factual disputes that precluded summary judgment." (D.I. 352 at 34) Here, Cisco does not identify any of the factors that could justify reconsideration; therefore, the court denies reconsideration of its grant of summary judgment of no anticipation by the EMERALD 1997 reference. *See Max's Seafood Cafe*, 176 F.3d at 677.

## F. Cisco's Motion To Supplement the Record

On November 18, 2016, Cisco moved to supplement the record to include evidence of its post-verdict activities to allegedly design around the asserted patents. (D.I. 385) SRI argues that the supplemented evidence is untimely, and "would therefore require significant discovery into the alleged re-designs." (D.I. 387 at 3) The proffered evidence is also irrelevant, SRI contends, because "it adds nothing that will help the court to assess SRI's motion for fees and enhanced damages." (D.I. 387 at 4) Cisco responds that the proffered "declarations relate to the post-trial issues of enhanced damages and ongoing royalties" and that "ongoing royalties are based on a post-verdict hypothetical negotiation that necessarily takes into account facts and circumstances arising after trial." (D.I. 389 at 2, citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009)). In *Fresenius*, the court awarded an ongoing royalty that ran past trial and until the expiration of the patents. *Fresenius*, 582 F.3d at 1303. On the record at bar, the jury awarded a lump sum based upon a 3.5% running royalty on revenues for the infringing products and services for the time period between filing of the suit in May 2012 and trial in May 2016. (D.I. 337 at 8; D.I. 397 at 1276:2-25) There are no post-verdict royalties; therefore, evidence of Cisco's post-verdict actions is not relevant to the jury's calculation of royalties.

Cisco argues that evidence of its post-verdict efforts to design around the patents-in-suit is relevant to the court's determination of enhanced damages. (D.I. 389 at 2) According to the Federal Circuit, district courts may consider a number of factors,

including "[r]emedial action by the defendant." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992) (citing *Intra Corp. v. Hamar Laser Instruments, Inc.*, 662 F. Supp. 1420, 1439 (E.D. Mich. 1987)). After a bench trial, the *Intra* court found willful infringement and awarded double (but not treble) damages, because defendant "voluntarily ceased manufacture and sale of infringing systems during the pendency of [] litigation, and presented an arguable basis for a finding of obviousness." *Intra Corp.*, 662 F. Supp. at 1439. Cisco identifies *Spectralytics, Inc. v. Cordis Corp.*, 834 F. Supp. 2d 920 (D. Minn. 2011), as supporting its argument. In *Spectralytics*, the plaintiff did not "dispute that [defendant] stopped using the infringing device . . . shortly after trial but before the Court entered a permanent injunction and while the parties' post-trial motions were still pending." *Id.* at 928. In the case at bar, Cisco did not redesign its products and services until after trial, and SRI contends that "significant discovery into the alleged re-designs" is necessary "to enable SRI to assess . . . whether the re-designed products contain new infringing features." (D.I. 387 at 3) Moreover, SRI identifies numerous potential factual disputes related to the evidence Cisco seeks to introduce. (D.I. 387 at 4-8) Given the stage in the proceedings and SRI's opposition, the court denies Cisco's motion.

## G. Attorney Fees and Enhanced Damages

Once a defendant's infringement has been deemed willful by a jury and judgment entered in favor of a plaintiff, the court has been given discretion to award damages over and above that amount found to be appropriate by the jury. Pursuant to 35 U.S.C. § 284, the court may "increase the damages up to three times the amount found or assessed" by the jury, so long as the court exercises it discretion "'in light of the considerations' underlying the grant of that discretion." *Halo*, 136 S.Ct. at 1926 (quoting *Octane Fitness*, 134 S.Ct. at 1756). The Federal Circuit, in *Read Corp.*, 970 F.2d at 826-27, offered the obligatory series of factors that a court should review in determining

how to exercise its discretion, including the following most relevant to the record at bar: (1) whether the infringer investigated the scope of the patent and had a good faith belief that it was not infringing or that the patent was invalid;[49] (2) the infringer's behavior during litigation;[50] (3) the infringer's size and financial condition; (4) the closeness of the case; (5) the duration of the infringing conduct; (6) any remedial actions taken; and (7) defendant's motivation for harm.

As noted above, 35 U.S.C. § 285 provides an opportunity for the court to award attorney fees and costs to the prevailing party in "exceptional" cases, that is, those cases that, in view of the totality of the circumstances, "stand[] out from others" with respect to the "substantive strength" of the losing party's litigating position and the "unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1751. Among the factors posited by SRI in this case are the jury's finding of willful infringement and Cisco's conduct during litigation. (D.I. 354 at 15-21) Given the overlap in the considerations the court should review under both statutes, as well as the discretionary nature of both awards, the court will review the overall litigation before exercising its discretion under either § 284 or § 285.

There can be no doubt from even a cursory review of the record that Cisco pursued litigation about as aggressively as the court has seen in its judicial experience. While defending a client aggressively is understandable, if not laudable, in the case at bar, Cisco crossed the line in several regards. First, Cisco maintained its reliance on nineteen invalidity theories to the eve of trial,[51] and then at trial presented only a single

---

[49] A factor which strikes the court as being the essence of whether infringement was willful in the first instance and, therefore, should not be double-counted.

[50] A factor that overlaps with those that are routinely scrutinized in making exceptional case determinations under 35 U.S.C. § 285.

[51] (D.I. 292, ex. 2.2 at 5-8)

defense of anticipation[52] and a single claim of invalidity under § 112.[53] With respect to its non-infringement defenses, Cisco presented a single defense for each of the two representative product groupings, to wit: Although the court had explained that "[t]he claim language and the parties' constructions do not require that the 'network monitor' and 'hierarchical monitor' be separate structures" (D.I. 301 at 32), Cisco maintained throughout trial that separate monitors were required. (D.I. 393 at 201:11-14; *see also* D.I. 398 at 1594:2-4 ("the infringement theory that has been advanced [by SRI] is that the individual threads are separate monitors, and that is simply not the case.") As to the Sourcefire products, the only defense that remained for trial was that the accused products did not perform correlation on multiple network intrusion events, despite contrary characterizations found in internal product literature (DTX 840 at 114), customer testimony (D.I. 395 at 807:14-808:10), and third party documents (PTX 707 at 20-21).

In addition to pursuing defenses to trial that were contrary to the court's rulings or Cisco's internal documents, Cisco asserted many more defenses through the summary judgment exercise, causing SRI to expend its resources on responding to such motions, all of which were denied. Having waded through the summary judgment labyrinth,[54] the court was presented with yet another motion filed by Cisco seeking sanctions against SRI based on the claim that SRI's royalty-sharing program violated the criminal bribery statute; again, SRI was forced to respond and the motion was denied. (D.I. 280; D.I. 281; D.I. 289; D.I. 300) During pre-trial preparations, Cisco designated 53 separate

---

[52] Based on a prior art reference that has been twice considered by the Patent Office and by this court in prior litigation. (*See* D.I. 398 at 1607:5-1622:3; DTX 116 ("DIDS reference"))

[53] The less than fulsome evidence presented in this regard was a single conclusory question to Cisco's expert. (D.I. 398 at 1606:17-25)

[54] Including four summary judgment motions and three subsequent letter briefs disputing portions of the summary judgment order. (D.I. 158; D.I. 182; D.I. 213; D.I. 216; D.I. 219)

transcripts consisting of nearly 48,000 lines of testimony (D.I. 292, ex. 5.2 at 3-146) which SRI was forced to review for objections and counter-designations; Cisco affirmatively presented 22 lines of testimony from a single transcript at trial. (D.I. 398 at 1637:9-1638:4) Cisco pursued every line of defense post-trial, as represented in the motions it filed and briefed, requiring both SRI and the court to address the issues presented. Once again, every motion for post-trial relief has been denied.

In sum, the court understands the need for flexibility in terms of allowing attorneys to vigorously pursue the best interests of their clients; as a consequence, the court has rarely awarded fees pursuant to § 285. However, Cisco's litigation strategies in the case at bar created a substantial amount of work for both SRI and the court, much of which work was needlessly repetitive[55] or irrelevant[56] or frivolous.[57] Of course,

---

[55] Rearguing claim construction and the significance of certain prior art references that had been considered before. (*See, e.g.*, D.I. 356, ex. 2 (finding, by the USPTO in a 2006 *ex parte* reexamination, that the patents are not obvious in light of combinations including the EMERALD 97, Net Ranger, and 1991 paper on the DIDS system)

[56] The assertion of a multitude of invalidity arguments and prior art references pre-trial that were dropped late in the case.

[57] Presenting arguments post-trial that had not been presented to the jury. For example, Cisco argued for the first time in its post-trial brief that SRI failed to demonstrate infringement by Sourcefire IPS products and services with respect to the "nested rules" feature. (D.I. 352 at 5, 6, 12, 13, 14, 24 & n.4; D.I. 379 at 3, 5, 7, 12, 13) Numerous other arguments were not presented to the jury. (*See* D.I. 352 at 14 (Cisco's user guides and marketing materials are insufficient to demonstrate inducement); D.I. 352 at 15 (Cisco's denial of infringement during pre-suit discussions precludes a finding of inducement); D.I. 352 at 13 (Cisco could not have induced infringement of the Sourcefire IPS product and services, because there was no direct infringement); D.I. 352 at 12 (the accused configuration of the Sourcefire products is not enabled by default); D.I. 379 at 6 (Dr. Lee's opinion about maintenance services involving reconfiguration of the products infringing the claims cannot apply to Sourcefire support services, because the testimony only relates to Cisco's IPS products); D.I. 352 at 11 (SRI failed to present evidence related to Sourcefire Standard, Gold, and Platinum support services); D.I. 352 at 10 (Cisco IPS services cannot infringe, because a signature update cannot "redeploy" a sensor)); D.I. 352 at 11 (SRI did not present evidence that any Cisco RMS customers had connected Cisco IPS products to the services); D.I. 352 at 25 (an accounting is needed to subtract SRI licensees from the sales factored into the jury's award))

the fact that the jury found that Cisco's infringement was willful is yet another factor to be considered. For all of these reasons, the court exercises its discretion pursuant to § 285 to award SRI its attorney fees and costs.[58]

With respect to the willfulness award under § 284, some enhancement is appropriate given Cisco's litigation conduct, its status as the world's largest networking company, its apparent disdain for SRI and its business model, and the fact that Cisco lost on all issues during summary judgment and trial, despite its formidable efforts to the contrary. Even assuming for purposes of the record that Cisco has undertaken some post-trial remedial actions,[59] the court concludes that a doubling of the damages award is appropriate. Similarly, the court concludes that it is appropriate to order a 3.5% compulsory license for all post-verdict sales. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1343 (Fed. Cir. 2012); *Amando v. Microsoft Corp.*, 517 F.3d 1353, 1361 (Fed. Cir. 2008). Moreover, the court concludes that an award of prejudgment interest at the prime rate, compounded quarterly, is appropriate.[60] *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983) ("prejudgment interest should be awarded under § 284 absent some justification[61] for withholding such an award.").

---

[58] The court finds that the amounts requested – $7,934,881.75 in fees and $104,640 in related expenses – are consistent with both counsel's usual and customary fixed preferred hourly rates as applied to SRI, and the amount of work performed commensurate with the demands of litigation imposed by Cisco. (*See* D.I. 355 at ¶ 5 (explaining the fees and expenses), *see also id.*, ex. 4 at I-108 (documenting mean patent litigation costs in the Philadelphia CMSA, which includes the court)

[59] The court is not prepared to undertake the kind of extensive proceeding that would be required to determine whether such remedial actions were sufficient to avoid infringement.

[60] The amount requested – $1,595,309, which represents the prime interest rate as applied to the apportioned revenues and compounded quarterly – is reasonable and consistent with the court's past awards.

[61] Cisco's justification is that SRI "delayed eight years before discussing its patents with Cisco[] and waited until September 2013 to file this lawsuit." (D.I. 362 at 31) "Laches

## V. CONCLUSION

For the foregoing reasons, the court denies Cisco's motion for judgment as a matter of law, new trial, and remittitur (D.I. 351); denies Cisco's motion to supplement the record (D.I. 385); and grants SRI's motion for attorney fees, enhanced damages, compulsory license, and prejudgment interest. (D.I. 349).

An appropriate order shall issue.

---

cannot be interposed as a defense against damages when the infringement occurred within the period prescribed by § 286." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, No. 15-927, slip op. at 16 (U.S. Mar. 21, 2017).